# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| NANCY HAWKINS,           ) | |
| )  | |
| Plaintiff,       )  | |
| )  | CIVIL ACTION NUMBER: |
| v.                       )  | 1:05cv540 W |
| )  | |
| DALE MEDICAL CENTER,     )  | |
| )  | |
| Defendant.       )  | |

### AFFIDAVIT OF JENNIFER SIMMONS

STATE OF ALABAMA    )
COUNTY OF DALE      )

My name is Jennifer Simmons. I am a resident of the State of Alabama, over twenty-one (21) years of age, and give this Affidavit of my own free will. I have personal knowledge of the information contained in this Affidavit.

1. I am currently employed by Dale Medical Center as the Nurse Manager of the Hospice Care Program. Dale Medical Center is an acute health care facility in Ozark, Alabama.

2. In 2004, I was employed by Dale Medical Center as the Nurse Manager in the New Day Senior Health program, our psychiatric unit for older patients. I was Nancy Hawkins' supervisor from approximately February 2004 through the end of her employment.

3. Dale Medical Center contracts with SeniorHealth, Inc., an independent management services company, to manage the senior psychiatric unit.

4. As the only Social Worker on unit, Ms. Hawkins played a critical role in the admission, treatment and discharge of patients. When a patient is first admitted to the

unit, the Social Worker has 72 hours in which to perform a psychosocial assessment, a five-page form used to determine the treatment needs of the patient. This psychosocial assessment is the basis on which the other health care professionals plan their treatment activities for a particular patient. Although it was a critical first step in patient care, Ms. Hawkins frequently did not complete the assessment on timely basis; some were not completed until long after patients had been discharged.

5. Ms. Hawkins was also responsible for conducting daily group therapy sessions with patients. These sessions should last an hour, but are required to last at least forty minutes. Ms. Hawkins was responsible for documenting these therapy sessions in the patient's medical record.

6. Although group therapy was required to be done separately for the low and high functioning groups, Ms. Hawkins repeatedly included low and high functioning patients in the same session. Ms. Hawkins failed to document these sessions, which meant that the sessions could not be billed to the insurance company. She also failed to complete social worker progress notes which were not available to the treating physicians in the medical records. In addition, I discovered that she had not conducted necessary family counseling when a family was unaware of and not prepared for developments with their patient.

7. Like the admission process, the Social Worker plays a critical role in planning for a patient's discharge. As the Social Worker on the unit, Ms. Hawkins was required to conduct Zung and GDS assessments to gauge patient improvement. The Social Worker must also make arrangements for a patient to be transferred to a state hospital or a group home and coordinate with the patient's family and other agencies.

and completed the required discharge screening. If done properly, discharge planning should begin shortly after the patient is admitted and assessed – as soon as their post-discharge needs can be assessed. Although the average patient stay in the unit should be ten to twelve days, Ms. Hawkins' patients typically stayed fourteen or more days, often because the discharge planning was not complete.

8. As the Social Worker, Ms. Hawkins was required to work and interact with the other members of the treatment team – doctors, nurses and mental health technicians. I observed her being abrupt, short and rude with co-workers. Some co-workers complained that she "talked down to them" and was generally unapproachable and unhelpful.

9. At the time I became her supervisor, Ms. Hawkins was already on an Action Plan for performance problems. After personally observing her performance, I concluded that her performance was not improving. In April 2004, I initiated a second action plan based upon complaints from co-workers, her failure to update her treatment plans, her failure to conduct family meetings and to document her actions. Specifically, on April 8, 2004, I gave Ms. Hawkins a "Social Worker Action Plan" which is attached hereto as Exhibit A. Ms. Hawkins did not question or dispute any of the listed deficiencies and did not request any assistance from to correct these deficiencies; nor did she ever request any form of accommodation from me at any time during her employment.

10. Despite this Action Plan, Ms. Hawkins' performance did not improve. In May 2004, I pulled a sampling of her patient charts and found that Ms. Hawkins was still significantly behind in her documentation. After consulting with Human Resources, I

3

decided to terminate her employment because of these continuing performance deficiencies. Because she was the only Social Worker on the unit and her work affected everyone else on the treatment team, we absolutely had to have someone performing effectively in that position. When I explained to Ms. Hawkins that she was being terminated because she had not corrected the deficiencies outlined in the January and April Action Plans, she did not voice any disagreement with my assessment that she had not improved her performance.

11. I based my decision to terminate Ms. Hawkins' employment on her failure to perform the critical functions of her job. I did not consider her vision or her age. Ms. Hawkins was the only person in her position and we desperately needed someone to perform those functions adequately.

_____
Jennifer Simmons

SWORN TO and SUBSCRIBED before me this the 20 day of March, 2006.

_____
NOTARY PUBLIC

My commission expires: Sept 06, 06

150443

4

# SOCIAL WORKER ACTION PLAN

| DEFICIENCY | CORRECTIVE ACTION | TARGET DATE |
|---|---|---|
| CONTINUE TO RECEIVE C/O FROM STAFF THAT NANCY IS DIFFICULT TO APPROACH WITH QUESTIONS OR CONCERNS. CONTINUES TO HAVE DIFFICULTY FUNCTIONING AS A TEAM MEMBER | MAINTAIN PROFESSIONAL RELATIONSHIP W/ STAFF MEMBERS. FUNCTION AS A TEAM MEMBER. | 4/08/04 AND CONTINUING |
| LACK OF INVOLVEMENT IN TREATMENT PLANNING AND REVISION. | ASSIST NURSE TO WRITE PROBLEM STATEMENT AND LEAD TREATMENT PLAN REVISION TEAM. | 4/08/04 AND CONTINUING |
| INADEQUATE FAMILY CONTACT AND FAMILY THERAPY SESSIONS OR INADEQUATE DOCUMENTATION OF SUCH | FAMILY THERAPY SESSIONS TO BE PROVIDED AS OFTEN AS DECIDED BY TREATMENT TEAM AND DOCUMENTED PER POLICY | 4/08/04 AND CONTINUING |
| INADEQUATE INDIVIDUAL THERAPY SESSIONS OR INADEQUATE DOCUMENTATION OF SUCH | INDIVIDUAL THERAPY TO BE SCHEDULED AT FIRST TX. TEAM MEETING. TO BE PROVIDED AND DOCUMENTED PER POLICY. | 4/08/04 AND CONTINUING |
| DISCHARGE PLANNING CONTINUES TO BE DEFICIENT WITHOUT NOTED IMPROVEMENT. | DISCHARGE PLANNING TO BE STARTED ON ADMISSION W/ TENTATIVE DC PLAN WITHIN 5 DAYS. ALL ACTIVITY MUST BE DOCUMENTED IN CHART | 4/08/04 AND CONTINUING |

NEW DAY NURSE MANAGER TO REASSESS LEVEL OF DEFICIENCIES IN 30 DAYS – May 6, 2004

EMPLOYEE SIGNATURE/DATE _Nancy E Hawkins_  4/8/04
NURSE MANAGER SIGNATURE/DATE _[signature] RN 4/8/04_

EXHIBIT A