# Exhibit C

FOSHEE & TURNER COURT REPORTERS

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    SOUTHERN DIVISION

4

5     CASE NUMBER:   1:05cv540 W

6

7     NANCY HAWKINS,

8          Plaintiff,

9     vs.

10    DALE MEDICAL CENTER,

11         Defendant.

12

13

14    BEFORE:

15         Cynthia M. Noakes, Commissioner

16         and Court Reporter

17

18

19

20    DEPOSITION TESTIMONY OF NANCY HAWKINS-KAHN

21

22

23       * * * * * * * * * * * * * * * * * * * * * * * * * * *

Page 2

1          S T I P U L A T I O N

2

3          IT IS STIPULATED AND AGREED by and

4     between the parties through their respective

5     counsel, that the deposition of NANCY

6     HAWKINS-KAHN may be taken before Cynthia M.

7     Noakes, Court Reporter, at the Law Offices of

8     HALL, SMITH, PRIM & FREEMAN, P.A., 360 North

9     Oates Street, Dothan, Alabama 36303, on the 19th

10    day of January, 2006.

11          IT IS FURTHER STIPULATED AND AGREED

12    that the signature to and the reading of the

13    deposition by the witness is waived, the

14    deposition to have the same force and effect as

15    if full compliance had been had with all laws and

16    rules of Court relating to the taking of

17    depositions.

18          IT IS FURTHER STIPULATED AND AGREED

19    that it shall not be necessary for any objections

20    to be made by counsel to any questions except as

21    to the form or leading questions, and that

22    counsel for the parties may make objections and

23    assign grounds at the time of the trial, or at

Page 3

1    the time said deposition is offered in evidence,

2    or prior thereto.

3         IT IS FURTHER STIPULATED AND AGREED

4    that the notice of filing of the deposition by

5    the Court Reporter is waived.

6

7

8

9

10

11

12

13

14

15

16

17         * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

18

19

20

21

22

23

FOSHEE & TURNER COURT REPORTERS

Page 4

1                          I N D E X

2   E X A M I N A T I O N   B Y:              P A G E   N U M B E R:

3   M R .   V R E E L A N D                        6 - 8 6

4

5   E X H I B I T S:

6   Defendant's Exhibit No. 1                      10

7   Defendant's Exhibit No. 2                      13

8   Defendant's Exhibit No. 3                      14

9   Defendant's Exhibit No. 4                      16

10  Defendant's Exhibit No. 5                      16

11  Defendant's Exhibit No. 6                      47

12  Defendant's Exhibit No. 7                      50

13  Defendant's Exhibit No. 8                      52

14  Defendant's Exhibit No. 9                      54

15  Defendant's Exhibit No. 10                     56

16  Defendant's Exhibit No. 11                     60

17  Defendant's Exhibit No. 12                     61

18  Defendant's Exhibit No. 13                     64

19  Defendant's Exhibit No. 14                     72

20  Defendant's Exhibit No. 15                     80

21  Reporter's Certificate                         87

22

23   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

FOSHEE & TURNER COURT REPORTERS

Page 5

```
 1                   A P P E A R A N C E S

 2

 3   ON  BEHALF  OF  THE  PLAINTIFF:

 4              BANKS  T.  SMITH,  Esquire

 5              HALL,  SMITH,  PRIM  &  FREEMAN,  P.A.

 6              360  North  Oates  Street

 7              Dothan,  Alabama   36303

 8

 9   ON  BEHALF  OF  THE  DEFENDANT:

10              ALBERT  L.  VREELAND,  II,  Esquire

11              LEHR,  MIDDLEBROOKS,

12              PRICE  &  VREELAND,  P.C.

13              2021  Third  Avenue  North

14              Birmingham,  Alabama   35203

15

16   ALSO  PRESENT:

17              Sheila  Dunn,  Dale  Medical

18              Center  Representative

19

20

21

22        * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

23
```

FOSHEE & TURNER COURT REPORTERS

Page 6

1          I, CYNTHIA M. NOAKES, a Court Reporter

2   of Eufaula, Alabama, acting as Commissioner,

3   certify that on this date, as provided by the

4   Alabama Rules of Civil Procedure and the

5   foregoing stipulation of counsel, there came

6   before me at the Law Offices of HALL, SMITH, PRIM

7   & FREEMAN, P.A., 360 North Oates Street, Dothan,

8   Alabama 36303, beginning at 10 a.m., NANCY

9   HAWKINS-KAHN, witness in the above cause, for

10  oral examination, whereupon the following

11  proceedings were had:

12

13          NANCY HAWKINS-KAHN,

14   being first duly sworn, was examined and

15          testified as follows:

16

17          THE COURT REPORTER:  Usual

18  stipulations?

19          MR. VREELAND:  Yes.

20          MR. SMITH:  Yes, that's fine.

21

22          EXAMINATION

23  BY MR. VREELAND:

FOSHEE & TURNER COURT REPORTERS

Page 7

1    Q.    Ms. Kahn, I'm Al Vreeland.  I'm one of the

2    lawyers representing Dale Medical Center in the

3    lawsuit you filed against them.  I'm just going to

4    be asking you some questions today to find out

5    what your lawsuit is about.  Do you understand the

6    purpose of your deposition?

7    A.    Yes.

8    Q.    If at any time today you don't understand my

9    question, if it doesn't make sense for any reason

10   or if you don't hear my question, if you'll ask me

11   to, I'll be happy to repeat or rephrase the

12   question.  Fair enough?

13   A.    Yes.

14   Q.    Okay.  The flip side of that is, if you

15   answer the question, I'm going to assume you've

16   heard it and understood it.

17   A.    Yes.

18   Q.    Okay.  You are now known as Nancy Kahn?

19   A.    Yes.

20   Q.    What is your full name, ma'am?

21   A.    The name I use is Nancy Hawkins-Kahn,

22   K-A-H-N.

23   Q.    Have you ever been known by any other names?

FOSHEE & TURNER COURT REPORTERS

Page 9

1    prepare for your deposition today?

2    A.    No, sir.

3    Q.    Have you reviewed any documents in

4    preparation for your deposition today?

5    A.    No, sir.

6    Q.    Are you on any medications today?

7    A.    Yes, I am.

8    Q.    What medications are you taking today?

9    A.    I take two medications for my high blood

10   pressure, Atenolol and Lotrel; and I take a

11   hormone replacement, Premarin; and an

12   antidepressant, Wellbu -- Wellbutrin.

13   Q.    I have a tough time saying that one too.

14   Any others?

15   A.    I take a Celexa at night, but I have not

16   taken that medicine today.

17   Q.    What is the Celexa for?

18   A.    It's also an antidepressant.

19   Q.    Any other medications you're taking today?

20   A.    No.

21   Q.    Would any of those medications interfere

22   with your ability to remember or give truthful

23   testimony today?

FOSHEE & TURNER COURT REPORTERS

Page 10

1    A.    No.

2    Q.    Is there anything else about the

3    circumstances today that would interfere with your

4    ability to remember or give truthful testimony?

5    A.    No.

6              (Defendant's Exhibit No. 1 was

7              marked for identification and a

8              copy of the same is attached

9              hereto.)

10   Q.    Let me show you what I've marked for

11   purposes of identification as Defendant's Exhibit

12   1 to your deposition.

13   A.    Okay.

14   Q.    My question will be if you've seen that

15   document before today.  It may be something you've

16   seen from your attorney.

17   A.    Similar to that, yes.

18   Q.    Have you provided your attorney with all the

19   documents in your control or possession that were

20   called for by Defendant's Exhibit 1?

21   A.    Yes.

22   Q.    Do you have any other documents related to

23   your employment with Dale Medical Center that you

**FOSHEE & TURNER COURT REPORTERS**

Page 11

1    have not provided to your attorney?

2    A.    No.

3    Q.    When did you first go to work for Dale

4    Medical Center?

5    A.    January 6th, 2003.

6    Q.    What was your first job there?

7    A.    I was the social worker assigned to the New

8    Day Senior Health.

9    Q.    Is that the same station you held throughout

10    your employment with Dale Medical Center?

11    A.    Yes.

12    Q.    How did you learn about that position?

13    A.    I saw an advertisement in the newspaper.

14    Q.    I take it you applied for it?

15    A.    Yes.

16    Q.    Did you interview with anybody for that

17    position?

18    A.    Yes.

19    Q.    Who did you interview with?

20    A.    Sandra Smolinski, which was her name at the

21    time.

22            THE COURT REPORTER:  Excuse me.  Can

23    you spell that last name for me, please?

FOSHEE & TURNER COURT REPORTERS

Page 12

1          MS. DUNN:  S-M-O-L-I-N-S-K-I.

2    Q.    Do you know if she's now known by Sandra

3    Gilbert?

4    A.    She was known as Sandra Fitsgerald while I

5    was employed there.

6    Q.    Okay.  Did you interview with anyone else

7    for the position at the Dale Medical Center?

8    A.    Present was her former husband, Len --

9    Leonard Smolinski.

10   Q.    Did you interview with anyone else?

11   A.    No, sir.

12   Q.    Did you ever interview with Sheila Dunn for

13   that position?

14   A.    No, sir.

15   Q.    Tell me about your interview with Ms.

16   Smolinski.

17   A.    I arrived at the appointed time, and Mr.

18   Smolinski was present.  And questions were asked

19   regarding my skills as a social worker/therapist,

20   what I had done in the past.

21   Q.    Where was the interview?

22   A.    It was held in the conference room of the

23   New Day Senior Health Unit.

Page 13

1    Q.      Did Leonard Smolinski ask any questions

2    during the interview?

3    A.      Yes, he did.

4    Q.      Is Mr. Smolinski employed by the Medical

5    Center?

6    A.      I believe he is employed there as a contract

7    employee, or was at the time.

8    Q.      Do you know in what capacity?

9    A.      He worked as a therapist of some type.

10            (Defendant's Exhibit No. 2 was

11            marked for identification and a

12            copy of the same is attached

13            hereto.)

14    Q.      Let me show you what I've marked for

15    purposes of identification as Defendant's Exhibit

16    2 to your deposition.  And I'll ask if you

17    recognize that as the resume you submitted to Dale

18    Medical Center for this job.

19    A.      Yes, I do.

20    Q.      And did this resume accurately reflect your

21    experience at the time you submitted it?

22    A.      Yes, it did.

23    Q.      Do you prefer I call you Ms. Hawkins-Kahn or

**FOSHEE & TURNER COURT REPORTERS**

1    Ms. Kahn?

2    A.    Ms. Kahn is fine, thank you.

3    Q.    Okay.  I appreciate that.

4          (Defendant's Exhibit No. 3 was

5          marked for identification and a

6          copy of the same is attached

7          hereto.)

8    Q.    I'm showing you what's been marked for

9    purposes of identification as Defendant's Exhibit

10   3 to your deposition.  I'll ask you if you

11   recognize that as the application for employment

12   you submitted to Dale Medical Center.

13   A.    Yes, I do.

14   Q.    And was this application accurate at the

15   time you submitted it to Dale Medical Center?

16   A.    Yes.

17   Q.    So, if I understand it, you had just one

18   interview, and that was with Sandra Smolinski and

19   Leonard Smolinski?

20   A.    That is correct.

21   Q.    And you said they asked you questions about

22   your experience as a social worker and therapist?

23   A.    That is correct.

**FOSHEE & TURNER COURT REPORTERS**

Page 15

1    Q.    Was anything else discussed?

2    A.    Not that I can recall.

3    Q.    Was there any discussion during the

4    interview about your vision?

5    A.    I disclosed that I had a visual problem and

6    that I read with a magnifying glass.

7    Q.    Did either Sandra Smolinski or Leonard

8    Smolinski indicate that that would be any problem?

9    A.    No.

10   Q.    Did they say anything about your vision

11   problem?

12   A.    I believe that it was brought up, Was there

13   anything else I needed in order to help me perform

14   the job?

15   Q.    What was your response?

16   A.    That I would not know until I actually began

17   to work and saw what my needs would be.

18   Q.    Was anything else discussed during the

19   interview about your vision?

20   A.    Not that I can recall.

21   Q.    And I take it you received the job?

22   A.    Yes, sir.

23   Q.    While you were employed with Dale Medical

FOSHEE & TURNER COURT REPORTERS

Page 16

1    Center, did you receive a copy of the employee

2    handbook?

3    A.     Yes.

4    Q.     Okay.

5           (Defendant's Exhibit No. 4 and

6           Defendant's Exhibit No. 5 were

7           marked for identification and

8           a copy of the same is attached

9           hereto.)

10   Q.     Let me show you what I've marked for

11   identification as Defendant's Exhibit 4 and

12   Exhibit 5.

13          Do you recognize Exhibits 4 and 5 as

14   acknowledgments for handbooks you received at Dale

15   Medical Center?

16   A.     Yes.

17   Q.     And, in fact, did you receive a handbook

18   when you started and then an updated handbook

19   later during your employment?

20   A.     Yes.

21   Q.     Okay.  Describe for me what your duties were

22   as the social worker in the New Day Senior Health

23   Unit.  Well, let me back up.

**FOSHEE & TURNER COURT REPORTERS**

Page 17

1          Will you explain for me, first, what the New

2     Day Senior Health Unit is?

3     A.      It is, or was at the time, a ten-bed acute

4     inpatient program for senior citizens with mental

5     health problems.

