IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **NANCY HAWKINS,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | **CIVIL ACTION NUMBER:** |
| v. ) | **1:05cv540 W** |
| ) | |
| **DALE MEDICAL CENTER,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Dale Medical Center, Defendant in the above-styled action, and submits this Memorandum of Law in Support of Defendant's Motion for Summary Judgment. As grounds for summary judgment, Defendant shows as follows:

### Introduction

This is a termination case brought under the Age Discrimination in Employment Act (ADEA) and the Americans with Disabilities Act (ADA). Fully aware of her age and vision limitations, Dale Medical Center hired Plaintiff as the Social Worker to work on its senior psychiatric unit. In this position, she was the sole person responsible for critical assessment and therapeutic functions which directly impacted both patient care and the financial health of the unit. She does not deny that she fell far behind in these functions. When counseled, she offered no excuse for her performance. After repeated warnings, but no improvement, Dale Medical Center terminated her employment for these legitimate reasons (which she does not deny), not her age and disability (of which it was well aware when she was hired).

# **STATEMENT OF UNDISPUTED FACTS**[1]

*Background*

1. Dale Medical Center is an acute health care facility in Ozark, Alabama. (Simmons Aff., ¶ 1.) The Medical Center includes a ten-bed specialty unit known as New Day Senior Health, which provides psychiatric care and treatment specifically for older patients. (Simmons Aff., ¶¶ 1-2; Fitzgerald Aff., ¶ 1; Hawkins 17:02-17:05.)

2. Dale Medical Center contracts with SeniorHealth, Inc., an independent management services company, to manage the senior psychiatric unit. (Simmons Aff., ¶ 3; Fitzgerald Aff. ¶ 1.) During Plaintiff's employment, SeniorHealth employed Sandra Fitzgerald as its Director of Nursing for the unit. (Fitzgerald Aff., ¶ 1.) From early 2004 through the end of Plaintiff's employment, Dale Medical Center's Nurse Manager on the unit (and Plaintiff's supervisor) was Jennifer Simmons. (Simmons Aff., ¶ 2; Fitzgerald Aff., ¶ 11; Hawkins 37:08-37:11.)

3. In January 2003, Plaintiff interviewed for the position of Social Worker on the senior psychiatric unit. (Hawkins 11:03-12:20). At the time of her interview, she was 61 years old. (Hawkins 39:12-39:13). During her interview, Plaintiff disclosed that she had a visual problem and that she needed to read with a magnifying glass. (Hawkins 15:03-15:06).

4. According to Plaintiff, her vision problems prevent her from driving, and she "read[s] better with large print," but "can read average print" with her magnifying

---

[1] Defendant presents the facts in the light most favorable to Plaintiff as required for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Defendant adopts this version of the facts only for purposes of summary judgment. The cited testimony, exhibits and affidavits have been filed as exhibits in Defendant's Evidentiary Submission. Depositions are referenced herein by the deponent's name and a page: line reference (e.g. Hawkins 4:1). Affidavits are referenced by the affiant's name and a paragraph reference (e.g. Simmons Aff., ¶ 1). Deposition exhibits are referenced as DX [exhibit number].

glass. Otherwise, she states that there is nothing significant which she cannot do because of her vision. (Hawkins 26:09-27:02.)

5. Aware of her age and her vision problems, Dale Medical Center hired Plaintiff to work as the Social Worker in its senior psychiatric unit. (Hawkins, 11:01-11:08). Initially, Sandra Smolinski was Plaintiff's supervisor. (Hawkins 17:22-18:01). In early 2004, Jennifer Simmons, the Nurse Manager, became Plaintiff's supervisor. (Hawkins 37:08-37:11).

### *Plaintiff's Responsibilities as the Social Worker*

6. As listed on her official job description, Plaintiff's primary job responsibilities as the Social Worker for New Day Senior Health were:

1. Complete an age specific psychosocial evaluation on assigned patients in a <u>timely</u> manner.

2. Conduct Group, Individual, and Family Therapy sessions focusing on the primary issues of the patient.

3. Engages in <u>timely</u>, efficient discharge planning, assuring the transition of patients to the appropriate level of care as determined by the patient's needs.

