```
 1           IN THE UNITED STATES DISTRICT COURT

 2          FOR THE MIDDLE DISTRICT OF ALABAMA

 3                   SOUTHERN DIVISION

 4

 5   CASE NUMBER:   1:05cv540 W

 6

 7   NANCY HAWKINS,

 8         Plaintiff,

 9   vs.

10   DALE MEDICAL CENTER,

11         Defendant.

12

13

14   BEFORE:

15         Cynthia M. Noakes, Commissioner

16         and Court Reporter

17

18

19

20   DEPOSITION TESTIMONY OF NANCY HAWKINS-KAHN

21

22

23         * * * * * * * * * * * * * * * * * * * * * * * * *
```

FOSHEE & TURNER COURT REPORTERS

Page 15

1  Q.   Was anything else discussed?
2  A.   Not that I can recall.
3  Q.   Was there any discussion during the
4  interview about your vision?
5  A.   I disclosed that I had a visual problem and
6  that I read with a magnifying glass.
7  Q.   Did either Sandra Smolinski or Leonard
8  Smolinski indicate that that would be any problem?
9  A.   No.
10 Q.   Did they say anything about your vision
11 problem?
12 A.   I believe that it was brought up, Was there
13 anything else I needed in order to help me perform
14 the job?
15 Q.   What was your response?
16 A.   That I would not know until I actually began
17 to work and saw what my needs would be.
18 Q.   Was anything else discussed during the
19 interview about your vision?
20 A.   Not that I can recall.
21 Q.   And I take it you received the job?
22 A.   Yes, sir.
23 Q.   While you were employed with Dale Medical

FOSHEE & TURNER COURT REPORTERS

Page 27

1  A.      I can't think of anything that's
2  significant.
3  Q.      Now, you told me that when you interviewed,
4  Sandra Smolinski asked if you needed anything
5  other than the magnifying glass to help you do
6  your job?
7  A.      That's correct.
8  Q.      At any point during your employment at Dale
9  Medical Center, did you tell her you needed
10 something other than --
11 A.      Yes.
12 Q.      When did you tell her that you needed some
13 other assistance?
14 A.      I told her shortly after. Because I needed
15 the computer adjusted so I could enlarge the type,
16 so I could see to read it and correct it.
17 Q.      That was shortly after you started work
18 there?
19 A.      Yes.
20 Q.      And how did Ms. Smolinski respond?
21 A.      There was no response.
22 Q.      She said absolutely nothing?
23 A.      She said absolutely nothing or she said,

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**FOSHEE & TURNER COURT REPORTERS**

Page 28

1  I'll look into it, or, I'll take care of it; but
2  nothing was done.
3  Q.    Did you discuss adjusting the computer with
4  her again?
5  A.    Yes.
6  Q.    When was that?
7  A.    There were two computers. Only one was on
8  line. So the computer that I did for daily work,
9  I didn't discuss again.
10       The on-line computer was situated in such a
11 way that I could not sit in the chair at the desk
12 to use the computer; I had to stand up. And in
13 standing up, I then had to bend down, which made
14 it uncomfortable; very tiring over a period of
15 time, when I needed to go on the on-line computer.
16       And when I told her that it was a problem
17 for me, her response was, it's a problem for her
18 too.
19 Q.    When did you tell Ms. Smolinski that the
20 situation of the on-line computer was a problem
21 for you?
22 A.    Several times during the course of my
23 employment.

1   Q.   Did she respond the same way each time?
2   A.   Yes.
3   Q.   Did she ever give you any other response?
4   A.   No.
5   Q.   Okay. Explain for me how this computer used to go on line was situated so that you couldn't sit.
8   A.   It was -- the monitor was up high, and I could not see the monitor. I could not get close enough to it to see to read the monitor to know that what I was typing in was appropriate; so I would have to stand up to place my glass on the screen.
14       And that's when my height or -- that's when it became uncomfortable or difficult.
16  Q.   When you stood and put your glass on the screen, were you able to see what was on the screen?
19  A.   Yes. When I adjusted my body posture, which was uncomfortable for me to continue to do.
21  Q.   With regard to the computer that you did your daily work on, did you also use your glass on that screen?

