PLAINTIFF'S EXHIBIT 119

Westlaw.
206 F.Supp.2d 1280
206 F.Supp.2d 1280, 13 A.D. Cases 79
(Cite as: 206 F.Supp.2d 1280)

C

Motions, Pleadings and Filings

United States District Court,
N.D. Georgia,
Atlanta Division.
Shanie ALPERT, Plaintiff,
v.
DEKALB OFFICE ENVIRONMENTS, INC.,
Defendant.
Civ. A. No. 1:00-CV-283-TWT.

April 25, 2001.

Employee who worked in sales, had undergone knee surgeries, and was terminated for failure to comply with employer's dress code upon her return to work sued employer under Americans with Disabilities Act (ADA), alleging failure to reasonably accommodate. On employer's motion for summary judgment, the District Court, Thrash, J., held that: (1) employee's knee surgeries and subsequent recuperation period did not constitute a "disability" within meaning of ADA, and (2) violation of dress code was legitimate, non-discriminatory reason for termination.

Motion granted.

West Headnotes

[1] Civil Rights ⚖1217
78k1217 Most Cited Cases
    (Formerly 78k173.1)
To establish prima facie case of employment discrimination under ADA, employee must demonstrate that: (1) he has disability; (2) he is qualified individual; and (3) he was subjected to unlawful discrimination as result of his disability. Americans with Disabilities Act of 1990, § 102(a), 42 U.S.C.A. § 12112(a).

[2] Civil Rights ⚖1217
78k1217 Most Cited Cases
    (Formerly 78k173.1)

[2] Civil Rights ⚖1218(6)
78k1218(6) Most Cited Cases
    (Formerly 78k173.1)

Employee bringing ADA action against employer must demonstrate that employer had either actual or constructive knowledge of employee's disability or considered employee to be disabled. Americans with Disabilities Act of 1990, § 102(a), 42 U.S.C.A. § 12112(a).

[3] Civil Rights ⚖1218(2)
78k1218(2) Most Cited Cases
    (Formerly 78k173.1)
Merely proving existence of a physical impairment, without addressing any limitation on major life activities, is insufficient to prove disability for purposes of ADA wrongful termination action. Americans with Disabilities Act of 1990, § 3(2)(A), 42 U.S.C.A. § 12101(2)(A); 29 C.F.R. § 1630.2(i).

[4] Civil Rights ⚖1218(2)
78k1218(2) Most Cited Cases
    (Formerly 78k173.1)
Individual claiming substantial limitation in major life activity of working, for purposes of ADA wrongful termination action, must show that his condition significantly restricts his ability to perform either class of jobs or broad range of jobs in various classes as compared to average person having comparable training, skills and abilities. Americans with Disabilities Act of 1990, § 3(2)(A), 42 U.S.C.A. § 12102(2)(A); 29 C.F.R. § 1630.2(i), (j)(2).

[5] Civil Rights ⚖1218(3)
78k1218(3) Most Cited Cases
    (Formerly 78k173.1)
Knee surgeries and subsequent recuperation period for employee working in sales did not constitute a "disability" under ADA, where employee did not show that she was substantially limited in activities of sitting, standing, climbing, walking, and running, but simply claimed to have some diminished capacity in those activities, and was not permanently restricted by physician from driving, walking, sitting, standing, caring for herself, or working. Americans with Disabilities Act of 1990, § 3(2)(a), 42 U.S.C.A. § 12102(2)(A); 29 C.F.R. § 1630.2(j)(1)(i-ii), (j)(2).

[6] Civil Rights ⚖1221
78k1221 Most Cited Cases
    (Formerly 78k173.1)
In order to show pretext in employer's proffered non-discriminatory reason for termination, employee

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

206 F.Supp.2d 1280
206 F.Supp.2d 1280, 13 A.D. Cases 79
(Cite as: 206 F.Supp.2d 1280)

bringing ADA **wrongful termination** action must offer evidence that demonstrates such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in proffered reasons that reasonable fact finder could find those reasons unworthy of credence. Americans with **Disabilities** Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

[7] **Civil Rights** 1220
78k1220 Most Cited Cases
(Formerly 78k173.1)
Violation of employer's dress code was legitimate, non-discriminatory reason for **termination**, where employer attempted to **accommodate** employee's knee surgeries by allowing her to wear athletic shoes during recuperation period, but insisted that **employee** not wear biker shorts and stretch pants; **employee** had other choices available for attire that would fit over her knee brace but still fit within dress code. Americans with **Disabilities** Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

*1281 Shanie Alpert, Roswell, GA, pro se.

