IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| NANCY HAWKINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | CIVIL ACTION NO. 1:05CV540-SRW |
| ) | (WO) |
| DALE MEDICAL CENTER, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

In this action, plaintiff Nancy Hawkins brings two claims against defendant Dale Medical Center. Hawkins asserts that defendant discriminated against her on the basis of her disability (impaired vision) when it terminated her employment instead of offering her reasonable accommodation[1] and, further, that defendant discriminated against her on the basis of her age (62) when it terminated her employment. This action is presently before the court on the motion for summary judgment filed by defendant. Upon consideration of the motion, the court concludes that it is due to be granted.

---

[1] It is not entirely clear from the wording of Count I that the ADA claim asserted by plaintiff is a termination claim. However, defendant treated this count as asserting such a claim. Plaintiff does not object to this characterization of the claim and clearly states this basis for her claim in her response for summary judgment, *i.e.*, that "Defendant failed to accommodate her disability and the failure to accommodate lead [sic] to work deficiencies that lead [sic] to her termination." (Doc. # 20, p. 12). Accordingly, the court likewise treats Count I as a failure-to-accommodate termination claim. Additionally, plaintiff asserts in both Counts I and II that defendant treated her in a "hostile and harassing manner." However, the court concludes that plaintiff does not raise a separate hostile environment claim because: (1) defendant moved for summary judgment on all claims and offered evidence negating the existence of a hostile environment (see Doc. # 15 and Doc. # 17, ¶ 25) and plaintiff presented no responsive argument suggesting that she brings hostile environment claims; and (2) the factual allegations of the complaint do not state a claim for hostile environment harassment on the basis of either age or disability.

## **BACKGROUND**[2]

Plaintiff Nancy Hawkins was born on August 27, 1941. Plaintiff's corrected vision is and was, at all times relevant to this complaint, 20/300. Because of her vision, plaintiff must use a magnifying glass to read average print. She cannot drive and cannot read telephone books, even with the magnifying glass, but "can't think of anything else that's significant" that she is unable to do because of her vision limitations. (Hawkins depo., pp. 26-27, 39).

Defendant Dale Medical Center is a health care facility in Ozark, Alabama. It includes a ten-bed unit – New Day Senior Health – which provides psychiatric care and treatment for older patients. Dale Medical Center contracts with SeniorHealth, Inc., an independent management services company, to manage the unit. SeniorHealth employs Sandra Fitzgerald (formerly Sandra Smolinski) as the Director of Nursing for the New Day unit. (Fitzgerald aff., ¶¶ 1-2; Simmons aff., ¶¶ 1-2).

In January 2003, Fitzgerald and Leonard Smolinski interviewed plaintiff for the sole social worker position on the unit. During the interview, plaintiff indicated that she had a vision problem and used a magnifying glass to read. In response to a query regarding whether plaintiff needed anything else to help her perform the job, plaintiff responded that she would not know until she began work. Plaintiff was hired for the position. Fitzgerald was plaintiff's supervisor until February 2004. (Hawkins depo., pp. 11-18, 37; Fitzgerald aff., ¶ 11).

---

[2] As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). The court considers any objections not made to the use or admissibility of evidence waived for purposes of this motion. Davis v. Howard, 561 F.2d 565, 570 (5th Cir. 1977). Plaintiff's hearsay objection to Fitzgerald's testimony (Doc. # 20, p. 2) is without merit and is overruled.

Shortly after she began work, plaintiff told Fitzgerald that she "needed the computer adjusted" so that she could enlarge the type, so that she could see to read and make corrections on the computer. Fitzgerald either did not respond or said that she would "look into it." She did not make the requested adjustment. Thereafter, plaintiff did not make any further requests regarding the computer she uses for "daily work." Plaintiff also used a second computer, the "on-line" computer. The monitor for the on-line computer was placed "up high" so that plaintiff could not see the monitor unless she stood and placed her magnifying glass on the monitor screen. Without doing so, plaintiff could not tell whether what she was typing was correct, so plaintiff was required to stand up and bend down, which was tiring and uncomfortable. Plaintiff told Fitzgerald several times over the course of her employment that the configuration of the on-line computer was a problem for her. Fitzgerald's only response was that it was a problem for Fitzgerald also. (Hawkins depo., pp. 27-30). Plaintiff asked Fitzgerald at least weekly if plaintiff could have a computer that she could "enlarge." (Id., pp. 35-36).