6     Q.      Okay.  What was your job responsibility in

7     that unit?

8     A.      I provided psychotherapy in group and

9     individual sessions for the patients, provided

10    family sessions for the families of the residents,

11    did discharge planning.

12    Q.      Did you provide any assessments when the

13    patient was first admitted to the unit?

14    A.      Yes.  Psychosocial assessments upon

15    admission.

16    Q.      Any other job responsibilities as the social

17    worker in the New Day Senior Health Unit?

18    A.      Working with the psychiatrists and the rest

19    of the staff on the patient's behalf.

20    Q.      Anything else?

21    A.      Whatever I was asked to do.

22    Q.      Who was your supervisor when you first

23    started?

Page 18

1    A.    Sandra Smolinski.

2    Q.    Were you the only social worker in that

3    unit?

4    A.    Yes.

5    Q.    The entire time you were there?

6    A.    Yes.

7    Q.    Explain for me what you would do to perform

8    a psychosocial assessment.

9    A.    There was a form of questions, and I

10   gathered the information and completed the form.

11   Q.    What was the purpose of that assessment?

12   A.    To basically get an idea of what the

13   patient's resources were; what their history was,

14   as far as their mental health problems.  Family

15   background, and what their resources were; their

16   employment in the past when they were employed,

17   their education level.  Just a general picture of

18   the individual.

19   Q.    And what was that used for?

20   A.    It was used to determine the course of care

21   and the planning for the patient's follow-up, once

22   they were discharged.

23   Q.    You said it was a form?

**FOSHEE & TURNER COURT REPORTERS**

1    A.    It was a form, yes.

2    Q.    While you were employed there, was anybody

3    else in the unit responsible for completing the

4    psychosocial assessment other than you?

5    A.    No.  That form was specifically designed for

6    the therapist to complete.

7    Q.    You said another of your responsibilities

8    was providing therapy in group and individual

9    sessions?

10    A.    That is correct.

11    Q.    How often did you do that?

12    A.    Group was to be done daily; and the

13    individual therapy sessions were done on an

14    as-need basis, but a minimum of weekly.

15    Q.    Who determined the need for the individual

16    therapy?

17    A.    I did, and the doctor.

18    Q.    How long did group sessions last?

19    A.    An hour.

20    Q.    How long did individual sessions last?

21    A.    Thirty minutes to an hour.

22    Q.    Were all the patients in the unit included

23    in the same group session?

**FOSHEE & TURNER COURT REPORTERS**

Page 20

1   A.    Yes, as their cognition permitted.  Some

2   could not participate.

3   Q.    But those who could participate all

4   participated in the same group?

5   A.    Yes.

6   Q.    There was no division among patients based

7   upon their needs or functioning?

8   A.    No.  Because I found that some of the, as

9   they called, lower-functioning patients benefitted

10  from being included.

11  Q.    Was that a decision you made?

12  A.    Yes.

13  Q.    So you conducted family sessions as well?

14  A.    Yes.

15  Q.    How frequently did you conduct family

16  sessions?

17  A.    It depended on the length of stay of the

18  resident or the patient.  Once a week, or more

19  frequently if needed.

20  Q.    So once a week was the minimum?

21  A.    Yes.

22  Q.    Going back to the individual and group

23  therapy sessions, was there any documentation

FOSHEE & TURNER COURT REPORTERS

Page 21

1    involved in those sessions?

2    A.    Yes.  I provided progress notes.

3    Q.    Who was responsible for doing that?

4    A.    I did.

5    Q.    Would they be individual progress notes for

6    each patient?

7    A.    Yes.

8    Q.    What was the purpose of keeping the progress

9    notes?

10    A.    As documentation to demonstrate progress of

11    the patient as well as content of the session.

12    Q.    Other than yourself, did anybody else use

13    those progress notes?

14    A.    Yes.  They were part of the medical record.

15    Q.    So the doctors would use them as well?

16    A.    Yes.

17    Q.    Was there any documentation associated with

18    the family sessions?

19    A.    Yes.

20    Q.    What sort of documentation?

21    A.    A progress note.

22    Q.    Would that be similar to the one for the

23    individual and group sessions?

Page 22

1    A.    Yes.

2    Q.    What was your responsibility for discharge

3    planning?

4    A.    Once it was determined what would best fit

5    the patient's needs, whether they were returning

6    to their home or going to a nursing home or some

7    other placement, that was my responsibility, to

8    see whatever the follow-up needs were that would

9    be in place, whether it be in-home care or

10   follow-up in the community with the community

11   mental health program.

12   Q.    Who would determine the appropriate

13   placement for the patient?

14   A.    It was determined by the doctor.

15   Q.    Did you have any other responsibilities as

16   far as discharge planning, other than facilitating

17   their placement?

18   A.    It depended on what they needed, whether it

19   was transportation to where they were returning or

20   whether a nurse needed to go into the home as

21   follow-up.  It just depended on each individual.

22   Q.    Okay.  Was there any assessment of the

23   patients prior to discharge, sort of similar to

FOSHEE & TURNER COURT REPORTERS

Page 23

1   what you do on the intake side?

2   A.    Only during the patient's treatment team,

3   when the team met with the doctor and the direct

4   care staff.  There was no -- it was not written.

5   Q.    So there was no written assessment of the

6   patient in anticipation of discharge?

7   A.    On only a progress note that stated what

8   progress toward discharge was made and what had

9   been completed for them; but no specific form.

10  Q.    Were you responsible for any paperwork

11  associated with discharge?

12  A.    Yes.

13  Q.    What was that?

14  A.    Again, depending on the need of the patient,

15  if they were going to a nursing home or returning

16  to a nursing home, there was paperwork that needed

17  to be filed with the State Department of Mental

18  Health.  It was computer generated.

19  Q.    What sort of paperwork was required for

20  that?

21  A.    Information regarding the patient's

22  medication, the doctor's diagnosis.  It was called

23  a level two screening.

FOSHEE & TURNER COURT REPORTERS

Page 24

1   Q.    Were you responsible for conducting the

2   level two screening?

3   A.    Yes.

4   Q.    You said it would indicate what medication

5   the patient was on and the patient's diagnosis?

6   A.    Yes.

7   Q.    Did it require any new assessment of the

8   patient at that point?

9   A.    Only based on what was in the medical chart.

10  Q.    And you said that's something you provided

11  to the state?

12  A.    Yes.

13  Q.    How long was the level two screening?

14  A.    Are you asking me how long it took me to do

15  it or how long the actual form was?

16  Q.    How many pages the form was.

17  A.    It was two, at the max.

18  Q.    And how long would it take you to complete

19  that?

20  A.    As long as -- it was computer generated.  I

21  had to go on line and, once I pulled up the form,

22  fill in the blanks and submit it.

23  Q.    Was that something that took minutes? hours?

FOSHEE & TURNER COURT REPORTERS

Page 25

1    A.    Oh, minutes.  Maybe 10, 15.

2    Q.    Going back to the psychosocial assessment,

how long did it take you to complete that?

4    A.    It could take up to an hour, depending on

5    how cooperative the patient was.

6    Q.    So I take it one hour would be for a

7    difficult patient?

8    A.    Yes.

9    Q.    If you had a cooperative patient, how long

10   would it take?

11   A.    Well, a cooperative patient, I probably

12   could do it in 30 minutes; but an uncooperative

13   patient might have to be done in stages.

14   Q.    Meaning you would have to come back to them

15   several times?

16   A.    Yes.

17   Q.    Part of your claim in this lawsuit has to do

18   with disability discrimination, correct?

19   A.    Yes.

20   Q.    And I take it that your disability is your

21   vision impairment?

22   A.    Yes.

23   Q.    Do you have any other disability?

**FOSHEE & TURNER COURT REPORTERS**

Page 26

1  A.     No.

2  Q.     What is the current state of your vision?

3  A.     Corrected, it is 20/300.

4  Q.     And by corrected, you mean with glasses?

5  A.     Yes.

6  Q.     Is that what your vision was at the time you

7  were employed at Dale Medical Center?

8  A.     Probably, or close to that.

9  Q.     How does your vision impairment limit your

10  ability to do daily activities?

11  A.     I don't drive.

12  Q.     Anything else you don't do?

13  A.     I read better with large print.

14  Q.     Now, you have with you today a magnifying

15  glass?

16  A.     Yes.

17  Q.     You use that for reading?

18  A.     Yes.

19  Q.     Are you able to read small print with that?

20  A.     I can read average print with this.

21  Telephone books are too small these days.

22  Q.     Too small for me too.  Anything else you

23  can't do because of your vision?

FOSHEE & TURNER COURT REPORTERS

1   A.    I can't think of anything that's

2   significant.

3   Q.    Now, you told me that when you interviewed,

4   Sandra Smolinski asked if you needed anything

5   other than the magnifying glass to help you do

6   your job?

7   A.    That's correct.

8   Q.    At any point during your employment at Dale

9   Medical Center, did you tell her you needed

10  something other than --

11  A.    Yes.

12  Q.    When did you tell her that you needed some

13  other assistance?

14  A.    I told her shortly after.  Because I needed

15  the computer adjusted so I could enlarge the type,

16  so I could see to read it and correct it.

17  Q.    That was shortly after you started work

18  there?

19  A.    Yes.

20  Q.    And how did Ms. Smolinski respond?

21  A.    There was no response.

22  Q.    She said absolutely nothing?

23  A.    She said absolutely nothing or she said,

Page 28

1    I'll look into it, or, I'll take care of it; but

2    nothing was done.

3    Q.    Did you discuss adjusting the computer with

4    her again?

5    A.    Yes.

6    Q.    When was that?

7    A.    There were two computers.  Only one was on

8    line.  So the computer that I did for daily work,

9    I didn't discuss again.

10         The on-line computer was situated in such a

11   way that I could not sit in the chair at the desk

12   to use the computer; I had to stand up.  And in

13   standing up, I then had to bend down, which made

14   it uncomfortable; very tiring over a period of

15   time, when I needed to go on the on-line computer.

16         And when I told her that it was a problem

17   for me, her response was, it's a problem for her

18   too.

19   Q.    When did you tell Ms. Smolinski that the

20   situation of the on-line computer was a problem

21   for you?

22   A.    Several times during the course of my

23   employment.

FOSHEE & TURNER COURT REPORTERS

Page 29

1   Q.    Did she respond the same way each time?

2   A.    Yes.

3   Q.    Did she ever give you any other response?

4   A.    No.

5   Q.    Okay.  Explain for me how this computer used

6   to go on line was situated so that you couldn't

7   sit.

8   A.    It was -- the monitor was up high, and I

9   could not see the monitor.  I could not get close

10  enough to it to see to read the monitor to know

11  that what I was typing in was appropriate; so I

12  would have to stand up to place my glass on the

13  screen.

14        And that's when my height or -- that's when

15  it became uncomfortable or difficult.

16  Q.    When you stood and put your glass on the

17  screen, were you able to see what was on the

18  screen?

19  A.    Yes.  When I adjusted my body posture, which

20  was uncomfortable for me to continue to do.

21  Q.    With regard to the computer that you did

22  your daily work on, did you also use your glass on

23  that screen?

Page 30

1    A.    Yes.

2    Q.    And were you able to read what was on that

3    screen with your magnifying glass?

4    A.    Not easily.

5    Q.    Were you able to do your work?

6    A.    With difficulty.

7    Q.    What sort of things did you use your daily

8    computer for?

9    A.    Typing letters and progress notes that

10   weren't a part of the preform -- there was a form

11   that was generated, but not on the computer.  It

12   was created by someone, and there were copies that

13   I had to fill in.  But, again, it was not within

14   the limits of my vision.

15   Q.    When you say preform, are you talking about

16   the psychosocial assessment?

17   A.    No.  This was a progress note that was

18   developed that was specific, and it had lines to

19   fill in, so -- I don't know how I can say this.

20         In previous jobs, any form that was on the

21   computer, I could enlarge it to do my work, and

22   then reduce it so that it would fit within the

23   standards of the chart.

**FOSHEE & TURNER COURT REPORTERS**

Page 31

1      This form was not a computer-generated form,

2  and neither could I put it into the computer so I

3  could use that.

4      I enlarged it on the copy machine so I could

5  see within the parameters to read it and fill it

6  in accurately.  Then I was told that it did not

7  meet the standards for the New Day progress note.

8  Q.    And this is a progress note for patient

9  charts?

10 A.    Yes, for patient charts.  And it was a group

11 note.

12 Q.    And this is something that you completed on

13 the computer?

14 A.    I could not complete it on the computer

15 because I could not put it into the computer so I

16 could manipulate it.

17      It would have been more useful had it been

18 on a computer screen that I could have pulled it

19 up, enlarged it, filled in the blanks, and then

20 reduce it back to the size of the chart, as I had

21 done in a previous job.

22 Q.    So it's a hard copy form?

23 A.    Yes.

FOSHEE & TURNER COURT REPORTERS

Page 32

1    Q.    And could you read that form with your

2    magnifying glass?