4. Attends and participates in multidisciplinary treatment staffing and in the development and revision of treatment plans.

5. Assist in the orientation of new patients to the program.

6. Provide for patient comfort, safety, respect, and confidentiality.

7. Completes documentation requirements in a <u>timely</u> manner in accordance with program standards.

(Hawkins 47:21-48:18; DX-6, p.3) (emphasis added).

7. As the only Social Worker on unit, Plaintiff played a critical role in the admission, treatment and discharge of patients. (Simmons Aff., ¶¶ 4-8, 10-11;

3

Fitzgerald Aff., ¶¶ 2-5; Hawkins 17:06-17:15; 18:02-18:07; DX-6, p.3.) When a patient is first admitted to the unit, the Social Worker has 72 hours in which to perform a psychosocial assessment, a five-page form used to determine the treatment needs of the patient. (Fitzgerald Aff., ¶ 3; Simmons Aff., ¶ 4; Hawkins 18:23-19:06; 53:13-53:23.) The form took between thirty minutes to one hour to complete. (Hawkins 25:02-25:13.)

      8.    This psychosocial assessment is the basis on which the other health care professionals plan their treatment activities for a particular patient. (Hawkins 18:11-18:22; 53:20-53:23; Simmons Aff., ¶ 4; Fitzgerald Aff., ¶ 3.) Although it was a critical first step in patient care, Plaintiff frequently did not complete the assessment on timely basis; many were not completed until after the patient had already been discharged. (Hawkins 52:18-53:10; 54:12-54:20, DX-7, DX-8, DX-9, DX-13.) Although the unit only had ten beds (and therefore a maximum of ten patients), Plaintiff was, at times, delinquent by as many as 44 patient assessments. (Hawkins 54:08-54:20; DX-9.)

      9.    Because Plaintiff did not conduct these assessments on a timely basis, the unit could not bill for them. (Hawkins 51:07-52:08.)

      10.    Plaintiff was also responsible for conducting daily group therapy sessions with patients. (Hawkins 19:07-19:10.) These sessions should have lasted an hour, but are required to last at least forty minutes. (Simmons Aff., ¶ 5; Fitzgerald Aff., ¶ 4; Hawkins 19:18-19:19; 79:02-79:11.) Plaintiff was responsible for documenting these therapy sessions in the patient's medical record. (Hawkins 20:22-21:16.)

      11.    During Plaintiff's employment, other employees reported that some daily sessions did not occur at all and some lasted only five minutes. (Fitzgerald Aff., ¶ 7.) Although group therapy was required to be done separately for the low and high

functioning groups, Plaintiff repeatedly combined low and high functioning patients into a single session. (Simmons Aff., ¶ 6; Fitzgerald Aff., ¶ 4; Hawkins 19:22-20:12; 76:05-77:12.) Plaintiff often failed to document these sessions, which meant that the progress notes were not available to the treating physicians in the medical records, and the sessions could not be billed to the insurance company. (Simmons Aff., ¶ 6; Fitzgerald Aff., ¶ 7.) In addition, her supervisor discovered that she had not conducted family counseling sessions when families were unaware of and not prepared for important developments with their patient. (Simmons Aff., ¶ 6.)

12.    As the Social Worker, Plaintiff was required to work and interact with the other members of the treatment team – doctors, nurses and mental health technicians. Plaintiff's supervisors observed her being abrupt, short and rude with co-workers. Some co-workers complained that she "talked down to them" and was generally unapproachable and unhelpful. (Simmons Aff., ¶ 8; Fitzgerald Aff., ¶ 9.) Plaintiff's supervisors also observed her treat patients (who had been admitted for psychiatric problems) curtly and abruptly, as well as asking them sensitive questions without taking precautions to protect the patient's privacy. (Fitzgerald Aff., ¶ 9; Hawkins 55:15-55:19, 58:16-58:19, 59:12-59:15.)