Page 30

1  A.   Yes.
2  Q.   And were you able to read what was on that
3  screen with your magnifying glass?
4  A.   Not easily.
5  Q.   Were you able to do your work?
6  A.   With difficulty.
7  Q.   What sort of things did you use your daily
8  computer for?
9  A.   Typing letters and progress notes that
10 weren't a part of the preform -- there was a form
11 that was generated, but not on the computer. It
12 was created by someone, and there were copies that
13 I had to fill in. But, again, it was not within
14 the limits of my vision.
15 Q.   When you say preform, are you talking about
16 the psychosocial assessment?
17 A.   No. This was a progress note that was
18 developed that was specific, and it had lines to
19 fill in, so -- I don't know how I can say this.
20      In previous jobs, any form that was on the
21 computer, I could enlarge it to do my work, and
22 then reduce it so that it would fit within the
23 standards of the chart.

Page 31

1    This form was not a computer-generated form,
2 and neither could I put it into the computer so I
3 could use that.
4    I enlarged it on the copy machine so I could
5 see within the parameters to read it and fill it
6 in accurately. Then I was told that it did not
7 meet the standards for the New Day progress note.
8 Q.   And this is a progress note for patient
9 charts?
10 A.   Yes, for patient charts. And it was a group
11 note.
12 Q.   And this is something that you completed on
13 the computer?
14 A.   I could not complete it on the computer
15 because I could not put it into the computer so I
16 could manipulate it.
17    It would have been more useful had it been
18 on a computer screen that I could have pulled it
19 up, enlarged it, filled in the blanks, and then
20 reduce it back to the size of the chart, as I had
21 done in a previous job.
22 Q.   So it's a hard copy form?
23 A.   Yes.

FOSHEE & TURNER COURT REPORTERS

Page 32

1  Q.    And could you read that form with your
2  magnifying glass?
3  A.    I could read it, but it was difficult to
4  fill it in at the space and size that it was.
5  Q.    Did you speak with anybody at Dale Medical
6  Center about your difficulty completing that form?
7  A.    Only Ms. Smolinski, or Fitzgerald, and the
8  representative from the New Day Company.
9  Q.    Do you know what her name was -- is?
10 A.    Debra. But I do not remember Debra's last
11 name.
12 Q.    And when you say the representative from the
13 New Day Company, that's somebody outside of Dale
14 Medical Center?
15 A.    Yes.
16 Q.    How did Ms. Smolinski respond when you
17 talked to her about your difficulty completing
18 this progress note?
19 A.    Mostly noncommittal.
20 Q.    What did she say to you?
21 A.    It was usually, "I'll see what I can do."
22 Q.    Did she give you any response other than
23 saying she'd see what she could do?

1    with the form again?
2    A.    No, because she was not readily accessible
3    to us.
4    Q.    Did you talk to anybody at Dale Medical
5    Center about it again, after she had told you she
6    thought she could put it on a disk?
7    A.    No.
8    Q.    The psychosocial assessment, is that
9    something you did on the computer or did by hand?
10   A.    By hand.
11   Q.    Were you able to complete that form?
12   A.    With difficulty.
13   Q.    You say "with difficulty." Were you able to
14   adequately fill out the form?
15   A.    The gentleman who is now my husband -- was
16   not then -- developed a notebook for me in which
17   every question was in large print. And the pages
18   were in a paper protector.
19         So I would use either a dry erase marker or
20   a grease pencil to take that to my interview, fill
21   out the answers or write notes on the page. That
22   would give me the information to take back to my
23   desks, and then fill it in, using my magnifying

1   something that I could have like, again, the
2   computer that I could enlarge.
3          When I needed to, I would ask someone to
4   read me particularly phone numbers.
5   Q.     Did people oblige you?
6   A.     Yes.
7   Q.     Did you say anything else to Ms. Smolinski
8   about your difficulty doing your job?
9   A.     No.  I tried to accommodate myself.
10  Q.     On your work computer, were you able to
11  adjust the fonts on that?
12  A.     No.
13  Q.     Where was that computer located?
14  A.     It was located in an office occupied by two
15  other people.
16  Q.     Who else shared that office with you?
17  A.     I went into their office.  It was, at that
18  time, occupied by the nurse manager and by the
19  marketing person.
20  Q.     Who was the nurse manager?
21  A.     In the beginning, her name was Joan Carter;
22  later, it was an individual known as Jeff Morrow;
23  and, lastly, Jennifer.  And I don't remember

1  Jennifer's last name.

2  Q.   Who was the marketing person?

3  A.   Barbara Gay Hamilton.

4  Q.   Was Ms. Smolinski your supervisor the entire
5  time you were employed at Dale Medical Center?

6  A.   For all but the last two months, three
7  months.

8  Q.   Who became your supervisor for the last two
9  to three months?

10 A.   The nurse, Jennifer, whose last name I
11 cannot remember.

12 Q.   Did you speak with the nurse manager,
13 Jennifer, about your difficulty completing these
14 forms or using the computers?