Randy C. Gepp, Arrington & Hollowell, Atlanta, GA, for defendant.

ORDER

THRASH, District Judge.

This is an action brought pursuant to the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. It is before the Court on Defendant's Motion for Summary Judgment [Doc.20]. For the reasons set forth below, Defendant's motion is granted.

I. BACKGROUND

Plaintiff was employed by Defendant between May, 1998, and July, 1999, as a sales support coordinator. Defendant is a Georgia corporation with its principal place of business in Atlanta, Georgia. It is engaged in the business of providing office furniture, space planning, installation, warehousing, and similar services to metropolitan Atlanta and North Georgia businesses.

The pertinent facts of this case viewed in the light most favorable to Plaintiff are as follows. Plaintiff applied for a job with Defendant in May, 1998. Before being hired, Plaintiff interviewed with Susan Stackhouse, DeKalb Office Environment's Administrative Support Manager, and Heather Butler, the company's Human Resources Manager. During the interview, Plaintiff informed Stackhouse and Butler that she had injured her knee a few years ago and was expecting to undergo surgery in the near future. She explained that there would be a lengthy recuperation period during which she would need to be out of work. She stated that upon her return to work, she would be unable to wear shoes other than tennis shoes, specifically white Keds, for a period of time to be specified by her personal physician. She *1282 also informed Stackhouse and Butler that she might require additional surgeries, depending on the success of the upcoming surgery. Stackhouse and Butler assured Plaintiff that her condition was not a problem and that the company would work with her during those periods of time. Plaintiff eventually was offered a position and accepted the offer.

At the time of Plaintiff's employment orientation with DeKalb Office Environments, she was provided a copy of the company handbook. The handbook explained requirements for office dress as follows:

Associates should wear apparel appropriate for the jobs they perform and the audience we serve. Associates should always dress in a businesslike manner. "Business Casual" attire is acceptable five days a week. "Business Casual" includes clothing in good taste for a business environment--such as slacks, dresses, suits, blouses, men's collared shirts, sweaters, vests, blazers, and sports coats. "Home or Weekend Casual" clothing, such as shorts, tank tops, jeans, sun dresses, T-shirts with advertising, casual sandals, men's shoes without socks, warm up suits, sweatshirts, and running shoes, is not appropriate for the business setting. Associates who have been issued uniforms should wear these at all time.

(Defendant's Motion for Summary Judgment, Ex. 1, at 4.11.) [Doc. 20] A few months later, in July, 1998, the company updated its dress code. For non-uniformed associates, of which Plaintiff was one, the requirements were as follows:

1. Non-uniformed associates should dress with "good business taste" and in clothing appropriate to their positions.
2. "Business casual" attire is the company's dress code policy and is applicable Monday through Thursday, during regularly scheduled business hours and/or during business functions.
3. Business casual is defined as clothing in "good taste" for a business environment which includes slacks, dresses, suits, blouses, collared shirts, sweaters, vests blazers, sports coats, or other generally business-like attire.
4. Good business taste does not include jeans (except on Fridays), tank tops, T-shirts with advertising, sweatshirts, warm up suits, athletic sportswear, sundresses with spaghetti straps, shorts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

206 F.Supp.2d 1280
206 F.Supp.2d 1280, 13 A.D. Cases 79
(Cite as: 206 F.Supp.2d 1280)

or skorts made of denim or all cotton material, athletic shoes, or other generally recognized casual or weekend attire.
5. Shorts and/or skorts of fine fabric (rayon, linen, silk, etc.) may be worn if done so with hosiery and dress shoes. Socks must be worn with men's shoes.
6. Company issued sportswear, which includes T-shirts and/or collared shirts, and outerwear, bearing the company logo, may be worn at the associate's discretion if done so within the standards of dress policy.
7. "Casual Friday" attire is permitted on Fridays only and includes appropriate jeans, casual sportswear and footwear, and any "business casual" clothing described above. Casual Friday attire does not include faded, torn, cut-off, or otherwise worn out or tightly fitting jeans.
(*Id.* at Ex. 2.) [Doc. 20]