Plaintiff was also required to use a printed form for progress notes. The form had lines that had to be filled in. Plaintiff could read the form with her magnifying glass, but it was difficult for her to fill in the form because of the size of the spaces. When plaintiff spoke with Fitzgerald about her difficulty in completing the form, Fitzgerald made no response other than to tell plaintiff that she would see what she could do. Plaintiff enlarged the form on the copier so that she could read it and fill it in accurately. However, a few months into plaintiff's employment, Debra Douglas – a representative from the management company who was "directly above" Fitzgerald – told plaintiff that the enlarged form did not meet the company's standards. Douglas told plaintiff that she thought she could put the form on a disk so that plaintiff could manipulate it on the computer; however, she

3

never did so. After the discussion with Douglas, plaintiff did not speak with anyone at Dale Medical Center about the form. (Hawkins depo., pp. 30-34, 48-50).

     Within 72 hours of a patient's admission to the New Day unit, plaintiff was supposed to complete a psychosocial assessment and record it on a five-page form which was then used by the treatment team, including other health care professionals, to determine the needs of the patient. Plaintiff completed the psychosocial form by hand, with difficulty. She used a notebook in which each question was in large print, and the pages were in page protectors. Plaintiff used a dry erase marker or grease pencil to fill out the answers or write notes on the page. She then would take the notebook back to her desk and use it to complete the psychosocial assessment form by using her magnifying glass and inserting her pen between the form and the lens so that she could fill in the blocks on the form. Using this technique, plaintiff was able to complete the psychosocial assessment forms adequately. (Fitzgerald aff., ¶ 3; Simmons aff., ¶4; Hawkins depo., pp. 34-35).

     On September 12, 2003, Fitzgerald gave plaintiff a memorandum listing twenty-one patients with discharge dates between June 4, 2003 and September 4, 2003 as to whom plaintiff had not yet completed the psychosocial assessment. Fitzgerald's handwritten note on the memorandum stated, "These assessments must be completed and filed in the charts immed[iately]. In the future, please have in chart no later than 3rd day of admission." Plaintiff does not recall speaking to Fitzgerald about the memorandum or giving her any explanation for the delinquency. On October 7, 2003, Fitzgerald gave plaintiff another memorandum listing past due psychosocial assessments. This memorandum listed delinquent assessments for forty-four patients, sixteen of which were carried over from the previous list. Plaintiff did not discuss the memorandum with Fitzgerald and did not offer any explanation for the delinquencies. Defendant could not bill for the psychosocial

assessments until the forms were completed. (Hawkins depo., pp. 51-55 and Exhibits 8 and 9).

Barbara Todd-Floyd, a registered nurse who worked on the unit during plaintiff's tenure, saw that plaintiff "had great difficulty in reading a writing due to her vision problems." Plaintiff told Todd-Floyd about a computer program she used at home that would be helpful in allowing plaintiff to use the computers at work more easily. Todd-Floyd spoke to Fitzgerald about purchasing the computer program. Fitzgerald responded that the hospital would "not go for that financially." When Todd-Floyd stated, "If you don't ask they won't give it to you," Fitzgerald looked at Todd-Floyd and said, "Bobbie," and laughed. (Todd-Floyd aff., p. 2). Fitzgerald complained to Todd-Floyd that plaintiff was "not getting certain work done," including a "'Level I' report that had to be done before a patient could be discharged for return to the nursing home." (Id., p. 1). However, according to Todd-Floyd, the "Level I" report could not be done "until you were aware a patient is ready for discharge, because of the constant changes in medication by physicians that would require[] these reports to be redone each time a medication was changed." (Id., pp. 1-2).