3    A.    I could read it, but it was difficult to

4    fill it in at the space and size that it was.

5    Q.    Did you speak with anybody at Dale Medical

6    Center about your difficulty completing that form?

7    A.    Only Ms. Smolinski, or Fitzgerald, and the

8    representative from the New Day Company.

9    Q.    Do you know what her name was -- is?

10   A.    Debra.  But I do not remember Debra's last

11   name.

12   Q.    And when you say the representative from the

13   New Day Company, that's somebody outside of Dale

14   Medical Center?

15   A.    Yes.

16   Q.    How did Ms. Smolinski respond when you

17   talked to her about your difficulty completing

18   this progress note?

19   A.    Mostly noncommittal.

20   Q.    What did she say to you?

21   A.    It was usually, "I'll see what I can do."

22   Q.    Did she give you any response other than

23   saying she'd see what she could do?

FOSHEE & TURNER COURT REPORTERS

1    A.    No.

2    Q.    And what did the representative from the New

3    Day Company say when you talked to her about your

4    difficulty completing this form?

5    A.    Other than she told me that when I enlarged

6    it, it did not meet with the standards that New

7    Day had set -- my form had to look like everybody

8    else's -- she thought that she could put it on a

9    disk for me that I could manipulate it, but that

10   never occurred.

11   Q.    When did she tell you she thought she could

12   put it on a disk?

13   A.    I think it was like three or four months

14   into the employment.

15   Q.    Did you speak with her -- the representative

16   from New Day -- about the form again, after she

17   told you that she thought she could put it on a

18   disk?

19   A.    I'm not sure I understand what you're asking

20   me.

21   Q.    After this representative from New Day told

22   you that she thought she could put the form on a

23   disk, did you speak with her about your difficulty

Page 34

1    with the form again?

2    A.    No, because she was not readily accessible

3    to us.

4    Q.    Did you talk to anybody at Dale Medical

5    Center about it again, after she had told you she

6    thought she could put it on a disk?

7    A.    No.

8    Q.    The psychosocial assessment, is that

9    something you did on the computer or did by hand?

10   A.    By hand.

11   Q.    Were you able to complete that form?

12   A.    With difficulty.

13   Q.    You say "with difficulty." Were you able to

14   adequately fill out the form?

15   A.    The gentleman who is now my husband -- was

16   not then -- developed a notebook for me in which

17   every question was in large print. And the pages

18   were in a paper protector.

19          So I would use either a dry erase marker or

20   a grease pencil to take that to my interview, fill

21   out the answers or write notes on the page. That

22   would give me the information to take back to my

23   desks, and then fill it in, using my magnifying

FOSHEE & TURNER COURT REPORTERS

Page 35

1  glass and inserting my pen in between the lens so

2  that I could fill in the blocks.

3  Q.    Using that technique, were you able to

4  complete the psychosocial assessments?

5  A.    To the best of my ability.

6  Q.    You qualify that.  Do you think you

7  adequately completed the psychosocial assessments?

8  A.    Yes.  Yes.

9  Q.    Other than what you've already told me about

10 conversations with Ms. Smolinski and the

11 representative from New Day, did you ask anybody

12 else or on any other occasion for some form of

13 accommodation?

14 A.    No.

15 Q.    Other than those occasions, did you complain

16 to anybody else that were having difficulty

17 performing your job duties?

18 A.    Yes.

19 Q.    Who else did you complain to?

20 A.    I brought it up with Ms. Smolinski almost --

21 well, at least on a weekly basis, if not daily.

22 Q.    What did you tell her about that?

23 A.    I would ask her, again, if there could be

FOSHEE & TURNER COURT REPORTERS

Page 36

1    something that I could have like, again, the

2    computer that I could enlarge.

3         When I needed to, I would ask someone to

4    read me particularly phone numbers.

5    Q.    Did people oblige you?

6    A.    Yes.

7    Q.    Did you say anything else to Ms. Smolinski

8    about your difficulty doing your job?

9    A.    No.  I tried to accommodate myself.

10   Q.    On your work computer, were you able to

11   adjust the fonts on that?

12   A.    No.

13   Q.    Where was that computer located?

14   A.    It was located in an office occupied by two

15   other people.

16   Q.    Who else shared that office with you?

17   A.    I went into their office.  It was, at that

18   time, occupied by the nurse manager and by the

19   marketing person.

20   Q.    Who was the nurse manager?

21   A.    In the beginning, her name was Joan Carter;

22   later, it was an individual known as Jeff Morrow;

23   and, lastly, Jennifer.  And I don't remember

Page 37

1    Jennifer's last name.

2    Q.    Who was the marketing person?

3    A.    Barbara Gay Hamilton.

4    Q.    Was Ms. Smolinski your supervisor the entire

5    time you were employed at Dale Medical Center?

6    A.    For all but the last two months, three

7    months.

8    Q.    Who became your supervisor for the last two

9    to three months?

10    A.    The nurse, Jennifer, whose last name I

11    cannot remember.

12    Q.    Did you speak with the nurse manager,

13    Jennifer, about your difficulty completing these

14    forms or using the computers?

15    A.    No.

16    Q.    Did you ask her for any form of

17    accommodation?

18    A.    No.

19    Q.    Other than the conversations you told me

20    about when you discussed your difficulty

21    completing these forms, did you discuss your

22    visual limitations with anybody else at Dale

23    Medical Center?

FOSHEE & TURNER COURT REPORTERS

Page 38

1   A.     No.

2   Q.     Did anyone else, other than the

3   conversations you've already related to me, make

4   any comments about your vision limitations?

5   A.     No.

6   Q.     Did anyone say anything negative about your

7   vision?

8   A.     I was sometimes teased about it jokingly,

9   but nothing that was negative.

10  Q.     Who teased you about it?

11  A.     A lot of the staff.

12  Q.     Let me see if I can make a distinction.  Did

13  anybody say anything you considered to be mean

14  spirited about your vision?

15  A.     No.

16  Q.     To the extent they teased you, you thought

17  it was in good humor?

18  A.     It was in good humor.

19  Q.     You also have, as part of your lawsuit, a

20  claim of age discrimination?

21  A.     Yes.

22  Q.     I take it that relates to your termination?

23  A.     Yes.

**FOSHEE & TURNER COURT REPORTERS**

Page 39

1  Q.    Do you believe Dale Medical Center did

2  anything else to you, other than your termination,

3  and we'll come back to that, but did anything else

4  to you because of your age?

5  A.    No.

6  Q.    Did anybody harass you because of your

7  vision?

8  A.    No.

9  Q.    Did anybody at Dale Medical Center make any

10  comments to you about your age?

11  A.    No.

12  Q.    What is your date of birth, ma'am?

13  A.    August 27, 1941.

14  Q.    What is your Social Security number?

15  A.    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.

16  Q.    What is your home address?

17  A.    905 Baywood Road, Dothan, 36305.

18  Q.    How long have you lived there?

19  A.    Five and a half years.

20  Q.    You live there with your husband?

21  A.    Now, yes.

22  Q.    Mr. Kahn?

23  A.    Yes.

Page 47

1    adequate, although she had difficulty reading my

2    handwriting when she read my notes.

3    Q.    Other than these conversations you've

4    described for me with Ms. Hamilton and Ms. Floyd,

5    have you spoken with any current or former

6    employees of Dale Medical Center since your

7    employment ended?

8    A.    Only in greeting them when I encountered Ms.

9    Smolinski and the current marketing director at

10   workshops or conferences.

11   Q.    So you've seen Ms. Smolinski at conferences

12   since your employment ended?

13   A.    Yes.

14   Q.    Has she been pleasant to you?

15   A.    We just exchanged, Hello, how are you.  And

16   yes, it was pleasant.

17             (Defendant's Exhibit No. 6 was

18             marked for identification and a

19             copy of the same is attached

20             hereto.)

21   Q.    Let me show you what I've marked for

22   purposes of identification as Defendant's Exhibit

23   6 to your deposition.

FOSHEE & TURNER COURT REPORTERS

Page 48

1        You're welcome to read as much of it as

2    you'd like, but my questions are going to be

3    concerning the third page under "Position

4    Responsibilities."

5    A.    Okay.

6    Q.    And my question is whether you agree that

7    that section accurately describes the position

8    responsibilities of your job at Dale Medical

9    Center.

10   A.    Yes.

11        MR. SMITH:  Take your time.  1 through

12   8 is what you're talking about, Position

13   Responsibilities?

14        MR. VREELAND:  Correct.

15   A.    Except for No. 8.  I had nothing to do with

16   the preadmission process.

17   Q.    It's all but No. 8?

18   A.    Yes.

19   Q.    Earlier you mentioned someone named Debra?

20   A.    Yes.

21   Q.    What was your understanding of Debra's

22   position?

23   A.    She was the -- she was directly above Ms.

FOSHEE & TURNER COURT REPORTERS

Page 49

1    Smolinski, who at the time was not employed by

2    Dale Medical Center but by New Day Senior Health.

3    There were three people on the unit that were not

4    direct employees of Dale Medical Center.

5    Q.    So that would be Debra, Ms. Smolinski,

6    and --

7    A.    Well, the secretary, Lorie.  I don't

8    remember Lorie's last name.  The marketing manager

9    at the time was also under Debra.  That would have

10   been Ms. Hamilton.

11   Q.    How frequently did Ms. Hamilton visit the

12   unit at Dale Medical Center?

13   A.    She was there daily.

14   Q.    I'm sorry.  I misasked that.  How frequently

15   did Debra?

16   A.    Maybe twice a month that she was there, if

17   that often.

18   Q.    Did Debra ever have any conversations with

19   you about your job performance?

20   A.    No.

21   Q.    Did Debra ever have any conversations with

22   you about the documentation requirements of your

23   job?

FOSHEE & TURNER COURT REPORTERS

Page 50

1    A.    Only insofar as the conversation regarding

2    getting the forms on the computer.  But nothing

3    else about that.

4    Q.    All right.  Was Debra, Debra Douglas?

5    A.    Yes.

6    Q.    Did Ms. Smolinski ever have discussions with

7    you about your job performance?

8    A.    Not until my evaluation, which was a year

9    after my employment.

10    Q.    Prior to that did she have any conversations

11    with you about completing paperwork?

12    A.    Not that I can recall.

13              (Defendant's Exhibit No. 7 was

14              marked for identification and a

15              copy of the same is attached

16              hereto.)

17    Q.    I'll show you what I've marked for purposes

18    of identification as Defendant's Exhibit 7.  Do

19    you recognize that document?

20    A.    I cannot remember it.

21    Q.    Did you receive this sort of memo -- not

22    this precise one, but this type of memo while you

23    were employed at Dale Medical Center?

Page 51

1    A.    Yes.

2    Q.    This appears to have a list of patients on

3    it who -- let me back up.  Strike that.

4          What is a Zung & GDS?

5    A.    Those were assessment forms that were done

6    on patients.

7    Q.    Is that what you were talking about with the

8    admission assessment?

9    A.    That was part of the admission assessment.

10   Q.    And are those forms that you would complete?

11   A.    Yes.

12   Q.    And would this be a list of patients who

13   needed that form completed?

14   A.    Yes.

15   Q.    And this says that they needed to be turned

16   in to Lorie Ingram.  She was the secretary?

17   A.    Yes.

18   Q.    Do you know what Ms. Ingram did with those?

19   A.    They were filed in the chart.

20   Q.    Do you know if she had any responsibility

21   for billing?

22   A.    Yes.

23   Q.    And do you know if she needed those to

Page 52

1    complete her billing task?

2    A.      Yes.

3    Q.      Is the psychosocial assessment something

4    that patients were billed for?

5    A.      Yes.

6    Q.      And would the paperwork need to be completed

7    before they could be billed?

8    A.      Yes.

9    Q.      Would you like to take a break?

10   A.      Yes.

11   Q.      Okay.

12                   (A brief recess was taken.)

13                   (Defendant's Exhibit No. 8 was

14                   marked for identification and a

15                   copy of the same is attached

16                   hereto.)

17   (BY MR. VREELAND)

18   Q.      Let me show you what I've marked for

19   purposes of identification as Defendant's Exhibit

20   8 to your deposition.

21   A.      Okay.

22   Q.      Take as long as you need to look at it.  My

23   first question would be:  Do you recognize the

FOSHEE & TURNER COURT REPORTERS

Page 53

1   document?

2   A.    Yes.

3   Q.    Is that a memo you received from -- here

4   it's Ms. Fitzgerald, but we've been referring to

5   her as Ms. Smolinski.

6   A.    Yes.

7   Q.    And this lists the various patients who need

8   to have the psychosocial assessment form

9   completed?

10  A.    Yes.

11  Q.    And on this sheet it says, "Please have in

12  chart no later than third day of admission."

13        Do you know what the importance of having

14  the psychosocial assessment in the chart within

15  three days of admission was?

16  A.    That was the standard.

17  Q.    That was the standard imposed by who, if you

18  know?

19  A.    I don't know.

20  Q.    Practically speaking, do you know why that

21  would be important?

22  A.    So that the information requested is in the

23  chart and available to those who need it.