13.    Like the admission process, the Social Worker plays a critical role in planning for a patient's discharge. (Simmons Aff., ¶¶ 4, 7; Fitzgerald Aff., ¶¶ 5, 8; Hawkins 22:02-22:11; 23:10--25). As the Social Worker on the unit, Plaintiff was required to conduct Zung and GDS assessments to gauge patient improvement prior to their discharge. (Simmons Aff., ¶ 7; Fitzgerald Aff., ¶ 5.) During Plaintiff's tenure in the

unit, patients were sometimes discharged without a completed Zung or GDS assessment. (Simmons Aff., ¶ 7; Fitzgerald Aff., ¶ 8.)

14. In preparing for a patient's discharge, the Social Worker must also make arrangements for the patient to be transferred to a state hospital or a group home if appropriate and must coordinate with the patient's family and other agencies. (Simmons Aff., ¶ 7; Fitzgerald Aff., ¶¶ 5, 8; Hawkins 22:02-22:11.) Patients cannot be discharged until the social worker has done the required planning and completed the required discharge screening. (Simmons Aff., ¶ 7; Fitzgerald Aff., ¶ 5.) If done properly, discharge planning should begin shortly after the patient is admitted and assessed – as soon as their post-discharge needs can be anticipated. (Simmons Aff., ¶ 7; Fitzgerald Aff., ¶ 8.) Although the average patient stay in the unit should be ten to twelve days, Plaintiff's patients typically stayed fourteen or more days, often because the discharge planning was not complete when they were otherwise ready for discharge. (Simmons Aff., ¶ 7; Fitzgerald Aff., ¶ 8.)

***Warnings for Plaintiff's Poor Work Performance***

15. In September 2003, Plaintiff was given a memorandum listing her delinquent psychosocial assessments (the intake assessment) for patients who had already been discharged. The list included 21 discharged patients for whom there was no written assessment – some of whom had been discharged more than three months earlier. In this memo, her supervisor stated: "These assessments must be completed and filed in the charts immed[iately.] In the future, please have in chart no later than 3rd day of admission." (Hawkins 52:18-53:10; DX-8). Plaintiff offered no excuse or

6

explanation for her failure to complete this critical documentation. (Hawkins at 54:01-54:07).

16. In October 2003, Plaintiff was given another list of delinquent psycho-social assessment reports for discharged patients, which had by then grown to 44 patients without their initial assessment documented in their charts prior to discharge. (Hawkins 54:12-54:20, DX-9). Plaintiff again offered no excuse or explanation for her failure to complete this critical documentation. (Hawkins 55:02-55:05).

17. At the time of her first performance evaluation, Plaintiff's supervisor addressed and documented her performance problems. (Hawkins 55:15-56:11; 59:08-59:22, DX-10). Specifically, in conjunction with her evaluation, Plaintiff was given a "Social Worker Action Plan" which identified the following deficiencies:

> Defensive attitude and difficulty getting along with other staff members. Difficulty functioning as a team member.
>
> Lack of involvement in treatment planning and revision.
>
> Inadequate family contact and family therapy sessions.
>
> Inadequate individual therapy sessions
>
> Discharge planning not done in a timely manner.

(Hawkins 56:6-56:11, DX-10).

18. Plaintiff did not question or dispute any of the listed deficiencies (Hawkins 60:05-60:13) and committed to the following corrective actions:

> Maintain professional relationship with other staff members. Function as a team member.
>
> Assist Nurse to write problem statement and lead treatment plan revision team.
>
> Family therapy sessions to be provided at least once weekly per Dr order.

> Individual therapy to be scheduled when psycho-social completed
>
> Discharge planning to be started on admission with tentative disposition planned within one week.

(Hawkins DX-10.)