15 A.   No.

16 Q.   Did you ask her for any form of
17 accommodation?

18 A.   No.

19 Q.   Other than the conversations you told me
20 about when you discussed your difficulty
21 completing these forms, did you discuss your
22 visual limitations with anybody else at Dale
23 Medical Center?

Page 56

1    (Defendant's Exhibit No. 10 was
2    marked for identification and a
3    copy of the same is attached
4    hereto.)
5  Q.   Let me show you what I've marked for
6  purposes of identification as Defendant's Exhibit
7  10 to your deposition.
8  A.   Yes.
9  Q.   Do you recognize this document as something
10 that was --
11 A.   Yes.  This was attached to my evaluation.
12 Q.   Did Ms. Fitzgerald cover it with you at the
13 time of your evaluation?
14 A.   No.
15 Q.   Did she point it out to you that it was
16 there?
17 A.   She gave it to me after I had my evaluation.
18 It was given to me a day or so after my
19 evaluation.
20 Q.   Did she explain to you what it was?
21 A.   She said -- what she said was, if I
22 remember, This is what we talked about.
23 Q.   Had she talked about these things with you

1  during your evaluation?
2  A.    The evaluation process, as I recall, was I
3  was given the form -- the numeric form -- to fill
4  out, and I did.  And then she had done the same.
5  And we compared our assessment of me.
6        And where we disagreed on the number
7  evaluation, the number assigned for the tasks, we
8  did not disagree to a point that it was
9  significant, in my mind, at the time.
10       And I know that my numerical score was in
11 the parameters that indicated a raise.  And it
12 really wasn't until I learned I was not getting a
13 raise that I was aware that there really was a
14 problem.
15       And when I was given this document to sign,
16 I was on my way to something that was going on on
17 the unit, either having to do my group with the
18 folks or something; and she said something to the
19 effect, I need you to sign this.  And I started by
20 signing it on the wrong line and realized I had
21 done that, and then completed my signature
22 underneath it.  I did not read the document at the
23 time.

1  Q.    Okay. My question, however, was whether she
2  discussed these issues with you during your
3  evaluation.
4  A.    Yes. I understand the question. But I
5  cannot remember specifically that these were
6  discussed in this form.
7        The general evaluation process was informal.
8  We were sitting, and she would read the particular
9  objective or the goal, I would give her my number
10 and she would give me her number, and I agreed to
11 go with whatever numeric score she gave me at the
12 time.
13       So specifically, in the general context the
14 way the evaluation went, I cannot remember that
15 these things were discussed in that way.
16 Q.    I think earlier you told me you did remember
17 her raising an issue about your not seeing the
18 families.
19 A.    Right. And that I was rude. But I did not
20 agree with her about not seeing the families
21 because there were many, many times when I
22 adjusted my time there to remain after my normally
23 scheduled work hours so I could accommodate a

Page 67

1   with the performance issues that were raised in
2   these memos that I've shown you?
3   A.   No.
4   Q.   Why not?
5   A.   I don't know.
6   Q.   After you were terminated, did you voice any
7   disagreement, other than obviously filing an EEOC
8   Charge and this lawsuit, about those issues to
9   anybody at Dale Medical Center?
10  A.   No.  I had no more contact with Dale Medical
11  Center.
12  Q.   I may have asked you this before and I
13  apologize if I did:  Did you ever have any
14  discussions with Jennifer Simmons about your
15  vision?
16  A.   Not in the context that she was my
17  supervisor.
18  Q.   Do you mean that you had conversations with
19  her before she was your supervisor?
20  A.   Well, the professional staff was aware that
21  I had difficulties reading and that it was
22  sometimes awkward for me to write.  It was just
23  part of who I was.

```
 1                CERTIFICATE
 2  STATE OF ALABAMA    )
 3  COUNTY OF JEFFERSON )
 4
 5            I hereby certify that the
 6  above and foregoing proceeding was taken
 7  down by me by stenographic means, and that
 8  the content herein was produced in
 9  transcript form by computer aid under my
10  supervision, and that the foregoing
11  represents, to the best of my ability, a
12  true and correct transcript of the
13  proceedings occurring on said date at said
14  time.
15            I further certify that I am
16  neither of counsel nor of kin to the
17  parties to the action; nor am I in anywise
18  interested in the result of said case.
19
20
21          _____CM Noakes_____
22                Court Reporter and Commissioner
23
```