Plaintiff was scheduled for knee surgery in September 1998. Plaintiff informed Stackhouse that she would be away from work recuperating for six to eight weeks. Despite the fact that Plaintiff had been employed with DeKalb Office Environments for only four months, Stackhouse approved Plaintiff's request for time off. Plaintiff underwent surgery on September 29 and remained out of work until October *1283 19, three weeks after the surgery. Defendant emphasizes that Plaintiff's personal physician cleared her to return to work with no substantial limitations on her ability. Plaintiff, however, contends that Stackhouse specifically asked her to return only three weeks after her surgery, even though she had been advised to spend six to eight weeks out of work. Dr. Haber was reluctant for Plaintiff to return to work this soon but ultimately allowed her to do so on a limited basis. Plaintiff says that she agreed to return to work so soon because she and Stackhouse had become very good friends.

Upon her return to work, Plaintiff did not wear normal work clothes for a period of time while she was outfitted with a knee immobilizer. During this period, Plaintiff also was required to keep her knee elevated and on ice, to wear shorts, and to walk on crutches. She was unable to perform various functions of her position, such as making photocopies. Stackhouse excused plaintiff from performing such functions and performed them herself during this period. Nevertheless, Plaintiff was present at work for only 11 days between October 19 and November 16, 1998. Eventually, Stackhouse and Human Resources Manager Ellen Warthen counseled Plaintiff about what they considered her erratic attendance record.

In January, 1999, DeKalb Office Environments moved to a new showroom. Unlike the previous office space, the new showroom allowed customers to walk through the showroom to better view the line of office furniture, space planning services, and installation expertise. The company believed that given this new open set-up, it was even more important that each employee dress and act in a business-like and professional manner. Almost four months after her surgery, Plaintiff was still wearing clothes that did not meet the requirements of the company dress policy. Consequently, Stackhouse and Warthen faxed a request to Plaintiff's physician, Dr. Jerold A. Haber, to inquire whether Plaintiff could wear more business-like shoes and clothing other than biker shorts or stretch pants:

> We have recently moved into a new building which is being used as a working show place. We have clients and potential clients walking through at all times. We are trying to establish and maintain a dress level that is professional. We are asking that employees dress at least business casual. We wondered if there might be some type/style of shoe that [Plaintiff] could wear which would provide her with the same needed support, but possibly look a little more professional than white lace up athletic shoes .... Such a[sic] a nursing brand shoe, SAS, or Easy Spirit Shoes just to name a few. Also, once the brace is removed, should she continue with the support type of shoe?
> [Plaintiff] has also said that she can't wear any other clothing except stretch pants. (Can't get other pants over or under the brace, the brace rubs her leg if she does wear the pants under the brace and it rubs holes in hose type wear.) I wondered if you had any suggestions as to anything that could be possible for her that would also be more professional than the athletic/exercsie [sic] type of stretch pants. Is it possible to wear a dress or some other types of pants with this brace? Is there someone we could go to to obtain additional ideas/help/suggestions with this?

(*Id.* at Ex. 5.) [Doc. 20] Dr. Haber responded that "[t]here is no medical reason why [Plaintiff] can't wear appropriate clothing with or without the brace" and that "[a]ppropriate shoes other than *1284 sneakers should be acceptable." (*Id.* at Ex. 6.) [Doc. 6]

Based on this response from Dr. Haber, Stackhouse and Warthen met with Plaintiff once again regarding her work attire. Plaintiff responded that she would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

206 F.Supp.2d 1280
206 F.Supp.2d 1280, 13 A.D. Cases 79
(Cite as: 206 F.Supp.2d 1280)

not be wearing the knee brace much longer. Plaintiff afterwards continued to wear the same attire. Knowing that Plaintiff shortly thereafter would be undergoing an additional surgery, Stackhouse and Warthen decided to hold off on any further action for the time being.