Plaintiff was also responsible for conducting daily group therapy sessions with patients, which were required to last at least forty minutes. Plaintiff was responsible for documenting the sessions on progress notes in each patient's medical record. Some mental health technicians reported to Fitzgerald that some of plaintiff's group therapy sessions did not occur at all and others lasted only five minutes, even though plaintiff documented them as a full hour. Fitzgerald confirmed on the treatment logs that there were many days when no treatment was conducted at all. Plaintiff sometimes failed to document her therapy sessions properly, and the defendant, therefore, could not bill for the treatment. According to Fitzgerald, the social worker should begin discharge planning shortly after the patient's needs are first assessed. Plaintiff often failed to begin discharge

planning early enough, resulting in increased length of stay for the patients. Some of plaintiff's patients were discharged without a completed "Zung" or "GDS" assessment which, according to plaintiff, are part of the admission assessment. Fitzgerald observed plaintiff being "abrupt, short and rude" with co-workers. Some of plaintiff's co-workers complained to Fitzgerald that plaintiff "talked down to them" and was unapproachable and unhelpful. Fitzgerald also saw plaintiff treat the psychiatric patients curtly and ask sensitive questions of the patients without taking precautions to protect their privacy. (Hawkins depo., pp. 19-21; Simmons aff., ¶¶ 5-6; Fitzgerald aff., ¶¶ 7-9).

In January 2004, Fitzgerald met with plaintiff to conduct plaintiff's annual performance evaluation. During the evaluation, plaintiff and Fitzgerald discussed plaintiff's numerical score on each objective or goal. Plaintiff's total numerical score on the evaluation was "80," which fell in the middle of the scoring range for "Consistently Meets Standards and Competencies." During the evaluation, Fitzgerald raised performance deficiencies with plaintiff. Plaintiff specifically recalls that Fitzgerald spoke with her about "not seeing the families" and about being "rude to the staff" but does not recall whether she raised other deficiencies. According to Fitzgerald, she discussed a number of performance deficiencies with plaintiff. Plaintiff did not dispute these deficiencies during the meeting, nor did she offer her vision problems as an excuse or ask for help in performing her job responsibilities. After the evaluation, Fitzgerald included these deficiencies in a written corrective action plan. According to plaintiff, Fitzgerald presented the written plan to plaintiff on January 14, 2004, "a day or so" after plaintiff's evaluation, and said, "This is what we talked about." (Hawkins depo., pp. 50, 55-60; Fitzgerald depo., pp. 19-20, 22-24; Plaintiff's Exhibit 7, performance evaluation; Exhibit 10 to Hawkins depo.; Fitzgerald aff., ¶ 10).

The corrective action plan listed five deficiencies: (1) "Defensive attitude and difficulty

getting along with other staff members. Difficulty functioning as a team member;" (2) "lack of involvement in treatment planning and revision;" (3) "inadequate family contact and family therapy sessions;" (4) "inadequate individual therapy sessions;" and (5) "discharge planning not done in timely manner." The plan also included corresponding "corrective action" for each of the listed deficiencies. Although plaintiff did not agree with the listed deficiencies, she did not voice any objection to Fitzgerald. (Exhibit 10 to Hawkins depo.; Hawkins depo., pp. 58-60).

In February 2004, Fitzgerald turned over supervision of plaintiff to Jennifer Simmons, the nurse manager of the unit, who was an employee of the hospital. Fitzgerald testified that she did so because plaintiff's supervision should have been under the nurse manager initially and because plaintiff had been "abrupt and sometimes short" with Fitzgerald and Fitzgerald believed that plaintiff might think that Fitzgerald had a "personal issue" with plaintiff. (Fitzgerald depo., pp. 16-18). According to Todd-Floyd, "[n]ot only did Ms. Fitzgerald lose supervisory authority over the Plaintiff, but over all of the other employees in our department sometime in the January, 2004 time frame." (Todd-Floyd aff., p. 2). Fitzgerald testified that, in the beginning, she supervised both the social worker and the activities therapist because the nurse manager was not yet familiar with their duties. (Fitzgerald depo., p. 16).