FOSHEE & TURNER COURT REPORTERS

Page 54

1    Q.     Did you have any discussions with Ms.

2    Fitzgerald when she gave this to you about being

3    behind in your charting?

4    A.     Not that I can recall.

5    Q.     Do you recall giving her any explanation for

6    why you were behind in your charting?

7    A.     None.  I took care of it.

8                (Defendant's Exhibit No. 9 was

9                marked for identification and a

10               copy of the same is attached

11               hereto.)

12   Q.     Let me show you what I've marked for

13   purposes of identification as Defendant's Exhibit

14   9 to your deposition.  I'll ask if you recognize

15   this as a memo you received from Ms. Fitzgerald.

16   A.     Yes.

17   Q.     Does this also list patients who need the

18   psychosocial assessment in their -- completed for

19   their files?

20   A.     Yes.

21   Q.     Did you have any discussions with Ms.

22   Fitzgerald about this memo when she gave it to

23   you?

Page 55

1    A.    No.

2    Q.    Did you give her any explanation for why the

3    documentation had not been completed at this

4    point?

5    A.    No.

6    Q.    At any point, did Ms. Fitzgerald indicate to

7    you that it was becoming a problem that you were

8    behind in your charting?

9    A.    I don't remember.

10   Q.    I think you testified earlier that she first

11   raised any issues, or the first you recall her

12   raising issues with your performance was when she

13   gave you your performance evaluation?

14   A.    That is correct.

15   Q.    Tell me what issues she raised at that time.

16   A.    She told me that I was not seeing the

17   families.  That was one thing that she told me I

18   was not doing.  She told me I was rude to the

19   staff.  I don't remember other things.

20   Q.    Do you recall if she raised any issues with

21   you about your documentation in the patient

22   charts?

23   A.    I do not recall.

FOSHEE & TURNER COURT REPORTERS

Page 56

1              (Defendant's Exhibit No. 10 was

2              marked for identification and a

3              copy of the same is attached

4              hereto.)

5    Q.    Let me show you what I've marked for

6    purposes of identification as Defendant's Exhibit

7    10 to your deposition.

8    A.    Yes.

9    Q.    Do you recognize this document as something

10   that was --

11   A.    Yes.  This was attached to my evaluation.

12   Q.    Did Ms. Fitzgerald cover it with you at the

13   time of your evaluation?

14   A.    No.

15   Q.    Did she point it out to you that it was

16   there?

17   A.    She gave it to me after I had my evaluation.

18   It was given to me a day or so after my

19   evaluation.

20   Q.    Did she explain to you what it was?

21   A.    She said -- what she said was, if I

22   remember, This is what we talked about.

23   Q.    Had she talked about these things with you

FOSHEE & TURNER COURT REPORTERS

Page 57

1    during your evaluation?

2    A.    The evaluation process, as I recall, was I

3    was given the form -- the numeric form -- to fill

4    out, and I did.  And then she had done the same.

5    And we compared our assessment of me.

6         And where we disagreed on the number

7    evaluation, the number assigned for the tasks, we

8    did not disagree to a point that it was

9    significant, in my mind, at the time.

10        And I know that my numerical score was in

11   the parameters that indicated a raise.  And it

12   really wasn't until I learned I was not getting a

13   raise that I was aware that there really was a

14   problem.

15        And when I was given this document to sign,

16   I was on my way to something that was going on on

17   the unit, either having to do my group with the

18   folks or something; and she said something to the

19   effect, I need you to sign this.  And I started by

20   signing it on the wrong line and realized I had

21   done that, and then completed my signature

22   underneath it.  I did not read the document at the

23   time.

Page 58

1    Q.     Okay.  My question, however, was whether she

2    discussed these issues with you during your

3    evaluation.

4    A.     Yes.  I understand the question.  But I

5    cannot remember specifically that these were

6    discussed in this form.

7         The general evaluation process was informal.

8    We were sitting, and she would read the particular

9    objective or the goal, I would give her my number

10   and she would give me her number, and I agreed to

11   go with whatever numeric score she gave me at the

12   time.

13        So specifically, in the general context the

14   way the evaluation went, I cannot remember that

15   these things were discussed in that way.

16   Q.     I think earlier you told me you did remember

17   her raising an issue about your not seeing the

18   families.

19   A.     Right.  And that I was rude.  But I did not

20   agree with her about not seeing the families

21   because there were many, many times when I

22   adjusted my time there to remain after my normally

23   scheduled work hours so I could accommodate a

FOSHEE & TURNER COURT REPORTERS

Page 59

1    family coming in later in the evening or late in

2    the afternoon when they got off their jobs or

3    whatever.

4        And since I knew I was doing that, I did not

5    realize she was unaware I was doing that.

6        MR. VREELAND:  Move to strike as

7    nonresponsive.

8    Q.    You do recall, whether you agreed with it or

9    not, that she raised the issue through your

10   evaluation?

11   A.    Yes.

12   Q.    And you do recall, whether you agree with it

13   or not, that she raised an issue about you being

14   rude to staff?

15   A.    Yes.

16   Q.    I take it, from your earlier answer, you

17   don't recall if she raised these other issues with

18   you during the course of your evaluation?

19   A.    That's correct.

20   Q.    And after your evaluation, she gave you

21   Defendant's Exhibit 10?

22   A.    Yes.

23   Q.    And it sounds as though you did not discuss

FOSHEE & TURNER COURT REPORTERS

Page 60

1   it with her at the time she handed it to you.

2   A.    That's correct.

3   Q.    Did you later discuss it with her?

4   A.    No.

5   Q.    Did you have any concerns about the issues

6   she was raising with you in Defendant's Exhibit

7   10?

8   A.    No.  Because in my mind I was doing that.

9   Q.    Well, if, in your mind you were doing these

10  things correctly, why didn't you go to her and

11  say, I don't understand why I'm getting this; I

12  think I'm doing a good job?

13  A.    I don't know.

14              (Defendant's Exhibit No. 11 was

15              marked for identification and a

16              copy of the same is attached

17              hereto.)

18  Q.    Let me show you what I've marked for

19  purposes of identification as Defendant's Exhibit

20  11.

21  A.    I don't recall ever seeing that.

22  Q.    Do you recognize the format?

23  A.    No.

FOSHEE & TURNER COURT REPORTERS

Page 61

1    Q.    You've never seen a chart like this?

2    A.    No.

3    Q.    And you don't recall Ms. Fitzgerald giving

4    you one of these?

5    A.    No.

6    Q.    Did Ms. Fitzgerald ever question you after

7    your evaluation about why therapy groups were not

8    done on particular days?

9    A.    No.

10   Q.    After your evaluation, did she ever question

11   you about why family therapy was not done at least

12   once a week?

13   A.    No.

14   Q.    Did she ever review with you the statistics

15   of how often therapy was being conducted?

16   A.    No.

17   Q.    How long after your evaluation was it when

18   your supervisor changed?

19   A.    Two months or six weeks.  Six weeks to two

20   months.

21              (Defendant's Exhibit No. 12 was

22              marked for identification and a

23              copy of the same is attached

**FOSHEE & TURNER COURT REPORTERS**

1          hereto.)

2    Q.    Let me show you what I've marked for

3    purposes of identification as Defendant's Exhibit

4    12 to your deposition.  Do you recognize that

5    document?

6    A.    Yes.

7    Q.    Did somebody give you a copy of this?

8    A.    I don't recall that I received a copy.

9    Q.    Did somebody go over it with you?

10   A.    Yes.

11   Q.    Who went over it with you?

12   A.    The nurse, Jennifer, whose name I don't

13   remember -- last name I don't remember.

14   Q.    Is it Jennifer Simmons?

15   A.    Yes.

16   Q.    Tell me what Ms. Simmons said to you when

17   she went over this with you.

18   A.    She had just become my supervisor; and she

19   said these are the things that were in your

20   evaluation that needed to be corrected.

21   Q.    Did you ask her about any specifics

22   concerning these issues?

23   A.    Not that I recall.

FOSHEE & TURNER COURT REPORTERS

Page 63

1   Q.     Did you object to any of the issues raised

2   here?

3   A.     Not that I recall.

4   Q.     Did you offer Jennifer any explanation

5   concerning any of these issues?

6   A.     No.

7   Q.     Why not?

8   A.     I didn't think that there was any reason to

9   do that.

10   Q.     You disagreed with the issues she was

11   raising here, correct?

12   A.     I recognized them as being a carryover from

13   the earlier form that I signed.

14   Q.     Well, did you agree that they were problems?

15   A.     I did not agree they were problems, but I

16   also did not disagree with her at the time this

17   was presented to me.

18   Q.     Did you ever tell Jennifer Simmons that you

19   disagreed with anything included in Defendant's

20   Exhibit 12?

21   A.     I don't believe I did.

22   Q.     Did you tell anybody at Dale Medical Center

23   that you disagreed with the issues raised in

Page 64

1    Defendant's Exhibit 12?

2    A.    No.

3    Q.    Do you recall anything you said to Jennifer

4    when she gave this to you?

5    A.    That I agreed to the time limit.

6    Q.    That it was be --

7    A.    That I agreed to correct them.

8    Q.    You agreed to correct the issues within the

9    time limit on the form?

10    A.    Yes.

11    Q.    Did you tell Jennifer you needed any

12    assistance from her to correct these?

13    A.    No.

14              (Defendant's Exhibit No. 13 was

15              marked for identification and a

16              copy of the same is attached

17              hereto.)

18    Q.    Let me show you what I've marked for

19    purposes of identification as Defendant's Exhibit

20    13.  Do you recognize this document?

21    A.    Yes.

22    Q.    Is this a memo you received from Jennifer

23    Simmons?

FOSHEE & TURNER COURT REPORTERS

Page 65

1    A.    Yes.

2    Q.    And it's a list of patients who needed the

3    psychosocial assessments completed?

4    A.    Yes.

5    Q.    Okay.  At the time you received this

6    document, did you have any discussions with Ms.

7    Simmons about the status of these reports?

8    A.    No.  I completed it and indicated I had

9    completed them.

10   Q.    When was the next time you had any

11   discussions with Ms. Simmons about your

12   performance?

13   A.    I do not recall.

14   Q.    Did you have any other discussions with her

15   about your performance before the day you were

16   terminated?

17   A.    No.

18   Q.    Did you have discussions with anybody at

19   Dale Medical Center, from the time you received

20   Defendant's Exhibit 12 until the time you were

21   terminated, about your performance?

22   A.    No.

23   Q.    How did you learn that you were being

FOSHEE & TURNER COURT REPORTERS

Page 66

1    terminated?

2    A.     I was called into Jennifer's office.

3    Q.     Who was present?

4    A.     Jennifer and someone from human resources.

5    Q.     Do you know if it was Ms. Dunn?

6    A.     I cannot remember, but it probably was.

7    Q.     What was said?

8    A.     That I was being terminated; that I was

9    given time to clean out my desk and leave.

10   Q.     Did they indicate why you were being

11   terminated?

12   A.     I believe there was some reference to a memo

13   that I had not fulfilled.

14   Q.     Anything else discussed?

15   A.     No.

16   Q.     How did you respond?

17   A.     I accepted the termination, cleaned out my

18   desk and left.

19   Q.     Did you disagree with them about their

20   assessments that you hadn't fulfilled the memo?

21   A.     I did not voice any that I can remember.

22   Q.     At any time during your employment at Dale

23   Medical Center, did you voice any disagreement

FOSHEE & TURNER COURT REPORTERS

Page 67

1    with the performance issues that were raised in

2    these memos that I've shown you?

3    A.    No.

4    Q.    Why not?

5    A.    I don't know.

6    Q.    After you were terminated, did you voice any

7    disagreement, other than obviously filing an EEOC

8    Charge and this lawsuit, about those issues to

9    anybody at Dale Medical Center?

10   A.    No.  I had no more contact with Dale Medical

11   Center.

12   Q.    I may have asked you this before and I

13   apologize if I did:  Did you ever have any

14   discussions with Jennifer Simmons about your

15   vision?

16   A.    Not in the context that she was my

17   supervisor.

18   Q.    Do you mean that you had conversations with

19   her before she was your supervisor?

20   A.    Well, the professional staff was aware that

21   I had difficulties reading and that it was

22   sometimes awkward for me to write.  It was just

23   part of who I was.

Page 68

1    Q.    I understand that she may have been aware,

2    but did you have any specific conversations with

3    her, Jennifer Simmons, about your vision?

4    A.    Not that I can recall.

5    Q.    Do you remember anything she ever said to

6    you about your vision?

7    A.    I do not.

8    Q.    Did she ever make any comments to you about

9    your age?

10   A.    No.

11   Q.    I asked this earlier concerning people

12   employed by Dale Medical Center -- well, let me

13   back up.

14         What is the name of the company that Ms.

15   Daugherty worked for?

16   A.    New Day Senior Health.

17   Q.    Did anybody with New Day make any negative

18   comments about your vision?

19   A.    No.

20   Q.    Did anybody with New Day make any negative

21   comments about your age?

22   A.    No, other than Ms. Smolinski in her comments

23   to Ms. Hamilton.  Not directly to me.