19. By April 2004, Plaintiff's performance had not improved and her new supervisor, Jennifer Simmons, identified similar problem areas. Simmons initiated a second action plan based upon complaints from co-workers, her failure to update the treatment plans, her failure to conduct family meetings and to document her actions. (Simmons Aff., ¶ 9.) Specifically, on April 8, 2004, Ms. Simmons gave Plaintiff a "Social Worker Action Plan" which identified the following deficiencies:

> Continue to receive [complaints] from staff that Nancy is difficult to approach with questions or concerns. Continues to have difficulty functioning as a team member.
>
> Lack of involvement in treatment planning and revision.
>
> Inadequate family contact and family therapy sessions or inadequate documentation of such.
>
> Inadequate individual therapy sessions or inadequate documentation of such.
>
> Discharge planning continues to be deficient without noted improvement.

(Hawkins 62:02-62:13; DX-12.)

20. Exactly as before, Plaintiff did not question or dispute any of the listed deficiencies (Hawkins 62:21-64:02) and committed to the following corrective actions:

> Maintain professional relationship w/ staff members. Function as a team member.
>
> Assist Nurse to write problem statement and lead treatment plan revision team.

> Family therapy sessions to be provided as often as decided by treatment team and documented per policy.
>
> Individual therapy to be scheduled at first [treatment] team meeting. To be provided and documented per policy.
>
> Discharge planning to be started on admission w/ tentative [discharge] plan within 5 days. All activity must be documented in chart.

(Hawkins DX-12.) Plaintiff specifically told her supervisor that she would correct these deficiencies within thirty (30) days. (Hawkins 64:03-64:10.) She did not request any assistance from her supervisor to correct these deficiencies; nor did she ever request any form of accommodation from Ms. Simmons. (Hawkins 37:16-37:18; 64:11-64:13.)

21. Despite these repeated warnings, Plaintiff's performance did not improve. In May 2004, Plaintiff's supervisor, Jennifer Simmons, pulled a sample of her patient charts and found that Plaintiff was still significantly behind in her documentation. After consulting with Human Resources, Simmons decided to terminate Plaintiff's employment because of these documented performance problems. (Hawkins 65:23-66:18; Simmons Aff., ¶ 10.)

22. When Ms. Simmons explained to Plaintiff that she was being terminated because she had not corrected the deficiencies outlined in the January and April Action Plans, Plaintiff once again did not voice any disagreement with Simmons' assessment that she had not improved her performance. (Hawkins 65:23-66:21).

23. In fact, Plaintiff <u>never</u> took issue with any of the performance issues that were raised with her at any time during her employment. (Hawkins 66:22-67:03; Simmons Aff., ¶ 10; Fitzgerald Aff., ¶ 10.)

24. Plaintiff received a written warning from her prior employer because she did not maintain required documentation on a timely basis. (Hawkins at 72:09-72:22,

9

DX-14.)  She also was transferred to a less demanding job with her current employer because she "was not able to keep abreast of the paperwork." (Hawkins 81:22-83:02.)  Her inability to "keep abreast of the paperwork" in these jobs "didn't have anything to do with" her vision problems.  (Hawkins at 74:03-74:06; 82:18-84:04.)

      25.    During her employment with the Medical Center, no one made negative or mean-spirited comments about Plaintiff's vision and no one harassed her because of her vision. (Hawkins 38:06-39:08.)  Additionally, no one made any comments to Plaintiff about her age or harassed her because of her age.  (Hawkins 39:01-39:11.)  Plaintiff's supervisor, Jennifer Simmons, never made any comments of any kind about her vision or age.  (Hawkins 68:01-68:10; Simmons Aff., ¶ 11.)  Finally, Plaintiff never complained to anyone with the Medical Center that she was being discriminated against due to her age or disability. (Hawkins 79:15-79:23.)

## ARGUMENT

**I.    Plaintiff Cannot Show a Prima Facie Case of Discriminatory Termination**

      Plaintiff claims that she was terminated in violation of the ADEA and the ADA.[2]  The ADEA requires that Plaintiff first prove that she was: (1) a person over the age of forty; (2) that she was subject to an adverse employment action; (3) that a substantially younger person filled the position from which she was discharged; and (4) that she was qualified to do the job.  O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 310 (1996); Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998).  The ADA requires that Plaintiff initially prove that she was (1) disabled; (2) a qualified individual; and (3) terminated because of her disability.  See, e.g., Cash v. Smith, 231

F.3d 1301, 1305 (11th Cir. 2000). Plaintiff cannot prove either prima facie case because she was not qualified for the job; she cannot prove her ADA case for the additional reason that she was not terminated because of her disability.