In April 1999, Plaintiff underwent a second surgery on her knee. She was allowed an additional eight weeks of medical leave even though she had been employed for less than a year. Just before Plaintiff took her medical leave, Stackhouse and Warthen sent her a memo informing her that she would be expected to dress appropriately upon her return to work. Plaintiff returned to work on July 7, 1999. She was not wearing a knee brace. She wore a short knit dress and gray biker shorts that were visible underneath the dress. Plaintiff says that she wore the biker shorts so as not to expose herself when elevating her knee to avoid excess swelling and pain. Stackhouse and Warthen instructed Plaintiff to return home to change into appropriate business attire. Plaintiff returned home but called Stackhouse to inform her that she had decided not to return to work that day. Stackhouse counseled Plaintiff on her need to comply with the requirements for appropriate business attire.

The next day, Plaintiff arrived at work wearing a short dress with the same gray biker shorts visible underneath the dress. Because of Plaintiff's refusal to wear appropriate business casual clothing, Stackhouse issued a written final warning indicating that further violation would subject Plaintiff to immediate termination. The next day, July 9, Plaintiff returned to work yet again wearing a short dress and the same gray biker shorts visible underneath the dress. Stackhouse terminated Plaintiff on July 9, 1999.

Plaintiff filed suit on January 25, 2000, pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. Plaintiff alleges that she was not provided with a reasonable accommodation, was subjected to a hostile work environment, and ultimately was terminated in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. Defendant seeks summary judgment on Plaintiff's claims.

*II. SUMMARY JUDGMENT STANDARD*
Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158-159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*III. DISCUSSION*
[1][2] Plaintiff asserts that Defendant has discriminated against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. The *1285 ADA prohibits covered employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case of discrimination under the ADA, "a plaintiff must demonstrate that (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination as the result of his disability." *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 910 (11th Cir.1996). A plaintiff must also demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled. *Gordon*, 100 F.3d at 910-11. If a plaintiff establishes these elements, the ADA imposes on employers a duty to provide reasonable accommodation for known disabilities unless doing so would result in undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir.1997).

[3][4] "In order to state a claim for **wrongful termination** under the ADA, a plaintiff must first prove that he has a **disability**, as defined by the Act." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1327 (11th Cir.1998). A "disability" is defined in the statute as a "physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A); *Standard*, 161 F.3d at 1327. "Merely proving the existence of a physical impairment, without addressing any limitation on major life activities, is not sufficient to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

206 F.Supp.2d 1280
206 F.Supp.2d 1280, 13 A.D. Cases 79
(Cite as: 206 F.Supp.2d 1280)

Page 5

prove disability under the Act." *Standard,* 161 F.3d at 1327. The phrase "major life activities" includes functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). In determining whether an impairment is substantially limiting, the court should consider the nature and severity of the impairment, its expected duration, and its long-term impact. 29 C.F.R. § 1630.2(j)(2). Individuals claiming substantial limitations in working must show that their condition "significantly 'restrict[s their] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training skills and abilities.'" *Standard,* 161 F.3d at 1327.

[5] Defendant first contends that Plaintiff is not disabled. Defendant states that although Plaintiff's knee condition admittedly constitutes a physical impairment, it is not sufficiently severe to substantially limit one or more of her major life activities. Plaintiff responds that she is disabled within the meaning of the ADA because she is substantially limited in several major life activities, namely "standing, walking, running, and working." (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, at 10.) [Doc. 23] The regulations define "substantially limits" as rendering an individual "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner, or duration under which the average person in the population can perform that same major life activity." 29 C.F.R. § § 1630.2(j)(1)(i)- (ii). The regulations also provide three factors for determining whether a substantial limitation exists: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long-term impact or expected permanent *1286 or long-term impact of the impairment. 29 C.F.R. § 1630.2(j)(2).

In this case, the Court first notes that Plaintiff's treating physician indicated that Plaintiff did not have any restrictions substantial enough to limit her ability to perform any major life activity. Second, case law from the Eleventh Circuit shows that no jury issue exists as to whether Plaintiff is disabled within the meaning of the ADA. In *Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1227 (11th Cir.1999), the Eleventh Circuit affirmed a decision that a plaintiff with coronary heart disease was not disabled within the ambit of the ADA. The Eleventh Circuit emphasized that although the plaintiff's heart disease did constitute a physical impairment, it did not rise to the level of a disability as defined by the ADA because the plaintiff did not demonstrate that her heart disease substantially limited any of her major life activities, which she identified as running, performing manual tasks, and lifting or walking. *Id.* The court noted that the plaintiff admitted in her deposition that she could engage in these activities and only provided conclusory allegations of diminished capacity. *Id.* at 1227-28. "[C]onclusory allegations without specific supporting facts have no probative value." *Id.* at 1228 (quoting *Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir.1985)).