In April 2004, Simmons concluded that plaintiff's performance was not improving, and issued a second corrective action plan. The corrective action plan implemented by Simmons again listed five specific deficiencies: (1) "continue to receive [complaints] from staff that Nancy is difficult to approach with questions or concerns. Continues to have difficulty functioning as a team member;" (2) "lack of involvement in treatment planning and revision;" (3) inadequate family contact and family therapy sessions or inadequate

7

documentation of such;" (4) inadequate individual therapy sessions or inadequate documentation of such;" and (5) "discharge planning continues to be deficient without noted improvement." The plan listed corresponding corrective action, and indicated that Simmons would reassess the deficiencies in thirty days. Plaintiff disagreed with the listed deficiencies but – when Simmons went over the corrective action plan with plaintiff on April 8, 2004 – did not indicate any disagreement, offer any explanation or state that she needed any assistance from Simmons to correct the deficiencies. Plaintiff told Simmons that she agreed to correct the deficiencies within the time limit. (Simmons aff., ¶ 9; Exhibit A to Simmons affidavit; Exhibit 10 to Hawkins depo.; Hawkins depo., pp. 62-64). On April 12, 2004, Simmons gave plaintiff a memo listing seven discharged patients with past-due psychosocial assessment reports. Plaintiff did not have any discussion with Simmons about the memorandum, but completed these reports by April 14, 2004 and indicated that she had done so. (Hawkins depo., pp. 64-65 and Exhibit 13).

In May 2004, Simmons pulled a sample of plaintiff's patient charts and found that plaintiff was still significantly behind in her documentation. After consulting with Human Resources, she decided to terminate plaintiff's employment. She explained to plaintiff that she was being terminated because she had not corrected the deficiencies in the January and April corrective action plans. Plaintiff did not voice any disagreement with Simmons' assessment that plaintiff had not improved her performance. (Simmons aff., ¶ 10; Hawkins depo., pp. 65-67).

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993). In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves. . . ."

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most

favorable to the nonmoving party.  Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).  It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.  Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment."  Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

## DISCUSSION

### ADEA Termination Claim

The Age Discrimination in Employment Act ("ADEA") makes it "unlawful for an employer to . . . discharge any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  Plaintiff claims that defendant discriminated against her by terminating her employment on the basis of her age.  The McDonnell Douglas/Burdine framework[3] was established by the Supreme Court for evaluating a Title VII plaintiff's claims of discrimination where, as here, there is no direct evidence of discrimination.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997).  This burden-shifting framework applies to claims of discrimination under the ADEA.  Cofield v. Goldkist, Inc., 267 F.3d 1264, 1267 n. 6 (11th Cir. 2001); Chapman v. AI Transport, 229 F.3d 1012, 1024

---

[3] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).

(11th Cir. 2000).

The plaintiff must first make out a *prima facie* case of discrimination. Burdine, 450 U.S. at 252-53; Walker v. Mortham, 158 F.3d 1177, 1183 (11th Cir.1998); Combs, 106 F.3d at 1527-28. A plaintiff may establish a *prima facie* case of age discrimination by showing that she: "(1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, and (4) was replaced by or otherwise lost a position to a younger individual." Chapman, *supra*, 229 F.3d at 1024. "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." Id. (quoting Burdine, 450 U.S. at 254); Walker, *supra*.

If the plaintiff establishes a *prima facie* case, the employer has the burden of producing "legitimate, non-discriminatory reasons for the challenged employment action." Combs, 106 F.3d at 1528 (citing McDonnell Douglas, 411 U.S. at 802). "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Combs, 106 F.3d at 1528 (quoting Burdine, 450 U.S. at 257). If the employer articulates a legitimate, nondiscriminatory reason for its decision, the mandatory inference of discrimination arising from the *prima facie* case is destroyed. Walker, 158 F.3d at 1184. The plaintiff must then produce evidence "including the

11

previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs, 106 F.3d at 1528.

Defendant challenges only the third element of the *prima facie* case, arguing that plaintiff cannot demonstrate that she was qualified for the position because her job performance has not met the expectations of her employer and her employment tenure has not been sufficiently long to permit an inference that she was qualified for her position. However, in this case, there is evidence that – despite the problems identified by Fitzgerald during plaintiff's performance evaluation and shortly thereafter in the initial written corrective action plan and – plaintiff received a performance evaluation score of 80 out of a possible 95, which placed her performance squarely in the category of "Consistently Meets Standards and Competencies." (Plaintiff's Exhibit 7, performance evaluation; Hawkins depo., pp. 56-59). This evidence is sufficient to permit an inference that plaintiff was at least minimally qualified for the position. See Hall v. Dempsey, 111 F.Supp.2d 1208 (M.D. Ala. 2000)("To prove that he was qualified, Plaintiff need only show that he met the minimum qualifications of the job.). Thus, defendant is not entitled to prevail on the basis of plaintiff's failure to establish a *prima facie* case of age discrimination.