Page 69

1  Q.    That's what you testified about earlier?

2  A.    Yes.

3  Q.    Other than that comment to Ms. Hamilton,

4  you're not aware of any other statements of Ms.

5  Smolinski?

6  A.    Not to me directly, no.

7  Q.    And I'm asking a broader question.  Other

8  than what Ms. Hamilton has told you, have you

9  heard that Ms. Smolinski's made any other comments

10 about your age or about your vision?

11 A.    No.  I did not hear that she had to any

12 other person.

13 Q.    Who did you work for prior to Dale Medical

14 Center?

15 A.    GAMBRO Healthcare.

16 Q.    Where is that located?

17 A.    It's located in Dothan.  It's no longer

18 GAMBRO.

19 Q.    What is it now?

20 A.    They were bought by another dialysis company

21 called DaVita.  And I don't know what they're

22 called now.

23 Q.    That was a dialysis center?

FOSHEE & TURNER COURT REPORTERS

Page 72

1    A.    No.

2    Q.    Did they raise any issues concerning your

3    documentation while you worked for SpectraCare?

4    A.    No.

5              (Defendant's Exhibit No. 14 was

6              marked for identification and a

7              copy of the same is attached

8              hereto.)

9    Q.    Ms. Kahn, let me show you what I've marked

10   for purposes of identification as Defendant's

11   Exhibit No. 14 to your deposition.

12        Do you recognize Defendant's Exhibit 14 as a

13   memo you received while you were working at

14   SpectraCare?

15   A.    I do not remember it, but I recognize that

16   my signature is on it and that it's addressed to

17   me.

18   Q.    Does this refresh your recollection that,

19   while you were working at SpectraCare, your

20   employer raised issues concerning the

21   documentation?

22   A.    Yes.

23   Q.    Okay.  Why did you leave the job at

Page 76

1    Q.    Okay.  So your prescription has stayed the

2    same since just prior to you going to work for

3    Dale Medical Center?

4    A.    Yes.

5    Q.    Did you have any discussions with Ms.

6    Simmons about the need for conducting separate

7    therapy sessions for the low and the high

8    functioning patients?

9    A.    Yes.

10    Q.    Tell me about those discussions.

11    A.    It was suggested/recommended that I separate

12    the two groups of people by their level of

13    functioning.

14         Often there were not enough people to

15    conduct a group.  In order to do a group, there

16    has to be more than one person in the group or

17    it's not considered a group.

18         And often we had patients that were not of

19    the same cognitive level.  They weren't all of the

20    same cognitive level.

21         It was my experience, when I included the

22    lower functioning people in the general group,

23    that they responded to that level of -- they

FOSHEE & TURNER COURT REPORTERS

Page 77

1    responded.  They got something -- it appeared they

2    got something out of being in the general group of

3    people.

4         So while it was suggested I do that, I

5    disagreed because I felt it was beneficial to the

6    patients that they be all together.

7    Q.    Did you tell Ms. Simmons you disagreed with

8    her?

9    A.    Yes, I did.

10   Q.    Did you tell her you were going to continue

11   to do it the way you thought best?

12   A.    Yes.

13   Q.    How did she respond?

14   A.    Noncommittal.

15   Q.    Can you describe for me generally what you

16   do in a group therapy session?

17   A.    Okay.  The patients, the group of people,

18   are presented with a topic for discussion that is

19   of a therapeutic nature.  It is either talking

20   about self-esteem or ability to function or

21   feelings that are associated with their mental

22   health condition.  Sometimes it's reminiscent,

23   especially working with the elderly.

**FOSHEE & TURNER COURT REPORTERS**

Page 78

1      Now that I'm working with kids, it's a

2  different type of scenario.

3      And the purpose is to engage everybody in

4  the conversation and to enable everyone to engage

5  with one another.

6      It's of a therapeutic nature.  It's either

7  instructional for them or in some way hopeful it's

8  going to benefit the individuals in the group

9  session.

10      I don't know what else to tell you.

11  Q.    Okay.  And I think you said these were done

12  on a daily basis?

13  A.    Yes.

14  Q.    And all the patients in the unit who were

15  able to, participated every day?

16  A.    Yes.  Unless they were off the unit for

17  another reason, like a medical procedure or

18  something.  But, yes, they were there.

19  Q.    Were you the only person who conducted group

20  therapy?

21  A.    Yes.  Except, in my absence, Mr. Smolinski

22  did.

23  Q.    When you were absent for a day?

Page 79

1    A.    Or on vacation.

2    Q.    And these sessions would last an hour?

3    A.    Yes.

4    Q.    Was that a fairly standard time or, I mean,

5    would it vary depending on what folks were talking

6    about?

7    A.    Yes, it was a fairly standard time.  In

8    therapeutic terms, 50 minutes is considered an

9    hour.  But it depended on the interaction of the

10   folks and how engaged they were.  And it could

11   last longer.

12   Q.    If folks were very engaged in meaningful

13   dialogue, you would let it keep going?

14   A.    Yes, yes.

15   Q.    Did you complain to anybody at Dale Medical

16   Center that you thought you were being

17   discriminated against either because of your age

18   or your disability?

19   A.    I wasn't aware I was being discriminated

20   against.

21   Q.    So I take it that the answer then would be

22   no, you didn't complain to anybody?

23   A.    Yes.

Page 80

1              (An off-the-record discussion

2              was held.)

3              (Defendant's Exhibit No. 15 was

4              marked for identification and a

5              copy of the same is attached

6              hereto.)

7     (BY MR. VREELAND)

8     Q.    I'm going to show you what I've marked for

9     purposes of identification as Defendant's Exhibit

10    15 to your deposition.

11          Do you recognize that as your Charge of

12    Discrimination that you filed with the Equal

13    Employment Opportunity Commission?

14    A.    Yes.

15    Q.    I don't want to ask you to repeat anything

16    you've already told me, but have you now testified

17    to all the facts you're aware of that support your

18    claims of discrimination?

19    A.    Yes.

20    Q.    Are you currently employed?

21    A.    Yes.

22    Q.    Where are you working?

23    A.    I work for Laurel Oaks Behavioral Center in

**FOSHEE & TURNER COURT REPORTERS**

Page 81

1    Dothan.

2    Q.    How long have you worked for Laurel Oaks?

3    A.    I started working for them on the 23rd of

4    March, '05.

5    Q.    What is your position with Laurel Oaks?

6    A.    Therapist.

7    Q.    Have you had the same position the entire

8    time you've been with them?

9    A.    Yes.

10    Q.    And how are you paid?

11    A.    By the hour.

12    Q.    How much are you making per hour?

13    A.    $18 an hour.

14    Q.    How many hours a week are you currently

15    working?

16    A.    24 to 28.

17    Q.    Has that been the same throughout your

18    employment with Laurel Oaks?

19    A.    The first month, I was there 40 hours a

20    week; but I was moved from one unit to another,

21    and my hours were decreased.

22    Q.    Do you know why you were moved from one unit

23    to another?

FOSHEE & TURNER COURT REPORTERS

Page 82

1  A.    I was not able to keep up the pace of the

2  acute unit.

3  Q.    In what sense were you not able to keep up

4  the pace?

5  A.    I was not able to keep abreast of the

6  paperwork.

7  Q.    Is that a conclusion that someone at Laurel

8  Oaks told you or you came to on your own?

9  A.    It was a conclusion that my supervisor told

10 me.

11 Q.    Who is your supervisor, or was your

12 supervisor?

13 A.    It's still the same supervisor.  Mary Clark

14 Earnest.

15 Q.    Did you disagree with Ms. Earnest's

16 assessment?

17 A.    No.  I agreed with her.

18 Q.    Have you requested any accommodations from

19 Laurel Oaks for your vision?

20 A.    None have been necessary.

21 Q.    Do you believe that your vision limitations

22 were what kept you from keeping up the pace of the

23 paperwork at Laurel Oaks?

FOSHEE & TURNER COURT REPORTERS

Page 83

1   A.    My vision didn't have anything to do with

2   it.

3   Q.    What unit are you working on now that you're

4   off the acute unit?

5   A.    The preadolescent residential unit.

6   Q.    Are you able to keep up with the paperwork

7   on that unit?

8   A.    Yes.

9   Q.    Let me go back to SpectraCare.  Did you

10  request any accommodations from SpectraCare while

11  you were working there?

12  A.    An accommodation was made for me that I

13  dictate my -- I can't think of what it was called.

14  It was a general summary of the intake.  And a

15  secretary typed it from my dictated form, rather

16  than me hand write it or type it on the computer,

17  because I made numerous computer errors.  It was

18  not a Word processor.

19        So the accommodation was made that I would

20  dictate the information and it would be typed.

21  Q.    Was that an accommodation before or after

22  you received the memo about your documentation?

23  A.    That was before.

Page 84

1    Q.    Which is Defendant's Exhibit 14?

2            MR. SMITH:   Which was before?

3    Q.    The accommodation was before?

4    A.    The accommodation was before.

5    Q.    Did you ever ask anybody at Dale Medical

6    Center about the possibility of being allowed to

7    dictate?

8    A.    No.

9    Q.    Is Laurel Oaks the first job you took after

10   Dale Medical Center?

11   A.    Yes.

12   Q.    Did you turn down any jobs or --

13   A.    No.  I was not offered any.  I would not

14   have turned down a job that was offered to me.

15   Q.    Do you have insurance through Laurel Oaks?

16   A.    No.

17   Q.    Are you covered under any healthcare

18   insurance?

19   A.    My husband's military benefits.

20   Q.    What were you making salary or hourly at

21   Dale Medical Center?

22   A.    It was more than $18 an hour; but it was

23   salary, so it didn't matter how many hours I

1                    C E R T I F I C A T E

2   STATE OF ALABAMA      )

3   COUNTY OF JEFFERSON )

4

5                    I hereby certify that the

6   above and foregoing proceeding was taken

7   down by me by stenographic means, and that

8   the content herein was produced in

9   transcript form by computer aid under my

10  supervision, and that the foregoing

11  represents, to the best of my ability, a

12  true and correct transcript of the

13  proceedings occurring on said date at said

14  time.

15                   I further certify that I am

16  neither of counsel nor of kin to the

17  parties to the action; nor am I in anywise

18  interested in the result of said case.

19

20

21   _____

22        Court Reporter and Commissioner

23

# EXHIBIT 6

Job Description /Performance Appraisal –
Social Worker New Day Senior Health



**DEFENDANT'S EXHIBIT**

# DALE MEDICAL CENTER
## JOB DESCRIPTION/PERFORMANCE APPRAISAL

POSITION TITLE: **SOCIAL WORKER**      DEPARTMENT: **NEW DAY SENIOR HEALTH**

EMPLOYEE'S NAME: _____      _____ **REVIEW PERIOD**: _____

FLSA STATUS: EXEMPT

**1.      POSITION SUMMARY:**
The Social Worker is responsible for providing quality patient care, displaying advanced skills in social
assessments, treatment planning and discharge planning. The social worker will lead Primary Treatment
Modalities, Group, Family and Individual Therapies. As a multidisciplinary team member, he/she is
expected to participate in community outreach programs, host-facility relationships and education.

**2.      POSITION EDUCATION/QUALIFICATIONS:**
Masters degree in social work from an accredited university preferred.

**3.      JOB KNOWLEDGE/EXPERIENCE:**
Licensed and registered to practice social work in the State of Alabama. Proficient written and
communication skills. Clinical specialty preferred.

**4.      LINES OF RESPONSIBILITY:**

ADMINISTRATOR/CEO, CNO, DIRECTOR, NURSE MANAGER

**5.      AMERICAN'S WITH DISABILITIES ACT (ADA)**

   A.   **Essential Duties:**  Indicated by bold print within performance standards, preceding
        individual numbered criteria.

   B.   **Physical Requirements:**  The position requires a considerable amount of physical work not
        to exceed 50 pounds. Any work exceeding 50 pounds will require assistance. The individual
        will be required to pull up or reposition patients in bed, lift supplies, place equipment on
        supports, push beds throughout the hospital, and perform external cardiac compressions. The
        individual must be able to bend over to perform certain duties, e.g., check chest tubes,
        drainage, check urinary output etc. The individual must be also able to maneuver throughout
        the halls, stairways, and patient rooms in response to hospital emergencies. Interpretation of
        environmental input requires visual and auditory skills. In the event there is a need to
        evacuate the building, heavy lifting will be required to carry patients to safety. A significant
        amount of writing is required. Trips to various departments may be required.

   C.   **Working Conditions:**  The individual spends over 95% of his/her time in an air-conditioned
        environment with varying exposure to noise. There is a protection from weather conditions
        but not necessarily from temperature changes. The position does have a heavy exposure to
        malodorous, infectious body fluids from patients and some minimal exposure to noxious
        smells from cleaning agents. Possible exposure to second hand smoke if requested to
        escort/supervise patients in a designated area. Also, working with patients who have potential
        for angry, violent, or combative behavior.

   D.   **Personal Protective Equipment (PPE):**

Dale Medical Center/Hawkins - CONFIDENTIAL Documents Produced by Defendant                D00027

Job Description /Performance Appraisal –
Social Worker New Day Senior Health

This position requires high exposure to infectious wastes such as blood and body fluids that mandate the wearing of gloves, masks, gowns, and goggles for every actual or potential exposure. Back belts will be worn for all excessive physical duties.