### A.     The Plaintiff Was Not Qualified

Plaintiff was not qualified for her position with Dale Medical Center. Where a plaintiff is not employed for a great length of time and her job performance has not met the expectations of the employer, the plaintiff cannot meet the fourth element of her prima facie case. See, e.g., Aldabblan v. Festive Pizza, 380 F. Supp. 2d 1345, 1352 (S.D. Fla. 2005). Plaintiff was hired in January 2003 and terminated in June 2004, which is not a "long tenure" significant enough to provide any inference that she was qualified for her position. See Damon v. Fleming Supermarkets of Florida, 196 F.3d 1354, 1360 (11th Cir. 1999). The undisputed evidence shows that Plaintiff was not qualified for her position, as shown by her "poor performance, violations of company policy, . . . and disregard for company procedures." Aldabblan, 380 F. Supp. 2d at 1352. As explained in detail above, Plaintiff had serious performance problems, including failing to conduct critical intake assessments, failing to properly provide treatment to patients, failing to adequately plan for patients' discharge and generally failing to complete required documentation in all phases of her job.

### B.     The Termination Was Not Related to Any Protected Characteristic

The additional failure in Plaintiff's ADA prima facie case overlaps with Defendant's subsequent responsibility in both Plaintiff's ADA and ADEA claims to articulate a legitimate, non-discriminatory reason for her termination. See, e.g.,

---

[2] Although the Complaint references claims for hostile work environment harassment under both the ADA and the ADEA, Plaintiff admitted at her deposition that she was not harassed based on either her age or

Pennington v. City of Huntsville, 261 F.3d at 1266 ("Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action."). Accordingly, the facts related to both this element of her prima facie case and the Defendant's non-discriminatory reason will be discussed in this section.

As discussed in detail above, Plaintiff's performance problems were well-documented. Throughout her employment, Plaintiff received multiple memoranda regarding her repeated and persistent failure to complete critical functions of her job. (Hawkins 52:18-53:10, 54:12-54:20; DX-7, DX-8, DX-9, DX-13.) She received an Action Plan which identified specific performance problems, what she needed to do to correct these problems and a timetable in which they needed to be corrected. (Hawkins 55:15-56:11, 58:16-58:19, 59:08-59:22; DX-10; Fitzgerald Aff., ¶¶ 4-10.) When she did not improve, a new supervisor gave Plaintiff another chance and second Action Plan – which also identified her specific performance problems, what she needed to do to correct these problems and a timetable in which they needed to be corrected. (Hawkins 62:02-64:10; DX-12; Simmons Aff., ¶ 9.) When her new supervisor followed up on these problems, she discovered that Plaintiff's performance problems continued. After repeated opportunities to improve, Plaintiff was ultimately terminated because of her poor job performance. (Hawkins 65:23-66:18; Simmons Aff., ¶ 10.)

## II.    Plaintiff Cannot Show Pretext

Once Defendant has produced a legitimate non-discriminatory reason, "[t]he presumption of discrimination is then rebutted and the employer is entitled to summary judgment unless the plaintiff proffers evidence sufficient to create a genuine issue of

---

any disability. (Hawkins 39:1-39:11).

material fact that discrimination was actually the reason for the challenged action." Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1471 (11th Cir. 1991) (quoting Carter v. Miami, 870 F.2d 578, 585 (11th Cir. 1989)). Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Silvera v. Orange Cty. Sch. Bd., 244 F.3d 1253, 1258 (11th Cir. 2001) (internal citation omitted).