Likewise, in this case, Plaintiff admits that she can sit, stand, climb, walk, and run. She simply claims in conclusory fashion to have some diminished capacity. For example, Plaintiff testified in her deposition that upon sitting for periods of time, it was "[k]ind of like if you sleep on something wrong and it is sore, that's what it would do." (Deposition of Shanie Alpert, at 41.) This statement, however, does not show that Plaintiff is substantially limited in sitting or standing, as defined by the ADA. Similarly, Plaintiff states that she is limited from climbing but admits that she climbed stairs at work three or so times per day to take a smoking break. (*Id.* at 71-72.) Furthermore, Plaintiff has not been permanently restricted by any of her physicians from driving, walking, sitting, standing, caring for herself, or working. Plaintiff may have suffered some diminished capacity from her knee surgery, but she has not created a triable issue that she is disabled within the meaning of the ADA. If the ADA were broadened to include any limitation or ailment, everyone would meet that definition of disability. The ADA was created to provide legal recourse to those with severe ailments. To broaden its definitions would disregard the scope of both its language and purpose. Plaintiff has failed to identify with requisite factual support any major life activity that is substantially limited by her physical ailment. Summary judgment, therefore, is appropriate for Defendant on Plaintiff's ADA claim.

[6] Additionally, even if Plaintiff could establish a triable issue of disability, there is no evidence that she was fired because of the disability instead of a legitimate non-discriminatory reason. If the plaintiff is able to establish a *prima facie* case, then the employer is afforded an opportunity to articulate a legitimate non-discriminatory reason for the action. *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1331 (11th Cir.1998). Once this is done, Plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

206 F.Supp.2d 1280
206 F.Supp.2d 1280, 13 A.D. Cases 79
(Cite as: 206 F.Supp.2d 1280)

must show that the articulated reason is merely pretextual. *Id.* A plaintiff must offer evidence that demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find [the articulate reasons] unworthy of credence." *Id.* at 1333 (quoting *1287*Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997)); see also *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1333 (11th Cir.1999) (applying framework to ADA claim). A plaintiff's failure to come forward with any evidence to show that the defendant's offered justification is pretextual warrants summary judgment for the defendant. *Holifield v. Reno*, 115 F.3d 1555, 1565-66 (11th Cir.1997).

[7] In this case, Plaintiff attempts to bootstrap her knee ailment to her work attire and argue that she needed to wear biker shorts and stretch pants for medical reasons. The record, however, belies this conclusion. Viewed in the light most favorable to the Plaintiff, the record establishes that perhaps Plaintiff did need some accommodations in regards to work attire while she was still wearing a brace, needing to elevate her leg, and otherwise recovering from her two knee surgeries. Defendant attempted to accommodate Plaintiff. She was allowed to wear athletic shoes for several months, even though other shoes which likely would provide the same support are more presentable. Defendant also explained its problems with her dress with her on a number of occasions before taking any disciplinary action. Plaintiff, in contrast, has not established a compelling or medical need to wear biker shorts. Plaintiff states that she wore them to keep from exposing herself. This argument, however, attempts to set up a construct that only two choices were available to Plaintiff--wear biker shorts or expose herself while elevating her leg. This construct, however, ignores that there exists a plethora of other clothing choices that would have met Defendant's dress requirements and would have served Plaintiff's needs. Plaintiff could have worn a longer dress, or she could have worn very loose-fitting pants. Instead, Plaintiff chose to disregard her supervisors' instructions not to come to work wearing a short dress with biker shorts visible underneath. The ADA does not provide a legal right to wear biker shorts. Consequently, the Court concludes that a legitimate non-discriminatory reasons exists for Plaintiff's dismissal.