Defendant further argues that it has articulated legitimate reasons for plaintiff's termination and plaintiff cannot establish pretext. The corrective action plan implemented by Simmons in April listed five specific deficiencies: (1) "continue to receive [complaints] from staff that Nancy is difficult to approach with questions or concerns. Continues to have

difficulty functioning as a team member;" (2) "lack of involvement in treatment planning and revision;" (3) inadequate family contact and family therapy sessions or inadequate documentation of such;" (4) inadequate individual therapy sessions or inadequate documentation of such;" and (5) "discharge planning continues to be deficient without noted improvement." (Exhibit A to Simmons affidavit; Exhibit 10 to Hawkins depo.). Simmons, the decisionmaker, states:

> Despite this Action Plan, Ms. Hawkins' performance did not improve. In May 2004, I pulled a sampling of her patient charts and found that Ms. Hawkins was still significantly behind in her documentation. After consulting with Human Resources, I decided to terminate her employment because of these continuing performance deficiencies.

(Simmons aff., ¶ 10). The court concludes that defendant has met its burden of articulating a legitimate, nondiscriminatory reason for termination.

Plaintiff's brief in opposition to summary judgment appears to be directed entirely to her disability discrimination claim. However, plaintiff's argument on the issue of pretext is relevant to her ADEA claim as well. Plaintiff argues:

> Plaintiff contends that the fact she passed her 90-day evaluation for her probationary period and came off of probation and then got an "consistently meets standards and competency" evaluation on January 9th of 2004, subsequently, one or two days later she received a laundry list of alleged deficiencies and this mysterious transfer of management from Ms. Fitzgerald to Ms. Simmons, even though Plaintiff asserts the evidence and testimony indicated Ms. Fitzgerald continued to be the department head and ultimate authority, all fits in what is described **Alpert** case, where the jury could reasonable find this is "impossibilities, inconsistencies, incoherencies and contradictions" in the Defendants offered testimony for the reasons of termination.

13

(Plaintiff's brief, Doc. # 20, pp. 11-12)(quoted as in original).[4]

The fact that plaintiff received a numerical score placing her evaluation in the range of "consistently meets standards and competency" just prior to the first corrective action plan does not establish pretext. It is undisputed that Fitzgerald discussed the performance deficiencies outlined in the plan during the evaluation. Additionally, the circumstances of the transfer of direct supervision from Fitzgerald to Simmons do not suggest any basis for concluding that the reasons articulated by Simmons for plaintiff's termination are pretextual. Plaintiff has failed to identify any evidence of record sufficient to establish pretext, and the court has found none. Accordingly, defendant is entitled to summary judgment on plaintiff's age discrimination claim.

## ADA Termination Claim

The Americans with Disabilities Act ("ADA") provides that an employer may not discriminate against an individual with a disability because of that disability with respect to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show: (1) she is disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability." Earl v. Mervyns, Inc., 207

---

[4] Plaintiff cites Alpert v. Decob Office Environments, Inc., 206 F.3d 1280 (2001) at 1287-88. (Plaintiff's brief, p. 11). The citation is inaccurate, and the court has been unable to locate this case by another means.

F.3d 1361, 1365 (11th Cir. 2000).[5]  In the Eleventh Circuit, the McDonnell Douglas burden-shifting framework applies to claims of failure to accommodate under the ADA.  See id. at 1365 (a failure-to-accommodate termination case)(citing Hilburn v. Murata Electronics North America, Inc., 181 F.3d 1220. 1226 (11th Cir. 1999)); Boone v. Rumsfeld, 2006 WL 531303 (11th Cir. Mar. 6, 2006)(applying McDonnell Douglas framework to a failure-to-accommodate termination claim under the Rehabilitation Act, after noting that such a claim is governed by the same standard as ADA employment discrimination claims).[6]

Defendant argues that plaintiff cannot establish a prima facie case of termination in violation of the ADA because: (1) she cannot establish that she was qualified; and (2) she cannot establish that she was terminated because of her disability.  As to the "qualified" element, defendant argued in its initial brief only that plaintiff cannot demonstrate that she was qualified for the position because her job performance has not met the expectations of her employer and her employment tenure has not been sufficiently long to permit an inference of her qualification for the position.  (See Doc. # 17, p. 11).  Plaintiff countered this argument with evidence that she received a January 2004 performance rating of