E.   Aptitudes:   HIGH  1   2   3   4   5   6   LOW

**Intelligence**: General learning ability: The ability to "catch on" or understand instructions and underlying principles. Ability to reason and make judgments.  1
**Verbal**: Ability to understand meanings of words and ideas associated with them, and to use them effectively. To comprehend language, to understand relationships between words, and to understand meanings of whole sentences and paragraphs. To present information or ideas clearly.        1
**Numerical**: Ability to perform arithmetic operations quickly and accurately.        2
**Spatial**: Ability to comprehend forms in space and understand relationships of plane and solid objects. Frequently described as the ability to "visualize" objects or two or three dimensions, or shadings of figures and widths and lengths of lines.        3
**Form Perception**: Ability to perceive pertinent details and objects or in pictorial or graphic material. To make visual comparisons and discriminations and see slight differences in shapes and shadings of figures and widths and length of lines.        1
**Clerical Perception**: Ability to receive pertinent details and verbal or tabular material. To observe differences in copy, to proofread words and numbers and to avoid perceptual errors in arithmetic computation.        1
**Motor Coordination**: Ability to coordinate eyes and hands to fingers rapidly and accurately in making precise movements with speed. Ability to make a movement response accurately and quickly.  1
**Finger Dexterity**: Ability to move fingers easily and skillfully. To work with hands in placing and turning motions.        1
**Manual Dexterity**: Ability to move hands easily and skillfully. To work with hands in placing and turning motions.        1
**Eye-Hand Coordination**: Ability to move the hand and foot coordinately with each other in accordance with visual stimuli.        2
**Color Discrimination**: Ability to perceive and respond to similarities or differences in colors, or to recognize harmonious or contrasting color combinations, or to match color accurately.  3

6.   **DEFINITIONS OF PERFORMANCE RATINGS:**

   E.   **Individual criteria**: Meets the standard of performance 95%-100% of the time.
      **Overall performance appraisal**: Clearly and consistently produces outstanding work results that far exceed performance standards and job requirements. Demonstrates exceptional initiative, dependability and effort. Demonstrates diligence in continuously seeking quality and achievements. Overall score between 1.50 and 2.00.
   M.   **Individual criteria**: Meets the standard of performance 80%-94% of the time.
      **Overall performance appraisal**: Capably and consistently produces work results that meet all performance standards and job requirements of the position. Commendable effort. Overall score between 1.00 and 1.49.
   D.   **Individual criteria**: Meets the standard of performance less than 80% of the time.  **Overall performance appraisal**: Performance is not acceptable and falls below standards or expectations for the position. Plan of professional development with corrective action for improvement is required within a short period of time to continue in the position, not to exceed 90 days. Immediate reassignment may be indicated based on specific circumstances. Overall score less than or equal to 0.99.

Dale Medical Center/Hawkins - CONFIDENTIAL Documents Produced by Defendant        D00028

Job Description /Performance Appraisal
Social Worker New Day Senior Health

### POSITION RESPONSIBILITIES:

1. Complete an age specific psychosocial evaluation on assigned patients
   in a timely manner.                                                          [E] [M] [D]

2. Conduct Group, Individual, and Family Therapy sessions focusing on
   the primary issues of the patient.                                          [E] [M] [D]

3. Engages in timely, efficient discharge planning, assuring the transition
   of patients to the appropriate level of care as determined by the patient's
   needs.                                                                       [E] [M] [D]

4. Attends and participates in multidisciplinary treatment staffing and in
   the development and revision of treatment plans.                            [E] [M] [D]

5. Assist in the orientation of new patients to the program.                   [E] [M] [D]

6. Provide for patient comfort, safety, respect, and confidentiality.          [E] [M] [D]

7. Completes documentation requirements in a timely manner in
   accordance with program standards.                                          [E] [M] [D]

8. Conducts/coordinates pre-admission screenings as assigned.                  [E] [M] [D]

### PROFESSIONAL RESPONSIBILITIES:

1. Maintains competencies as required by program standards and
   credentialing organizations.                                                [E] [M] [D]

2. Establish and maintain a cooperative, professional relationship
   with the host facility personnel and external agencies.                     [E] [M] [D]

3. Provides educational in-services to the para-professional staff,
   families and community as requested.                                        [E] [M] [D]

4. Operates as a liaison between patients, families, and other healthcare
   providers.                                                                  [E] [M] [D]

5. Follows the policies and procedures of the program.                         [E] [M] [D]

6. Adheres to billing requirements to ensure appropriate reimbursement.        [E] [M] [D]

7. Participates in the conversion of program inquiries into assessments
   or admissions.                                                              [E] [M] [D]

**Demonstrates ability to adapt to varied age-specific patient populations. (To be completed for all
employees in departments having patient and/or customer contact; checking N/A box indicates
employees does not care for patients in that particular age group).**

                                                                        N/A

1. Neonate ( 28 days)/Infant (28 days to 18 months):
   a. Assists parent(s)/guardian to identify and meet infant's needs.          [E] [M] [D]
   b. Involves parents in procedure(s), if possible.                           [E] [M] [D]
   c. Explains procedure(s) to parent guardian prior to
      initiation.                                                              [E] [M] [D]
   d. Uses accessories/equipment appropriate for infant's size

DMC Nursing Services

**Dale Medical Center/Hawkins - CONFIDENTIAL Documents Produced by Defendant**                     **D00029**

Job Description /Performance Appraisal –
Social Worker New Day Senior Health

|  |  |  |
|---|---|---|
|  | and mobility. | [E] [M] [D] |
| e. | Does not leave infant unattended. | [E] [M] [D] |
| f. | Permits infant to be held, if possible. | [E] [M] [D] |
| g. | Always places infant back in isolette/crib and ensures safety rails are in place or places infant in safe environment. | [E] [M] [D] |
| 2. | Toddler (1 ½ to 3 years) | N/A |
| a. | Explains actions prior to initiating. | [E] [M] [D] |
| b. | Demonstrates equipment prior to utilization. | [E] [M] [D] |
| c. | Involves parent(s)/guardian in procedure and education of procedure. | [E] [M] [D] |
| d. | Uses appropriate distraction techniques. | [E] [M] [D] |
| e. | Gives child one directive at a time. | [E] [M] [D] |
| f. | Speaks at eye level with child; maintains eye contact. | [E] [M] [D] |
| g. | Speaks in a calm, clear slow voice in language that the child may understand. | [E] [M] [D] |
| h. | Provides for a safe environment by removing any unnecessary equipment; does not leave child unattended. | [E] [M] [D] |
| i. | Utilizes equipment specific to age and size of child. | [E] [M] [D] |
| j. | Encourages the use of comfort objects such as blankets and stuffed toys. | [E] [M] [D] |
| k. | Tells the child when the assessment/procedure is completed. | [E] [M] [D] |
| l. | Provides opportunities for social activity play. | [E] [M] [D] |
| 3. | Preschool-Age Child (3-6 years): | N/A |
| a. | Permits parent(s)/guardian to remain close to the child. | [E] [M] [D] |
| b. | Explains procedure(s) to parent(s)/guardian prior to initiating. | [E] [M] [D] |
| c. | Permits the child to handle the equipment. Uses demonstration techniques. | [E] [M] [D] |
| d. | Explains procedures to child in language that the child may understand. | [E] [M] [D] |
| e. | Exposes the child minimally. | [E] [M] [D] |
| f. | Utilizes games to gain cooperation. | [E] [M] [D] |
| g. | Does not leave child unattended. | [E] [M] [D] |
| h. | Utilizes equipment specific to age and size of child. | [E] [M] [D] |
| i. | Provides opportunities for social activity play. | [E] [M] [D] |
| 4. | School-Age Child (6-12 years): | N/A |
| a. | Educates parent(s)/guardian prior to examination/ procedure(s). | [E] [M] [D] |
| b. | Explains procedure(s) to patient using correct terminology. | [E] [M] [D] |
| c. | Permits questions and answers prior to examination | [E] [M] [D] |
| d. | Gives the child the choice as to whether the parent(s)/ guardian is present, if appropriate for the situation. | [E] [M] [D] |
| e. | Does not leave child unattended. | [E] [M] [D] |
| f. | Plans procedure(s) in advance to minimize waiting time. | [E] [M] [D] |
| g. | Permits the child to exercise some control. | [E] [M] [D] |
| h. | Provides for privacy/modesty when possible. | [E] [M] [D] |
| i. | Provides for safe environment by removing unnecessary equipment. | [E] [M] [D] |
| j. | Utilizes equipment specific to size and mobility of child. | [E] [M] [D] |
| 5. | Adolescent (12 to 18 years): | N/A |
| a. | Explains procedure(s) uses correct terminology. | [E] [M] [D] |
| b. | Gives the patient the choice as to whether the parent /guardian is present if appropriate for the situation. | [E] [M] [D] |
| c. | Includes the parent(s)/guardian in education. | [E] [M] [D] |
| d. | Explains the purpose of equipment and assessments procedure(s). | [E] [M] [D] |

DMC Nursing Services

4

Job Description /Performance Appraisal –
Social Worker New Day Senior Health

|  |  |  |
|---|---|---|
| e. | Involves the patient in decision making and planning. | [E] [M] [D] |
| f. | Alleviates any fears by addressing all questions. | [E] [M] [D] |
| g. | Maintains privacy. | [E] [M] [D] |
| h. | Plans for a safe/comfortable environment. | [E] [M] [D] |
| i. | Utilizes equipment appropriate for the size/mobility of the patient. | [E] [M] [D] |
| j. | Stays within sight of the patient whenever possible. | [E] [M] [D] |
| k. | Addresses the patient by name. | [E] [M] [D] |
| l. | Does not make patient feel like you are treating them as a child. | [E] [M] [D] |

6. Adult (18 to 65 years)  N/A
| a. | Provides education regarding procedure(s) to patient and/or significant other. | [E] [M] [D] |
| b. | Explains information using correct understandable terminology. | [E] [M] [D] |
| c. | Explains equipment that is utilized. | [E] [M] [D] |
| d. | Addresses the patient using their last name. | [E] [M] [D] |
| e. | Involves the patient in procedure and individual Variances. | [E] [M] [D] |
| f. | Maintains privacy. | [E] [M] [D] |
| g. | Explains time sequencing and individual variances. | [E] [M] [D] |
| h. | Remains in sight of the patient whenever possible. | [E] [M] [D] |

7. Geriatric (>65 years):  N/A
| a. | Provides education regarding procedure(s). | [E] [M] [D] |
| b. | Addresses the patient using their last name. | [E] [M] [D] |
| c. | Speaks distinctly and does not raise their voice unless the patient is hard of hearing. | [E] [M] [D] |
| d. | Provides adequate lighting. | [E] [M] [D] |
| e. | Slows down pace if necessary. | [E] [M] [D] |
| f. | Ensures patient warmth due to increase heat regulation. | [E] [M] [D] |
| g. | Permits patient to dictate mobility. | [E] [M] [D] |
| h. | Maintains privacy. | [E] [M] [D] |
| i. | Interacts frequently with patient. | [E] [M] [D] |

**Demonstrates maturity and accountability for job performance. Supports the philosophy, objectives and goals of the Department(s) and assesses areas of personal and professional skills**

| 1. | Maintains an effective rapport with patients, visitors, physicians, subordinates and other directors. | [E] [M] [D] |
| 2. | Works collaboratively with other staff members to provide continuous service to the organization. | [E] [M] [D] |
| 3. | Demonstrates good judgment and analytical ability in preparing work for review. | [E] [M] [D] |
| 4. | Promotes confidentiality and uses complete discretion when discussing information. | [E] [M] [D] |
| 5. | Maintains calm and effective behavior during stressful situations. | [E] [M] [D] |
| 6. | Inspires confidence from callers, visitors, co-workers by remaining well informed and prepared at all times. | [E] [M] [D] |
| 7. | Establishes good rapport and cooperative working relationships with personnel in the organization. | [E] [M] [D] |
| 8. | Appears well groomed and observes established dress guidelines, visibly wearing the photo/name identification badge. | [E] [M] [D] |
| 8. | Demonstrates ability to express self in all areas of communication (verbal, written, non-verbal). | [E] [M] [D] |
| 10. | Attentive to detail, record-keeping and required paperwork inherent to the position. | [E] [M] [D] |

**Dale Medical Center/Hawkins - CONFIDENTIAL Documents Produced by Defendant**          **D00031**

Job Description /Performance Appraisal
Social Worker New Day Senior Health

11.  Demonstrates knowledge of current computer systems used
     in the organization.                                        [E] [M] [D]
12.  Demonstrates effective delegation skills.                   [E] [M] [D]
13.  Completes assignments accurately and on time.               [E] [M] [D]
14.  Willingly accepts assignments to special projects.          [E] [M] [D]
15.  Adheres to identified work schedule; notifies the Chief
     Nursing Officer of needed changes in schedule.              [E] [M] [D]
16.  Is punctual in attendance to meetings.                      [E] [M] [D]
17.  Adjusts personal schedule to complete assignments.          [E] [M] [D]
18.  Maintains assigned equipment, reports malfunctions
     and orders services as necessary.                           [E] [M] [D]
19.  Responsible for charging of supplies utilized.              [E] [M] [D]
20.  Participates in continuing education programs and
     utilizes the information in area(s) of practice as evidenced
     by attendance records or certificates.                      [E] [M] [D]
21.  Participates in 75% of staff meetings as evidenced by
     attendance records.                                         [E] [M] [D]
22.  Participates in performance improvement activities,
     including data collection, development of indicators,
     and evaluation criteria.                                    [E] [M] [D]
23.  Floats to other areas as assigned; responds to floating
     requests with a positive attitude.                          [E] [M] [D]
24.  Provides proper notification for absence as per hospital
     policy as evidenced by time and attendance records.         [E] [M] [D]
25.  Evaluates and updates CPSI programs as needed.              [E] [M] [D]
Total absences in 12 months    (Pro-rate for less than 12 months).
     E - 0-2,  M - 3-5,  D - 6

**Supports and promotes excellence in customer/guest relations**
1.   Assist all patients, family members/significant others,
     physicians, visitors, and employees in a friendly manner.   [E] [M] [D]
2.   Introduces self and uses caring, thoughtful words either in
     person or on the telephone.                                 [E] [M] [D]
3.   Demonstrates ethical and appropriate behavior for a
     clinical environment to include but not limited to,
     dignity, patient's rights and privacy, and the maintenance
     of confidentiality of patient information.                  [E] [M] [D]
4.   Demonstrates caring. If unable to assist an individual in
     needs, offers to find someone who can.                      [E] [M] [D]
5.   Demonstrates proper telephone etiquette. If transferring
     a telephone call, announces the caller and briefly explains
     the situation before ending the transfer.                   [E] [M] [D]
6.   Always makes eye contact when speaking with patients,
     family members/significant others, visitors, employees,
     etc.                                                        [E] [M] [D]
7.   Knocks before entering a room or office.                    [E] [M] [D]
8.   Address all individuals courteously.                        [E] [M] [D]
9.   Keeps voice down; does not shout or use improper
     language.                                                    [E] [M] [D]
10.  Responds to all inquiries promptly and courteously          [E] [M] [D]
11.  Works together in the spirit of teamwork.                   [E] [M] [D]
12.  Shares information so that the people who need to be
     aware of the facts are informed.                            [E] [M] [D]

**Supports and promotes the organization's Infection Control Program.**
1.   Demonstrates adherence to infection control policies as
     evidenced by in-service attendance records and employee

Dale Medical Center/Hawkins - CONFIDENTIAL Documents Produced by Defendant

Job Description /Performance Appraisal ·
Social Worker New Day Senior Health

| | | |
|---|---|---|
| practices. | | [E] [M] [D] |
| 2. Demonstrates correct hand-washing techniques. | | [E] [M] [D] |
| 3. Demonstrates knowledge of appropriate personal protective equipment (PPE). | | [E] [M] [D] |
| 4. Notifies the Infection Control Practitioner of real or potential exposures. | | [E] [M] [D] |
| 5. Demonstrates knowledge of OSHA regulations: | | |
| a. Complies with OSHA regulations regarding blood-Borne Pathogens Exposure Control Plan. | | [E] [M] [D] |
| b. Complies with OSHA regulations regarding TB Exposure Control Plan. | | [E] [M] [D] |
| 6. Demonstrates knowledge of the organization's Hazardous Waste Management Plan: | | |
| a. Appropriately segregates waste at the point of origin. | | [E] [M] [D] |
| b. Discards waste in appropriate bags, receptacles, etc. | | [E] [M] [D] |

**Supports and promotes the organization's Safety Program.**

| | | |
|---|---|---|
| 1. Demonstrates adherence to safety policies as evidenced by in-service attendance records and employee practices. | | [E] [M] [D] |
| 2. Maintains a clean and safe environment for patients and co-workers. | | [E] [M] [D] |
| 3. Demonstrates an understanding of fire drills, internal/external disaster plans and procedures, and evacuating procedures as evidenced by in-service records and participation in drills. | | [E] [M] [D] |
| 4. Demonstrates knowledge of Safety Committee activities. | | [E] [M] [D] |
| 5. Maintains confidentiality of employees and patients. | | [E] [M] [D] |

**Supports and promotes the organization's Risk Management program**

| | | |
|---|---|---|
| 1. Demonstrates adherence to risk management policies as evidenced by in-service attendance records and employee practices. | | [E] [M] [D] |
| 2. Submits occurrence reports according to hospital policy. | | [E] [M] [D] |
| 3. Notifies the Risk Manager of occurrence involving injury or having the potential for injury. | | [E] [M] [D] |
| 4. Maintains confidentiality regarding knowledge of adverse occurrences. | | [E] [M] [D] |

General Comments: _____

_____

_____

_____

_____

_____

_____

_____

Employee Comments: _____

_____

_____

_____

_____

_____

_____

DMC Nursing Services

**Dale Medical Center/Hawkins - CONFIDENTIAL Documents Produced by Defendant**                    **D00033**

Job Description /Performance Appraisal
Social Worker New Day Senior Health

Expectations:                                                    Deadline:

_____

Number of criteria meeting the standard of
Performance less than 80% of the time.          (D) _____ X 0 _____

Number of criteria meeting the standard of
Perfornance less than 80 - 94% of the time.     (M) _____ X 1 _____

Number of criteria meeting the standard of
Performance 95% -100% of the time.              (E) _____ X 2 = _____

                                                Totals _____  _____
                                                        (A)        (B)

                                                Total Score: _____
                                                            (B  A)

Recommended Action:

[ ] Merit increase  [ ] End Probation (No increase)   Date: _____
[ ] Probation - Date: _____            [ ] Termination - Date: _____
[ ] Other: _____
I have read and reviewed my performance appraisal with my supervisor.

Employee Signature: _____  Date: _____

Reviewer Signature: _____  Date: _____

Chief Nursing Officer Signature: _____  Date: _____

Chief Executive Officer Signature: _____  Date: _____

Human Resources Signature: _____  Date: _____

**NEW EMPLOYEES ONLY:**

I have read and reviewed my job description/performance appraisal with my supervisor or designee
and I understand the job I am expected to perform.

DMC Nursing Services

8

# EXHIBIT 7

**New Day Senior Health**

# Memo



**DEFENDANT'S EXHIBIT**

*7 Hawkins*

**To:**   Nancy Hawkins

**From:**   Sandra Fitzgerald

**CC:**

**Date:**   08/25/03

**Re: Due Reports**

---

The following Zung & GDS need to be turned into Lorie Ingram ASAP.

8/8 Brown, Queen - Admit

8/12 Cade, Jean - Admit   *pt. discharged - will require change to pt. bill*

8/14 Walton, Mildred – Admit

8/15 McKinney, Robbie – Admit

8/21 Golden, Lois – Admit


*Sandra Fitzgerald*
Sandra Fitzgerald, Program Director

● Page 1

# Exhibit 8

*Nancy,*
*These assessments must*
*be completed and filed in the*
*charts immed.*
*In the future, please have in chart no later than*
*3rd day of admission.*

**New Day Senior Health**

*Thanks,*
*Sandra*

# Memo

**To:** Nancy Hawkins

**From:** Sandra Fitzgerald

**CC:** Psychosocial Assessment Reports ~~Due~~ *Delinquent*

**Date:** September 12, 2003

**Re:** Due Reports



DEFENDANT'S EXHIBIT
*8 Hawkins*

| Discharge Dates | Name | MR # |
|---|---|---|
| 1. 06/04/03 | Love, Janie | 82778 |
| 2. 06/13/03 | Henderson, Hazel | 83058 |
| 3. 06/20/03 | Jones, Hattie | 01461 |
| 4. 07/09/03 | Crowder, Patroma | 83538 |
| 5. 07/10/03 | Beckworth, Myrain | 83618 |
| 6. 07/15/03 | Hoxie, Mary | 83668 |
| 7. 07/22/03 | Beasley, Jewel | 83729 |
| 8. 07/24/03 | Williams, Dorothy | 83354 |
| 9. 07/31/03 | Thomas, Helen | 06544 |
| 10. 08/01/03 | Moye, Carol | 50552 |
| 11. 08/08/03 | Williams, Essie | 24033 |
| 12. 08/21/03 | Condrey, Cecil | 84074 |
| 13. 08/21/03 | Mauldin, Frances | 44558 |
| 14 08/22/03 | Cade, Jean | 83125 |
| 15. 08/22/03 | Kimbrough, James | 84150 |

● Page 1

| 16. | 08/22/03 | Willis, Anne | 76707 | |
| 17. | 08/25/03 | Johns, Jessie | 83818 | ? update |
| 18. | 08/26/03 | Brown, Queen | 84063 | |
| 19. | 08/28/03 | McKinney, Robbie | 84186 | |
| 20. | 09/04/03 | Eason, Patricia | 82342 | |
| 21. | 09/04/03 | Walton, Mildred | 83561 | ? update |

Sandra Fitzgerald, Program Director



● Page 2

# EXHIBIT 9



**DEFENDANT'S EXHIBIT**

**New Day Senior Health**

# Memo

*done 11/7/03*

**To: Nancy Hawkins**

**From:** Sandra Fitzgerald

**CC:** Past due Psychosocial Assessment Reports

**Date: October 7, 2003**

**Re: Past Due Reports**

| **Discharge Dates** | **Name** | **MR#** |
|---|---|---|
| 1. 06/13/03 | Henderson, Hazel | 83058 |
| 2. 06/20/03 | Jones, Hattie | 01461 |
| 3. 07/15/03 | Hoxie, Mary | 83668 |
| 4. 07/22/03 | Beasley, Jewel | 83729 |
| 5. 07/31/03 | Thomas, Helen | 06544 |
| 6. 08/01/03 | Moye, Carol | 50552 |
| 7. 08/08/03 | Williams, Essie | 24033 |
| 8. 08/21/03 | Condrey, Cecil | 84074 |
| 9. 08/21/03 | Mauldin, Frances | 44558 |
| 10. 06/06/03 & 08/22/03 | Cribb, Jean | 83125 |
| 11. 08/22/03 | Kimbrough, James | 84150 |
| 12. 08/22/03 | Willis, Anne | 76707 |
| 13. 08/25/03 | Johns, Jessie | 83818 ? update |
| 14. 08/26/03 | Brown, Queen | 84063 |
| 15. 09/28/03 | McKinney, Robbie | 84186 |

● Page 1

Dale Medical Center/Hawkins - CONFIDENTIAL Documents Produced by Defendant

| | | |
|---|---|---|
| 16. 07/03/03 & 09/04/03 | Walton, Mildred | 83561 |
| 17. 09/02/03 | Golden, Lois | 84278 |
| 18. 07/29/03 | Starling, Martin | 83833 |
| 19. 07/21/03 | Watson, Elizabeth | 83763 |
| 20. 07/23/03 | Tindol, Earline | 83759 |
| 21. 07/17/03 | Stephenson, Olean | 83670 |
| 22. 07/18/03 | Lewis, Myrtle | 83651 |
| 23. 07/25/03 | Fannin, William | 83578 |
| 24. 07/03/03 | Colon, Verdell | 83309 |
| 25. 07/02/03 | Mercer, Vannie | 83236 |
| 26. 07/24/03 | Shiver, Pete | 83202 |
| 27. 06/11/03 | Rogers, Melva | 83093 |
| 28. 06/05/03 | Campbell, Estelle | 83017 |
| 29. 05/29/03 | Henderson, Martha | 82905 |
| 30. 05/15/03 | Woodson, Delores | 82591 |
| 31. 04/04/03 | Clark, Willie | 82092 |
| 32. 04/25/03 | Walker, Louise | 82076 |
| 33. 06/18/03 | Rainey, Martha | 80057 |
| 34. 06/05/03 | McCarter, James | 67976 |
| 35. 06/11/03 | McDougald, Mary | 57620 |
| 36. 08/01/03 | Matthews, Benjamin | 29699 |
| 37. 08/15/03 | Banks, Flora | 26481 |
| 38. 08/08/03 | Barnett, Jessie | 25728 |
| 39. 07/24/03 | Smith, Maudie | 24296 |
| 40. 07/14/03 | Ruggiero, Dorothy | 22625 ? update |
| 41. 07/22/03 | Vesters, Shirley | 12476 |
| 42. 07/31/03 | Thomas, Helen | 06544 |
| 43. 03/02/03 | Lewis, Johnnie | 81594 |

Dale Medical Center/Hawkins - CONFIDENTIAL Documents Produced by Defendant

D00019

44. 03/01/03                      Creel, Frances                81606

● Page 3

# EXHIBIT 10



# SOCIAL WORKER ACTION PLAN

| DEFICIENCY | CORRECTIVE ACTION | TARGET DATE |
|---|---|---|
| DEFENSIVE ATTITUDE AND DIFFICULTY GETTING ALONG WITH OTHER STAFF MEMBERS. DIFFICULTY FUNCTIONING AS A TEAM MEMBER. | MAINTAIN PROFESSIONAL RELATIONSHIP WITH OTHER STAFF MEMBERS. FUNCTION AS A TEAM MEMBER. | 1/12/04 AND CONTINUING |
| LACK OF INVOLVEMENT IN TREATMENT PLANNING AND REVISION. | ASSIST NURSE TO WRITE PROBLEM STATEMENT AND LEAD TREATMENT PLAN REVISION TEAM. | 1/12/04 AND CONTINUING |
| INADEQUATE FAMILY CONTACT AND FAMILY THERAPY SESSIONS | FAMILY THERAPY SESSIONS TO BE PROVIDED AT LEAST ONCE WEEKLY PER DR ORDER | 1/12/04 AND CONTINUING |
| INADEQUATE INDIVIDUAL THERAPY SESSIONS | INDIVIDUAL THERAPY TO BE SCHEDULED WHEN PSYCHO-SOCIAL COMPLETED. | 1/12/04 AND CONTINUING |
| DISCHARGE PLANNING NOT DONE IN TIMELY MANNER | DISCHARGE PLANNING TO BE STARTED ON ADMISSION WITH TENTATIVE DISPOSITION PLANNED WITHIN ONE WEEK. | 1/12/04 AND CONTINUING |

NEW DAY PROGRAM DIRECTOR TO REASSESS LEVEL OF DEFICIENCIES
IN 60 DAYS – MARCH 12, 2004

EMPLOYEE SIGNATURE/DATE _____ 1/14/04
PROGRAM DIRECTOR SIGNATURE/DATE _____

# EXHIBIT 12



*12 Hawkins*

# SOCIAL WORKER ACTION PLAN

| DEFICIENCY | CORRECTIVE ACTION | TARGET DATE |
|---|---|---|
| CONTINUE TO RECEIVE C/O FROM STAFF THAT NANCY IS DIFFICULT TO APPROACH WITH QUESTIONS OR CONCERNS. CONTINUES TO HAVE DIFFICULTY FUNCTIONING AS A TEAM MEMBER | MAINTAIN PROFESSIONAL RELATIONSHIP W/ STAFF MEMBERS. FUNCTION AS A TEAM MEMBER. | 4/08/04 AND CONTINUING |
| LACK OF INVOLVEMENT IN TREATMENT PLANNING AND REVISION. | ASSIST NURSE TO WRITE PROBLEM STATEMENT AND LEAD TREATMENT PLAN REVISION TEAM. | 4/08/04 AND CONTINUING |
| INADEQUATE FAMILY CONTACT AND FAMILY THERAPY SESSIONS OR INADEQUATE DOCUMENTATION OF SUCH | FAMILY THERAPY SESSIONS TO BE PROVIDED AS OFTEN AS DECIDED BY TREATMENT TEAM AND DOCUMENTED PER POLICY | 4/08/04 AND CONTINUING |
| INADEQUATE INDIVIDUAL THERAPY SESSIONS OR INADEQUATE DOCUMENTATION OF SUCH | INDIVIDUAL THERAPY TO BE SCHEDULED AT FIRST TX. TEAM MEETING. TO BE PRO-VIDED AND DOCUMENTED PER POLICY. | 4/08/04 AND CONTINUING |
| DISCHARGE PLANNING CONTINUES TO BE DEFICIENT WITHOUT NOTED IMPROVE-MENT. | DISCHARGE PLANNING TO BE STARTED ON ADMISSION W/ TENTATIVE DC PLAN WITHIN 5 DAYS. ALL ACTIVITY MUST BE DOCUMENTED IN CHART | 4/08/04 AND CONTINUING |

NEW DAY NURSE MANAGER TO REASSESS LEVEL OF DEFICIENCIES
IN 30 DAYS – May 6, 2004

EMPLOYEE SIGNATURE/DATE *Jenn E Hawkins* *4/8/04*
NURSE MANAGER SIGNATURE/DATE *Jon RN 4/8/04*

# EXHIBIT 13

**New Day Senior Health**

# Memo



DEFENDANT'S EXHIBIT

13 *Hawkins*

**To: Nancy Hawkins**

**From:** Jennifer Simmons, RN

**CC:** Past due Psychosocial Assessment Reports

**Date: April 12, 2004**

**Re: Past Due Reports**

| Discharge Dates | Name | MR# |
|---|---|---|
| 1   04/02/2004 | Blankenship, Mary | 12887 |
| 2   04/05/2004 | Beverett, Betty | 84044 |
| 3   03/31/2004 | Searcy, WJ | 03368  U.D. |
| 4   04/02/2004 | Starling, Patricia | 87484 |
| 5   03/31/2004 | Harden, Opal | 87478 |
| 6   04/08/2004 | Segars, Lucinda | 87570 |
| 7   04/05/2004 | Powers, Janice | 08931 |



● Page 1

Dale Medical Center/Hawkins - CONFIDENTIAL Documents Produced by Defendant

D00161

# EXHIBIT 14

SPECTRACARE

**DEFENDANT'S EXHIBIT**

*14 Hawkins*

Date:  March 11, 2001

To:  Nancy Hawkins

FR:  Terry Bradley

RE:  Deficits

As we have discussed, I arrived at work on February 25, 2001 and went into the records room to utilize the copy machine and found a cart with several open records and papers in disarray.  My first thought was that someone had vandalized the records.  After further investigation, I discovered that most of the work appeared to be yours and I thought that perhaps you had brought everything from your office into the records room and had quit.  I then found a key to your office to verify my suspicions and found your desk to be in a similar situation.  I found many unfiled documents, dated prescriptions, dated medication and other out of date documents that were of great concern.  I did not audit any files in your office, therefore I do not know the extent of these difficulties and/or if this is a pattern, however I found the following unfiled and dated information which I found very disturbing and of great concern:

An entire unfiled page from chart # 88329, numerous unsigned medication monitoring sheets, some without the names of clients, some without the therapist signature, most without dates with the names of the medication only, doctors notes from January, unprocessed disability claims, one from October 2000, two from November 2000, two from December 2000 and two from January of 2001.

Of greatest concern was a blank prescription signed by Dr. Ferrell attached to a note that looked to be a request for medication for a client who was having difficulties, no date and a bottle of IDP medication that I saw in your office dated 12/7/00, which by pharmaceutical records had been signed, received by the client.

In addition, I found a request for records from Attorney Michael Brown dated August 21, 2000 and a notice to dismiss Guardianship over D. McSween dated January 16, 2001. I know that this client was transferred from me to Pam Williams, therefore I was a bit puzzled as to why that particular document would be in your officer. I also found two IDP cards from the Pharmaceutical office with prescriptions dated 10/25 and 1/31. I found a blank treatment plan signed by the client only, without goals or diagnosis. I found numerous PAP forms signed by both physician and client some dated as far back as 8/31/00, which had never been processed. Some of these forms had the prescription attached and some did not. I found a TB skin test sent by GDT dated 11/14/00.

There were numerous IOP progress notes with dates 9/13/00, 1/22/01 and 11/30 etc. on different clients, helpline sheets from client # 85257 dated 10/21 given to you by Angie Bradley, a Discharge Summary from Geeil hospital dated 2/12/01, orders for inpatient commitments dated 10/19/00 and numerous releases of information dating as far back as January 3, 2001.

There were original IDP requests dated 1/5/01, a helpline form dated 12/22/00, a client drug info sheet dated 9/20/2000, complete clerical updates dated 1/3/01, 12/11/00, 12/6/00, 1/11/01, Drug information sheets dated 1/26/01, Social Security B SSA 1099 form with no date, several unprocessed PAP forms with client signature only, proof of income for client dated 2/2/01, drug profile not filed in chart with last entry date 6/29/00, numerous medication monitoring sheets completed but not filed, Social Security information for 3 clients dated December 2000, client's proof of income no date, client's financial data dated 12/4/00, financial data dated 2/1/99 and a release of info dated 12/6/00. There was request for correction dated 11/28/00, client files sent by Our House dated November 21,00, drug information sheet dated 8/8/2000,and a prescription for Risperdal dated 11/30/00.

I found G Dantley's DD Psychological Evaluation marked received May 11, 2000 and an EAP client's financial waiver Dated Oct. 4, 2000. There were unprocessed service logs dated 2/12/00, 2/13 and 2/14. There were several no show progress notes that were not dated but completed with case number and client name.

These deficits found were just a portion of what I witnessed.  The magnitude of the deficits is in my opinion serious, especially in light of the fact I had asked you on numerous occasions if I could be of assistance.  I feel I gave you ample opportunity to report the magnitude of the problem area.

I realize that recently you have shared with me that your caseload has become overwhelming and this issue will be discussed with you further, however, at this time we are giving you an opportunity to free up your schedule in order to correct the deficits and bring your records up to date.

Previously you and I talked and you had agreed to have paperwork completed by March 9, 2001, however, I understand that your secretary has not been available and several therapists were out on sick leave which has placed you behind in your commitment.

You are a valuable employee but I will expect you to have your paperwork up to date by March 23, 2001.  You and I will meet on Monday March 19, to discuss your progress thus far.


CC:  Angie Bradley
        Starla Dowling


I have been instructed to correct the deficits aforementioned and will have the work completed by 3/23/01.  I will develop a plan of action to assure my work will remain current and up to date.  I will meet with my supervisor Terry Bradley on 3/19/01 to discuss progress.

Nancy Hawkins

Terry Bradley

Nancy Hawkins has
Completed these deficits
4/3/01

## STEP I

### NOTICE OF NEED FOR IMPROVEMENT

**EMPLOYEE NAME:** Nancy Hawkins

**Deficiencies:** 1) Clinical chart maintenance is significantly below standard in both timeliness and accuracy. Specific addressed in 3-11-01 memo by T. Bradley, supervis 2) Fraudulent information has been recorded by you on Indigent Drug and Special Exception Profiles.

**Expectations:** 1) Clinical charts will be maintained accurately and timely. This must occur whi Productivity is maintained. Corrections for the 3-11-01 memo must be completed by 3-23-01. 2) Information entered into clinical charts, submitted to other agencies, and given to supervisors requires accuracy, honesty, and ethical disclosure.

**Review Date:** Ongoing for 6 mths - Random time and charts.
Any further significant violations will result in further disciplinary action.

I have reviewed this plan and understand what is expected of me.

Employee _[signature]_          Date: 3/27/01
Supervisor _[signature]_, M, SW     Date: 4/3/01

Action Taken at Time of Review:

_____

_____

_____

Personnel Director_____     Date:_____

Distribution:   Supervisor
                Employee
                Personnel File
WMHB #0781015

# EXHIBIT 15

**DEFENDANT'S EXHIBIT**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See Privacy Act Statement before completing this form.

| AGENCY | |
|---|---|
| | FEPA |
| X | EEOC |

*(5 Hawkins)*

130-2004-04240

and EEOC

State or local Agency, if any

| | |
|---|---|
| NAME (Indicate Mr., Ms., Mrs.)<br>Ms.   NANCY HAWKINS | HOME TELEPHONE (Include Area Code)<br>334-673-9740 |
| STREET ADDRESS<br>905 Baywood Road | CITY, STATE AND ZIP CODE<br>Dothan, AL  36305 | DATE OF BIRTH<br>8/27/41 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below).

| NAME<br>Dale Medical Center | NUMBER OF EMPLOYEES, MEMBERS<br>more than 100 | TELEPHONE (Include Area Code)<br>334-774-2601 |
|---|---|---|
| STREET ADDRESS<br>100 Hospital Avenue | CITY, STATE AND ZIP CODE<br>Ozark, AL  36360 | COUNTY<br>Dale |
| NAME | TELEPHONE NUMBER (Include Area Code) | |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| | | | | |
|---|---|---|---|---|
| [ ] RACE | [ ] COLOR | [ ] SEX | [ ] RELIGION | [X] AGE |
| [ ] RETALIATION | [ ] NATIONAL ORIGIN | [X] DISABILITY | [ ] OTHER (Specify) | |

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)          LATEST (ALL)

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)): Charging party was employed with Dale Medical Center for approximately eighteen (18) months. During this time, she received one above-standard evaluation and a week later she received a list of deficiencies that were not listed on nor referred to in her evaluation by her supervisor, Sandra Fitzgerald. Charging party has information that Fitzgerald had said on earlier occasions that she did not know why she (charging party) "was working at her age with her eye problems." Charging party is in fact legally blind with vision correctable to 20/300. She requires large print computer and paper type in order to be able to read. Charging party has requested to use large type documents, and she has even provided the same. Her employer has refused to allow her to use the large type documents, which charging party contends denies her reasonable accommodations for her disability. Charging party believes that she has been discriminated against based both on her age, being 61, as well as her visual disability, as her employer has failed and/or refused to reasonably accommodate her. Charging party was allegedly terminated due to "unsatisfactory work" even though she had successfully completed her 90-day initial probation, as well as having received an above-standard evaluation prior to her termination.

SEP  1 2004

| I want this charge filed with both the EEOC and the State or local Agency, if any I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | *Willa M Coller* |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Mary E Hernan*<br>Date 8/30/04        Charging Party (Signature) | SIGNATURE OF COMPLAINANT<br><br>*Nancy R Hawkins*<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

EEOC FORM 5 (10/94)