Moreover, Plaintiff must not only show that Defendant's articulated reason is false, but also that its true reason for terminating Plaintiff was discriminatory. Clark v. Coats & Clark, 990 F.2d 1217, 1228 (11th Cir. 1993). At all times, "[t]he ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited . . . conduct remains on the plaintiff." Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). "Although termination may, to some, seem a draconian response . . . the reasonableness of [the employer's] disciplinary policies are not a consideration. . . . [A]n 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" Abel v. Dubberly, 210 F.3d 1334, 1339 n.5 (11th Cir. 2000).

13

At this stage, the issue is <u>not</u> whether the Medical Center was ultimately correct in its assessment of Plaintiff's performance or whether some lesser employment action might have sufficed.  The Eleventh Circuit has made it clear that courts

> must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees.  The factual issue to be resolved is not the wisdom or accuracy of [the employer's] conclusion that [the employee] was an unsatisfactory employee.  We are not interested in whether the conclusion is a correct one, but whether it is an honest one.  Like all Title VII cases where pretext is an issue, the question the factfinder must answer is whether [the employer's] proffered reasons were a coverup for a . . . discriminatory decision.

<u>Rojas v. State of Florida</u>, 285 F.3d 1339, 1342 (11th Cir. 2002) (internal citations omitted) ("We are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.")

Plaintiff cannot show that Dale Medical Center's articulated reasons for her termination are a pretext for either age or disability discrimination.   Plaintiff was given memo after memo listing her delinquent patient assessments and overdue documentation (Hawkins DX-7, 8, 9, 13); she never challenged a single one. (Statement of Fact No. 16.)  In January 2004, she was given an Action Plan listing multiple areas of deficiency (Fact No. 17); she never challenged a single one, never offer any excuses and never asked for any help. (Fact No. 18.)  In April 2004, her new supervisor have Plaintiff a second Action Plan listing her deficiencies (Fact No. 19); she committed to improve each, but never challenged a single one, never offer any excuses and never asked for any help.  (Fact No. 20.)  When her new supervisor concluded that

14

her performance had not improved, Plaintiff again did not dispute her assessment or offer any explanation. (Fact Nos. 21, 22).

As we explained above, the senior psychiatric unit is a small unit (with a maximum of ten patients) and only one social worker. The social worker plays a critical role in patient care – conducting the first assessment of their treatment needs, providing treatment through therapy, and preparing for a patient's discharge and transition to other facilities. (Fact No. 7.) When Plaintiff fell behind in her job, patient care was necessarily affected. Specifically:

- At one point, Plaintiff was forty-four (44) patients behind on intake assessments – assessments on which other members of the treatment team relied to plan their patient care. (Fact No. 8.)

- Her therapy sessions were sometimes configured improperly, sometimes too short; sometimes did not occur at all and often were not properly documented. (Fact Nos. 10, 11.)

- Patient discharges were often delayed by several days because Plaintiff did not begin to plan for them early enough. (Fact Nos. 13, 14).

Despite the seriousness of these problems, Plaintiff was not terminated immediately. Instead, she was given multiple opportunities over nine months to improve her performance. Under the assessment of two different supervisors, the problems persisted. In the end, Dale Medical Center had no choice but to terminate her employment.

**CONCLUSION**

For all the foregoing reasons, Dale Medical Center is entitled to summary judgment as a matter of law on all claims.

Respectfully Submitted,

s/Albert L. Vreeland, II
Albert L. Vreeland, II  ASB-0066-V78A

OF COUNSEL:
LEHR MIDDLEBROOKS PRICE & VREELAND, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Banks T. Smith, Esq.
Hall & Smith
P. O. Box 1748
Dothan, Alabama 36302

Respectfully submitted,

s/Albert L. Vreeland, II
Albert L. Vreeland, II ASB-0066-V78A
Lehr Middlebrooks Price & Vreeland, P.C.
P.O. Box 11945
Birmingham, AL 35202-1945
Phone:  (205) 326-3002
Fax:  (205) 326-3008
E-mail:  avreeland@lmpv.com
Bar No.: ASB-0066-V78A

148425