Finally, Plaintiff cannot establish that she was subjected to a hostile work environment based on her knee ailment. An ADA claim for hostile work environment is "modeled after the similar claim under Title VII." *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir.1998). Under Title VII,

[a]n employee must establish: (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and (5) a basis for holding the employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir.2000) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)). Obviously, for disability harassment, the hostile work environment claim must be based on the plaintiff's disability rather than sex or race.

Plaintiff's claim is without merit. As a matter of fact, Defendant and its employees who supervised Plaintiff bent over backwards to assist Plaintiff during her period of recuperation. Despite the fact that she had worked with Defendant only a short time, she was granted medical leave. When she returned, her supervisor assumed many of the activities that Plaintiff says were discomforting for her to attempt. Plaintiff was allowed to wear clothes that did not meet the full requirements *1288 of the dress code. When her supervisors finally concluded that Plaintiff had gone too far in her work attire and needed to dress more professionally, they attempted to discuss the matter with her. Plaintiff nevertheless continued to ignore their requests. Even after they finally warned Plaintiff that she would be terminated if she did not dress appropriately, Plaintiff's insubordination continued. Plaintiff has provided no evidence whatsoever that Defendant in any way subjected her to a hostile work environment based on her alleged disability. She cites to no harassing statements by fellow employees referring to her knee ailment. The only statements she cites are those that she should dress within the company guidelines. The overwhelming evidence is that Defendant supported Plaintiff. Defendant patiently attempted to assist Plaintiff throughout her knee ailment. Plaintiff cannot recover for a hostile work environment when it was she who abused Defendant's support and leniency.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment [Doc. 20] is GRANTED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

206 F.Supp.2d 1280
206 F.Supp.2d 1280, 13 A.D. Cases 79
**(Cite as: 206 F.Supp.2d 1280)**

SO ORDERED, this 24th day of April, 2001.

206 F.Supp.2d 1280, 13 A.D. Cases 79

**Motions, Pleadings and Filings (Back to top)**

- 1:00CV00283 (Docket) (Feb. 02, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Page 1

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1459400 (M.D.Fla.)
(Cite as: 2005 WL 1459400 (M.D.Fla.))

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
M.D. Florida.
Raymond WALKER, Plaintiff,
v.
UNITED STATES SUGAR CORPORATION,
Defendant.
No. 204CV143FTM29SPC.

June 20, 2005.

*OPINION AND ORDER*

STEELE, J.

*1 This matter comes before the Court on Defendant's Motion for Summary Judgment (Doc. # 46) filed on April 11, 2005. Plaintiff filed his Response (Doc. # 56) on May 23, 2005, incorporating by reference his Memorandum of Law in Opposition (Doc. # 30) to defendant's first Motion for Summary Judgment (Doc # 26). [FN1] Defendant attached to its filings numerous affidavits and deposition transcripts, and other material in support of its position. (Doc. # 46, Exhibits 1-10). Plaintiff attached two affidavits given by him two months apart. (Doc. # 56, Exhibits 1-2).

FN1. Defendant's first Motion for **Summary Judgment** was **denied** as moot. (Doc. # 40).

I.

**Summary judgment** is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. *Id.* The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986), *cert. denied,* 484 U.S. 1066 (1988); *Hickson Corp. v. Northern Crossarm Co., Inc.,* 357 F.3d 1256, 1259-60 (11th Cir.2004).

To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, which are sufficient to establish the existence of the essential elements to that party's case, and the elements on which that party will bear the burden of proof at trial motion. *Celotex Corp. v. Catrett,* 477 U.S. at 322; *Hilburn v. Murata Elecs. N.Am., Inc.,* 181 F.3d 1220, 1225 (11th Cir.1999). In ruling on a motion for summary judgment, if there is a conflict in the evidence the non-moving party's evidence is to be believed and all reasonable inferences must be drawn in favor of the non-moving party. *Shotz v. City of Plantation, Fl.,* 344 F.3d 1161, 1164 (11th Cir.2003).

II.

Plaintiff filed a one-count Complaint (Doc. # 2) claiming that defendant discriminated against him on the basis of his job-related neck injury and resulting **disability**, in violation of the Americans with **Disabilities** Act ("ADA"), 42 U.S.C. § 12101 et seq., the Florida Civil Rights Act, and the Rehabilitation Act, by **wrongfully terminating** his employment and/or by failing to provide a reasonable **accommodation**. For **Summary Judgment** purposes, the Court adopts the "Admitted Facts Which Will Require No Proof at Trial" portion of the Joint Pretrial Statement [FN2] (Doc. # 36), and views any disputed material fact in favor of plaintiff.

FN2. Local Rule 3.06(e) states in pertinent part: "All pleadings filed by any party prior to filing of the pretrial statement shall be deemed to be merged therein ... The pretrial statement and the pretrial order ... will control the course of the trial and may not be amended except by order of the Court in the furtherance of justice."

Plaintiff, Raymond Walker ("Walker"), began his employment with defendant, United States Sugar Corporation ("U.S.Sugar"), in February of 1982 as a Sugar Boiler and Mechanic/Welder. (Doc. # 36, p. 4, ¶ 9A). He worked as a Sugar Boiler on "C side." A and B sides were automated, while C side was and is

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1459400 (M.D.Fla.)
(Cite as: 2005 WL 1459400 (M.D.Fla.))

not.

*2 "On May 4, 1993, Plaintiff was injured on the job when he stood up quickly in a small space and hit his head on a steel beam. For this injury, [p]laintiff received medical care and workers' compensation benefits from U.S. Sugar." (Doc. # 36, p. 5, ¶ 9B). As a result of this injury, Walker had surgery on his cervical vertebrae in March, 2002. (Id at ¶ 3B,9C; Doc. # 47, Exh. 4., p. 40). More specifically, Walker underwent a C5-C6 and C6-C7 anterior cervical discectomy and fusion with Atlantis plating. (Docs. # 47, Exh. 4, p. 40; # 56, p. 7).

Walker returned to work under certain doctor-imposed restrictions. (Doc. # 47, Exh. 4, p. 9). In particular, Dr. Grabel stated Walker should avoid lifting and working overhead, and lifting over thirty pounds. (Docs. # 47, Exh. 9, p. 40; # 56, Exh. 1, p. 3). As of September 26, 2002, Dr. Grabel assessed that Walker had not reached maximum medical improvement ("MMI") due to a linear fracture extending from the anterior aspect to the posterior aspect of the body of C4, but that this fracture should heal (Doc. # 47, Exhibit 9, p. 41). Dr. Grabel also wrote that he had read Walker's job description and found it unlikely that he would be able to return to work at the same job that he had prior to surgery. (Id). Dr. Grabel's evaluation said, "I agree with the current management.... He should remain on no-work status." (Id). Doctor Alvarez also expressed the opinion that Walker would not be able to perform the requirements of his position. (Doc. # 47, Exhibit 4, p. 24).

In October, 2002, Walker had a meeting with a Human Resources Manager for U.S. Sugar (Fred Dyess, Jr. ("Dyess")), a Boiling House Supervisor, and others in which he was told that he was being taken off the payroll because he was not medically capable of performing his job as Sugar Boiler. (Doc. # 56, Exh. 1, p. 4). Dyess showed Walker a list of open positions outside the Boiling House to which Walker could transfer. (Id). Walker inquired about a Field Foreman job and Dyess informed Walker that the job required a Spanish speaker. (Id). There were no other open positions in which Walker was interested or for which he was qualified. (Doc. # 47, Exhibit 4, p. 14).

After his employment at U.S. Sugar, plaintiff worked for an air conditioning company in Fort Myers, Florida; as a maintenance man at Hendry Regional Medical Center; and as a Sheet Metal Lead Man at Ivey Mechanical. (Doc. # 36, p. 5, ¶ 9E). Plaintiff left Advanced Air because of the distance he had to travel. (Doc. # 47, Exhibit 5, pp. 21-22). Walker was terminated from his job at Hendry Regional Medical Center due to a demonstrated inability to get along with co-workers and supervision. (Doc. # 47, Exhibit 3, p. 4). Plaintiff no longer works at Ivey because he lacked the skill to hang duct and the job changed from moving duct to hanging it. (Doc. # 47, Exhibit 6, pp. 9-10).

III.

Defendant argues that **summary judgment** is due to be granted "because plaintiff was: (1) not a qualified individual as contemplated by the ADA; (2) does not suffer from a **disability** as defined in the ADA; and (3) U.S. Sugar met and/or exceeded any and all obligations it may have toward Plaintiff under the ADA." (Doc. # 46, p. 1). In particular U.S. Sugar argues that Walker (1) does not have a disability as defined by the ADA, (2) does not suffer a substantial limitation in caring for himself or in working, (3) was not able to work at the time of the employment action and was therefore not a qualified individual under the ADA, (4) was dismissed for legitimate nondiscriminatory reasons, (5) requested unreasonable **accommodations,** and (6) failed to mitigate.

*3 The ADA [FN3] prohibits discrimination "against a qualified individual with a **disability** because of the **disability** of such individual...." 42 U.S.C. § 12112(a). The Eleventh Circuit has recognized that ADA claims are to be construed by the framework set out by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Lubetsky v. Applied Card Sys., Inc., 296 F.3d 1301, 1305 (11th Cir.2002), cert. denied, 537 U.S. 1106 (2003). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802; Lubetsky, 296 F.3d at 1305. To establish a prima facie case of discrimination under the ADA, plaintiff must show that he: (1) is disabled, (2) was a qualified individual at the relevant time, and (3) was subjected to unlawful discrimination because of his disability. Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir.2001); Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir.2000). By establishing a prima facie case, the plaintiff creates a rebuttable presumption that the challenged action was motivated by a discriminatory intent. Equal Employment Opportunity Comm'n v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir.2002), cert. denied, 539 U.S. 941 (2003); see also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2005 WL 1459400 (M.D.Fla.)  
(Cite as: 2005 WL 1459400 (M.D.Fla.))

Page 3

*Burdine,* 450 U.S. at 254. The burden then shifts to the defendant to produce a "legitimate, nondiscriminatory reason" for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802; *Lubetsky,* 296 F.3d at 1305. If the defendant articulates one or more such reasons, the presumption of discrimination is rebutted and the burden shifts back to the plaintiff to prove that the reasons offered by the defendant are a pretext for unlawful discrimination. *McDonnell Douglas,* 411 U.S. at 805; *Lubetsky,* 296 F.3d at 1305; *Chapman v. Al Transport,* 229 F.3d 1012, 1024 (11th Cir.2000). "Although the intermediate burdens of production shift back and forth, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Joe's Stone Crabs,* 296 F.3d at 1273.

> FN3. The parties agree that this action is governed by the ADA and that both the Rehabilitation Act and FCRA may be reviewed under case law interpreting the ADA. (Doc. # 36, p. 5, ¶ 10B).

The Court concludes that there are multiple issues of disputed material facts which preclude **summary judgment**. For instance, the parties dispute: (1) the job description and essential job functions of a Sugar Boiler; (2) whether Walker requested or identified any **accommodation**(s) prior to **termination**; (3) whether Walker asserted that he could perform his job as required; (4) whether at the time of Walker's **termination** U.S. Sugar informed him he could reapply without loss of seniority if, within two years of **termination**, his medical restrictions were lifted; and (5) whether Walker was told he couldn't return to U.S. Sugar property without an attorney or police escort. Whether plaintiff failed to mitigate is not an issue which would justify **summary judgment**.

*4 Accordingly, it is now

ORDERED:

Defendant's Motion for **Summary Judgment** (Doc. # 46) is **DENIED**.

DONE AND ORDERED.

Not Reported in F.Supp.2d, 2005 WL 1459400 (M.D.Fla.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2317877 (Trial Motion, Memorandum and Affidavit) Defendant's Response to Plaintiff's Motion in Limine (Jul. 15, 2005)

• 2005 WL 2317876 (Trial Motion, Memorandum and Affidavit) Defendant's Consolidated Motions in Limine (Jul. 05, 2005)

• 2004 WL 2739348 (Trial Motion, Memorandum and Affidavit) Agreed Motion to Permit Counsel to Conduct Case Management Report Meeting by Telephone (With Supporting Memorandum of Law) (Apr. 05, 2004)

• 2004 WL 2739340 (Trial Pleading) Defendant's Answer and Affirmative Defenses (Mar. 16, 2004)

• 2004 WL 2739327 (Trial Pleading) Complaint (Mar. 08, 2004)

• 2:04cv00143 (Docket) (Mar. 08, 2004)

END OF DOCUMENT