---

[5] See also Foster v. Arthur Andersen, LLP, 168 F.3d 1029, 1032 (7th Cir. 1999)("[T]o state a *prima facie* case of "failure to accommodate" disability discrimination, a plaintiff who has suffered an adverse employment action must show that: (1) she was or is disabled; (2) the defendant was aware of her disability; (3) she was otherwise qualified for her job, . . . ; and (4) the disability caused the adverse employment action . . . .")(citations omitted).

[6] But see Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1283 (7th Cir. 1996)(McDonnell Douglas framework is applicable to an ADA disparate treatment claim, but not to an ADA reasonable accommodation claim); Fenney v. Dakota, Minnesota & Eastern Railroad Co., 327 F.3d 707, 711-12 (8th Cir. 2003)(same).

"Consistently Meets Standards and Competencies." In defendant's motion and plaintiff's response, neither party presented argument addressing the actual issue with regard to this prong of the *prima facie* case, *i.e.*, whether plaintiff meets the statutory definition of a "qualified individual" for purposes of an ADA claim. This definition does not equate to the term "qualified" as used in the formulations of the *prima facie* cases for claims of disparate treatment under the ADEA or Title VII. Under the ADA, a "qualified individual" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . . ." 42 U.S.C. § 12111(8).[7] The court concludes that defendant has not adequately challenged this element of the *prima facie* case and is not entitled to summary judgment on the basis of plaintiff's lack of qualification.[8]

To prove the third prong of her *prima facie* case – *i.e.*, that she was subjected to unlawful discrimination because of her disability – plaintiff must present facts which would permit a reasonable inference of discrimination. See Cotton v. Hospital Housekeeping Systems, Ltd., 2005 WL 2654354, * 5 n. 4 (M.D. Ala. Oct. 18, 2005). Since plaintiff

---

[7] Defendant has made no argument in this motion that plaintiff cannot establish that she was physically capable of performing the essential functions of the position, with or without reasonable accommodation. Instead, defendant concedes that plaintiff has a disability, but argues that plaintiff's termination "was not related to any protected characteristic." (Doc. # 17, p. 11).

[8] In its reply brief, defendant recited the proper statutory definition. However, it continued to assert that plaintiff was not qualified because she "never performed her job satisfactorily" and because of her "repeated failure to meet performance expectations." (See reply brief, Doc. # 24, pp. 7-8). As noted above, the evidence that plaintiff's performance was evaluated as "consistently meets standards and competencies" is sufficient to overcome this argument.

16

complains of discriminatory termination, she must present evidence sufficient to permit an inference that "[she] was terminated *because of* [her] disability." Id. at * 5 (emphasis in original). However, the ADA does not require that plaintiff establish that her disability was the sole reason for discharge; instead, "the ADA imposes liability whenever the prohibited motivation makes the difference in the employer's decision, *i.e.*, when it is a 'but for' cause." McNely v. Ocala Star-Banner Corporation, 99 F.3d 1068, 1076 (11th Cir. 1996).

The court concludes that the evidence of record is insufficient to permit a trier of fact to reasonably determine that plaintiff's disability was a "but for" cause of defendant's decision to terminate her employment. Plaintiff has produced evidence that her vision limitations caused her difficulty in reading and writing which made completing documentation more tedious for her. She has also testified that she requested assistance from her employer – adjustment of the computers so that she could see them more easily and/or enlargement of the type, and permission to use an enlarged font on standard forms – that would have made it easier for her to complete the documentation, and that defendant failed to provide the requested accommodation. Additionally, there is evidence that plaintiff's failure to complete required documentation in a timely manner was a primary reason for the defendant's decision to terminate her employment. However, plaintiff has produced no admissible evidence that would permit a reasonable inference that her failure to complete documentation for patient records in a timely manner was *caused* by her visual impairment.[9]

---

[9] The only evidence offered by plaintiff to prove this point is the affidavit testimony of Barbara Todd-Floyd. Todd-Floyd testified:

In other words, while plaintiff has demonstrated that her impairment caused her to be slower in completing forms, she has not produced competent evidence permitting the conclusion that

---

> Ms. Simmons became angry with the Plaintiff, Nancy Hawkins-Kahn because of her inability to get reports done on time. It is my opinion that as Nancy Hawkins-Kahn had difficulty in getting those reports done based to a great extent on Ms. Hawkins-Kahn's inability to effectively see, because of the computer limitations and the small print on the documents.
>
> \* \* \* \* \*
>
> It is my opinion that the major reason she was behind and had difficulty is simply because of the limitation of her vision and lack of proper computer programs and documents to assist her in her work.
>
> On the date, Ms. Hawkins-Kahn was terminated, it is my opinion that things that were said and done by Ms. Simmons because she was angry for the failure of the "Level I" reports not being completed." Ms. Simmons further got angry at Ms. Hawkins-Kahn because of the social history documents that were not completed.

(Plaintiff's Exhibit 3). Defendant has moved to strike Todd-Floyd's opinion testimony that: (1) plaintiff was terminated because her supervisor became angry about Plaintiff's failure to complete certain reports, and (2) the "major reason" plaintiff was behind on completing the reports was "because of limitation of her vision and lack of proper computer programs and documents to assist her in her work." Fed. R. Civ. P. 56(e) requires that the party opposing summary judgment "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Eleventh Circuit has "'consistently held that conclusory allegations without specific supporting facts have no probative value.'" Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000)(quoting Evers v. General Motors Corp., 770 F.2d 984, 985 (11th Cir. 1985)); see also Miller v. Citizens Security Group, Inc., 116 F.3d 343, 346 (8th Cir. 1997)("A conclusory statement in an affidavit, however, cannot create a genuine issue of material fact which precludes summary judgment."). Todd-Floyd's affidavit provides no factual detail to support her conclusion that Simmons was "angry" on the day she terminated plaintiff's employment or her conclusions regarding the reasons that Simmons was angry and, thus, the conclusions have no probative value. Additionally, the factual statements in Todd-Floyd's affidavit are insufficient to support Todd-Floyd's broad conclusion that plaintiff's visual impairment is the reason that plaintiff was behind on her documentation. Accordingly, the court will grant defendant's motion to strike and will not consider Todd-Floyd's unsupported opinion testimony. The court has considered the remainder of the affidavit.

it caused her to be so slow that she was unable to meet her employer's requirements.[10]  This evidentiary gap is fatal to plaintiff's claim.  Plaintiff has failed to make a connection between her impairment and her performance deficiencies and, thus, cannot demonstrate that her disability was a "but for" cause of her termination.  Since plaintiff has not produced evidence permitting an inference that her termination was based on her disability, defendant is entitled to summary judgment on plaintiff's ADA claim.

Additionally, as discussed above, plaintiff has not produced evidence sufficient to establish that any of the reasons advanced by defendant for plaintiff's termination are causally related to her disability.  Thus, the reasons articulated by Simmons for plaintiff's termination are legitimate, nondiscriminatory reasons for purposes of plaintiff's ADA claim.  As noted above with regard to plaintiff's ADEA claim, the evidence of record is insufficient to demonstrate that these reasons are pretextual.

## CONCLUSION

For the foregoing reasons, it is

ORDERED that defendant's motion to strike (Doc. # 23) is GRANTED as to the conclusory testimony in Todd-Floyd's affidavit, as set forth *supra* n. 8.

---

[10] In the deposition excerpts before the court, plaintiff did not testify that her failure to complete required documentation in a timely manner was because of her vision problems.  Additionally, she testified that when her supervisors placed her on the two corrective action plans she did not offer her vision impairment as an explanation or tell them that she needed assistance to comply with the requirement for timely documentation. (Hawkins depo., pp. 53-55, 59-60, 62-67).  Plaintiff further testified that her current employer, Laurel Oaks Behavioral Center, moved her from one unit to another and reduced her hours because she was "not able to keep abreast of the paperwork," and that her vision limitations "didn't have anything to do with" her inability to keep up with the paperwork at Laurel Oaks. (Id., pp. 80-83).

It is further ORDERED that defendant's motion for summary judgment is GRANTED. A separate judgment will be entered.

DONE, this 31st day of May, 2006.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE